GINA DURHAM, Bar No. 295910
gina.durham@us.dlapiper.com
OSCAR M. OROZCO-BOTELLO, Bar No. 313104
Oscar.orozco-botello@us.dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel:  415.836.2500
Fax:  415.836.2501

COLIN STEELE (*pro hac vice*)
colin.steele@us.dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Tel:  212.335.4500
Fax:  212.335.4501

Attorneys for Defendants/Counterclaimants
KUDOBOARD, LLC AND AARON RUBENS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KUDOS, INC., an Alberta, Canada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>KUDOBOARD, LLC, a Louisiana Limited Liability Company; AARON RUBENS, an individual residing in California,<br><br>Defendants.<br><br>————————————<br><br>KUDOBOARD, LLC, a Louisiana Limited Liability Company; AARON RUBENS, an individual residing in California,<br><br>Counterclaimants,<br><br>v.<br><br>KUDOS, INC., an Alberta, Canada corporation,<br><br>Counterdefendant. | CASE NO. 3:20-cv-01876-SI<br><br>**DEFENDANTS/COUNTERCLAIMANTS KUDOBOARD, LLC AND AARON RUBENS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT [REDACTED]**<br><br>Date:     October 29, 2021<br>Time:     10:00 AM<br>Crtrm:   1<br>Judge:   Hon. Susan Illston<br>Original Complaint filed:  March 17, 2020 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................2

    A.   Origins of Kudoboard ..............................................................................2

    B.   The Kudoboard Mark ..............................................................................4

    C.   Kudoboard's Growth ...............................................................................5

    D.   Plaintiff's Business And Enforcement Of Its Marks .............................6

    E.   Mr. Rubens Reaches Out To Plaintiff .....................................................7

III.  ISSUES TO BE DECIDED (CIV. L.R. 7-4(A)(3)) ............................................7

IV.  LEGAL STANDARD ..........................................................................................7

V.   ARGUMENT .......................................................................................................8

    A.   The Doctrine Of Laches Bars Plaintiff's Claims ....................................8

    B.   Plaintiff's Delay Was Unreasonable ......................................................8

        1.   *Plaintiff Delayed Filing Suit For Five Years* ...............................9

        2.   *Plaintiff's Claims Are Presumptively Barred By Laches Because Plaintiff Filed Suit Outside The Applicable Statutes Of Limitations* ..........11

        3.   *The E-System Factors Confirm That Plaintiff's Delay Was Unreasonable* ................................................................................13

            a.   The first E-Systems factor —strength of the marks—weighs in Defendants' favor. ...................................................................13

            b.   The second E-Systems factor—Plaintiff's diligence in enforcing its marks—weighs in Defendants' favor. ....................17

            c.   The third E-Systems factor—harm to senior user if relief denied—weighs in Defendants' favor. .......................................18

            d.   The fourth E-Systems factor— good faith ignorance by junior user—weighs in Defendants' favor. .................................20

            e.   The fifth E-Systems Factor—competition between senior and junior users—weighs in Defendants' favor. ..........................21

            f.   Sixth E-Systems Factor / Prejudice—Weighs in Defendants' Favor. ..........................................................................................23

C.      The Doctrine Of Progressive Encroachment Is Inapplicable Here ..........................24

VI.      CONCLUSION ...................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# <u>TABLE OF AUTHORITIES</u>

2

CASES                                                                                                    PAGE(S)

3
*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
4
    616 F.2d 440 (9th Cir. 1980)......................................................................................16, 17

5
*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)....................................................................................................20

6
*Bias v. Moynihan*,
7
    508 F.3d 1212 (9th Cir. 2007)...................................................................................................7

8
*Bosley Med. Inst., Inc. v. Kremer*,
    403 F.3d 672 (9th Cir. 2005)....................................................................................................25

9
*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
10
    468 F. Supp. 2d 1181 (C.D. Cal. 2007)...................................................................................17

11
*Cusano v. Klein*,
    264 F.3d 936 (9th Cir. 2001)....................................................................................................11

12
*E-Systems, Inc. v. Monitek, Inc.*,
13
    720 F.2d 604 (9th Cir. 1983), (1) .........................................................2, 9, 10, 19, 21, 22

14
*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002)....................................................................................13, 16, 17

15
*Fitbug Ltd. v. Fitbit, Inc.*,
16
    78 F. Supp. 3d 1180 (N.D. Cal. 2015) .........................9, 10, 12, 18, 20, 21, 22, 24, 25

17
*Glow Indus., Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002).....................................................................................16

18
*Groupion, L.L.C. v. Groupon, Inc.*,
19
    826 F.Supp.2d 1156 (N.D. Cal. 2011) ....................................................................................21

20
*Guess, Inc. v. Superior Court*,
    176 Cal. App. 3d 473 (1986)....................................................................................................11

21
*Halo Mgmt., LLC v. Interland, Inc.*,
22
    308 F. Supp. 2d 1019 (N.D. Cal. 2003) ...................................................................................16

23
*High Country Linens, Inc. v. Block*,
    2002 WL 1998272 (N.D. Cal. Aug. 20, 2002).........................................................................12

24
*In re Oracle Corp. Sec. Litig.*,
25
    627 F.3d 376 (9th Cir. 2010).......................................................................................................7

26
*Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*,
    559 F.3d 985 (9th Cir. 2009).....................................................................................................12

27
*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
28
    304 F.3d 829 (9th Cir. 2002)..........................................................................................1, 8, 9, 11

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
    290 F. Supp. 2d 1083 (C.D. Cal. 2003).................................................................16

*Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*,
    2011 WL 940218 (N.D. Cal. Feb. 18, 2011)...................................................21, 22

*Miller v. Glenn Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006)..........................................................8, 12, 23, 24

*Mission Imports, Inc. v. Superior Ct.*,
    31 Cal. 3d 921, 647 P.2d 1075 (1982) .............................................................11

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
    331 F. Supp. 2d 1214 (C.D. Cal.), *aff'd*, 114 F. App'x 921 (9th Cir. 2004)...........16

*Murphy v. Hartford Acc. & Indem. Co.*,
    177 Cal. App. 2d 539 (1960)..........................................................................11

*Nutri/System, Inc. v. Con-Stan Industries, Inc.*,
    809 F.2d 601 (9th Cir. 1987)..........................................................................19

*Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*,
    894 F.3d 1015 (9th Cir. 2018)....................................................8, 12, 17, 21, 23

*Pinterest, Inc. v. Pintrips, Inc.*,
    140 F. Supp. 3d 997 (N.D. Cal. 2015) ..............................................................19

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004)..........................................................................12

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    182 F. Supp. 350 (E.D.N.Y. 1960), *aff'd*, 287 F.2d 492 (2d Cir. 1961) ...................10

*RDF Media Ltd. v. Fox Broad. Co.*,
    372 F. Supp. 2d 556 (C.D. Cal. 2005)..............................................................11

*Roxbury Ent. v. Penthouse Media Grp., Inc.*,
    2008 WL 11339095 (C.D. Cal. Nov. 20, 2008) ..................................................17

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
    627 F. Supp. 2d 1096 (N.D. Cal. 2008) ..........................................8, 10, 18, 23, 25

*Servpro Indus. Inc. v. Zerorez of Phoenix LLC*,
    339 F. Supp. 3d 898 (D. Ariz. 2018).................................................................22

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015)..........................................................................7

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005)..........................................................................13

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987)...........................................................................7

iii

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
    295 F.3d 623 (6th Cir. 2002)................................................................................19

*Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020) ....................................................14, 15, 17

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006)...........................................................................24, 25

**STATUTES**

15 U.S.C § 1072 ....................................................................................................11

Cal. Bus. & Prof. Code § 17208....................................................................................11

Cal. Civ. Proc. Code § 339...............................................................................11, 12

Cal. Civ. Proc. Code § 343...............................................................................11, 12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c)..........................................................................................7

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 29, 2021 at 10:00 AM, or as soon thereafter as this matter may be heard, before the Honorable Susan Illston in Courtroom 1, 17th Floor, of this Court located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants/Counterclaimants Kudoboard, LLC ("Kudoboard LLC") and Aaron Rubens will and hereby do move for an order granting summary judgment in their favor on the First, Second, Third, and Fourth Causes of Action in Plaintiff/Counterdefendant Kudos, Inc.'s Complaint for trademark infringement and false designation of origin and unfair competition (Dkt. 1, the "Complaint").

The grounds for the Motion are that Plaintiff's claims are barred pursuant to the doctrine of laches. The Motion is based upon this Notice and Memorandum in Support of Motion for Summary Judgment, the Declarations of Aaron Rubens ("Rubens Decl.") and Gina Durham ("Durham Decl."), all filed concurrently herewith, and all the files and records of the within proceeding.

### MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION

"[O]ne who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 835 (9th Cir. 2002). The doctrine of laches bars a party's claims where it unreasonably delays in asserting them, as Plaintiff has done here. Plaintiff knew or should have known of the basis for each of the claims in its Complaint no later than July of 2015, nearly five years before it eventually filed that Complaint in March of 2020. Kudoboard LLC has never made any secret of its uses of the "Kudoboard Mark" (*see* §IIB-C, *infra*), rather, those uses have been open, public, and notorious. Indeed, Plaintiff itself alleges there was a likelihood of confusion as of 2015, and at that time (i) the same products Kudoboard LLC sells today were publicly available on the Kudoboard website under the Kudoboard Mark, (ii) those products were openly and widely advertised across a variety of publicly available online platforms under the Kudoboard Mark, (iii) there was significant online media coverage of Kudoboard and the Kudoboard Mark, (iv) Defendants were devoting substantial resources and time to expanding the Kudoboard brand, and (v) Plaintiff claims to have been regularly running a slew of searches to locate

1  uses of marks incorporating the terms "KUDO" and/or "KUDOS." Later, Mr. Rubens even reached

2  out to Plaintiff to discuss potential collaborations. Plaintiff then requested Kudoboard LLC's

3  confidential pitch deck, purportedly to conduct due diligence in connection with those potential

4  collaborations. Plaintiff instead prepared a cease-and-desist letter based upon information pulled

5  from the documents Defendants provided. Defendants promptly responded to that letter, denying

6  any likelihood of confusion. Plaintiff then delayed filing suit for almost a full additional year.

7          The foregoing establishes a textbook case for the application of laches. Plaintiff delayed

8  filing suit for months longer than any potentially applicable statute of limitations, and so there is a

9  strong presumption that its claims are barred by laches. An analysis of the six factors set out in *E-*

10 *Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983)[1] confirms this. First, Plaintiff's mark,

11 "Kudos," is a common noun which describes Plaintiff's products and which is in wide usage by

12 third parties. There is moreover no particular connection in the minds of consumers between the

13 term "Kudos" and Plaintiff or its services. Plaintiff's mark is therefore highly descriptive and weak,

14 and so is entitled only to limited protections. Second, either Plaintiff did not have sufficient

15 monitoring mechanisms in place to identify Kudoboard LLC's open and obvious uses of the

16 Kudoboard Mark, or it did, but chose not to take any action. Either way, Plaintiff has not been

17 diligent in enforcing its mark. Third, Plaintiff has not been able to identify *any* specific harms it has

18 suffered as a result of the alleged infringement. Fourth, Defendants have at all times acted in good

19 faith, and were unaware of Plaintiff or its mark at the time the Kudoboard mark was selected. Fifth,

20 there is no competition between the parties. Even assuming *arguendo* that there were some overlap

21 between their products, they are not interchangeable. Sixth, Defendants would be severely

22 prejudiced if forced to halt use of the Kudoboard mark, as they would lose all of the goodwill and

23 recognition associated with that mark they have spent six years building. For all of the foregoing

24 reasons, the Court should find that all of the claims in the Complaint are barred pursuant to laches.

25 **II.    FACTUAL BACKGROUND**

26          **A.    <u>Origins of Kudoboard</u>**

27 ――――――――――――――
[1] (1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3)
28 harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition between
senior and junior users; and (6) extent of harm suffered by senior user because of senior user's delay.

2

1    Kudoboard is an online greeting card company that provides a platform for consumers to

2  create and send digital or printed greeting cards from groups of people.  Kudoboard users can create

3  one of Kudoboard's online group cards by (1) visiting www.kudoboard.com and creating an

4  account, (2) choosing a recipient, (2) adding content such as a written message, picture, video, GIF,

5  or any combination thereof, (3) inviting other members of a group such as friends, family, or

6  colleagues to add their own content, and (4) delivering the card to the recipient either online or in a

7  print version.  *See* Rubens Decl. ¶¶ 2-3, Exs. 1-2.

8    Kudoboard's founder Aaron Rubens conceived of the idea for Kudoboard during his time

9  working as a high school math teacher with Teach for America from 2009 through 2011.  Rubens

10  Decl. ¶¶4, 9, Ex. 3 (Aaron Rubens Deposition ("Rubens Depo.")) at 46:10-13.  At the end of each

11  school year, Mr. Rubens would direct his students to "write their name on a piece of paper, and …

12  pass around that piece of paper to their classmates" with the instruction "to each write something

13  nice or positive" about the student.  *Id.* at 46:16-21.  Several students reached out to Mr. Rubens in

14  subsequent years to tell him that this exercise was very meaningful.  *Id.* at 47:1-6.

15    Four years later, in 2015, Mr. Rubens graduated from Harvard Business School and founded

16  Kudoboard LLC.  *Id.* ¶¶5, 9 at 195:1.  He turned down a 6-figure job to build the business and

17  invested over ten thousand dollars of his personal savings to start the business from the ground up.

18  *Id*. ¶5.  From 2015 through mid-2017, Mr. Rubens worked full-time on building the Kudoboard

19  business.  *Id.* ¶¶5, 9 at 195:1-2.  By mid-2017, the Kudoboard business had grown substantially, but

20  was not yet generating sufficient revenue to independently support Mr. Rubens and his growing

21  family.  *Id.* ¶¶6, 9 at 195:9-12.  With a new daughter on the way, Mr. Rubens decided to take a full-

22  time day job, continuing to work on Kudoboard on nights and weekends.  *Id.* at 195:13-196:7.

23    By 2018, Mr. Rubens' years of effort began to bear fruit, as Kudoboard LLC had grown to

24  a point where it was possible for Mr. Rubens and his co-founder, Kyler Deutmeyer, to begin taking

25  income from the company and to return to working on Kudoboard full-time.  *Id.* ¶¶7, 9 at 198:8-11.

26  Since Mr. Rubens became the first full time employee in 2015, Kudoboard now has eight full time

27  employees that rely on the business for their livelihood and is actively recruiting for four more open

28  positions.  *Id.* ¶7.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.     <u>The Kudoboard Mark</u>

Mr. Rubens "made up" the name Kudoboard by combining the words "kudo" or "kudos," "a generic way to say appreciation,"[2] *id.* ¶¶8, 9 at 48:17-19, and "board," which references "how the content is actually presented," *id.* at 48:20-23.  Kudoboard LLC[3] has made continuous use of the term "Kudoboard" as a trademark (the "Kudoboard Mark") in commerce since at least as early as July 1, 2015.  *See* Rubens Decl. ¶10, Ex. 4 at '001.

The kudoboard.com domain was created and registered on February 24, 2015.  *See* Rubens Decl. ¶11.  The site went live on March 11, 2015.  *Id.* ¶11, Ex. 5.  Public Kudoboard Twitter and Facebook accounts were set up in July of 2015, and Kudoboard LLC has actively and continually posted on those accounts since that time, all the while utilizing the Kudoboard Mark.  *See, e.g.*, *id.* ¶12, Ex. 6 (public posting on the Kudoboard Twitter account dated July 23, 2015); *id.* ¶13, Ex. 7 (Kudoboard Facebook page, showing that page was created on July 8, 2015); *id.* ¶14, Ex. 8 (public posting on the Kudoboard Facebook page dated October 15, 2015); *id.* ¶15, Ex. 9 (public posting on the Kudoboard Twitter account dated December 17, 2015).  Kudoboard also maintains a public "Kudoboard" YouTube page, and has posted videos to that page since 2015.  *See id.* ¶¶2, 16, Ex. 10 (showing videos posted on October 3, 2015).  Kudoboard LLC has also actively and regularly posted about Kudoboard on the blog on its website.  *See, e.g.*, *id.* ¶17, Ex. 11 (public blog post on Kudoboard website dated November 9, 2015); *id.* ¶18, Ex. 12 (public blog post on Kudoboard website dated December 17, 2015).

From its inception in 2015, Kudoboard has attracted widespread media attention across a host of digital news outlets.  *See* Rubens Decl. ¶19, Ex. 13 (list of articles written about Kudoboard between 2015 and 2020); *id.* ¶20, Ex. 14 (online news article discussing Kudoboard from September 2015); *id.* ¶21, Ex. 15 (same, from October 2015); *id.* ¶22, Ex. 16 (same, from December 2015); *id.* ¶23, Ex. 17 at '686 (same, from January 2016); *id.* ¶24, Ex. 18 (same, from March 2016); *id.* ¶25,

---

[2] In addition to expressions of "appreciation," Kudoboard LLC's boards can be used for essentially any event: "[t]hey can be used for online memorials.  They can be used for get-well cards.· They can be used for farewell cards."  Rubens Decl. ¶9, Ex. 3 at 49:8-10.
[3] It remains unclear why Plaintiff has named Mr. Rubens as a defendant in this action, except as an intimidation tactic.  The Complaint does not allege any specific uses of the Kudoboard Mark by Mr. Rubens in his individual capacity separate and apart from Kudoboard LLC.  The Complaint moreover does not allege that Mr. Rubens could be held liable for Kudoboard LLC's actions.

4

Ex. 19 (same, from October 2016).  Additionally, Kudoboard issued a press release in August of 2015 announcing the launch of the consumer tier of Kudoboard.  *Id.* ¶26, Ex. 20.  Kudoboard for Business, a subscription option for group e-cards, officially launched in April 2016, *id.* ¶27, Ex. 21, though outreach to businesses began long before then, *id.* ¶¶28-29, Exs. 22-23.

Kudoboard LLC filed an application to register the Kudoboard Mark on April 20, 2016.  *Id.* ¶10, Ex. 4 at '004.  The USPTO published the Kudoboard Mark for opposition on October 18, 2016.  *Id.* at '005.  The examining attorney at the USPTO did not cite Plaintiff's mark against the Kudoboard Mark, nor did Plaintiff oppose the application.  *See generally, id.*  The USPTO issued a registration for the Kudoboard Mark on January 27, 2017.  *Id.* at '005.  Plaintiff has never moved to cancel the registration for the Kudoboard Mark, including in this action.  The validity of the Kudoboard registration is accordingly not in dispute.

## C.  Kudoboard's Growth

Kudoboard LLC has experienced substantial and sustained growth since its inception.  Every year, Kudoboard's annual revenues have increased significantly, from approximately ████████ ███████████████████████████████████████████████████████████ Rubens Decl. ¶30, Ex. 24 at '117; *id.* ¶31, Ex. 25.  Kudoboard has experienced parallel growth in number of users.  For example, Kudoboard had a quarter of a million registered users by the end of 2019.  *Id.* ¶32, Ex. 26.  Today, that number had grown to over 7 million users.  *Id.* ¶33; *id.* ¶30, Ex. 24 at '106.  This number is only a small fraction of the 22 million unique visitors to the Kudoboard website last year.  *Id.* ¶33; *id.* ¶9, Ex. 3 at 125:5.  Annual recurring revenue from subscribers has also increased at a rapid rate.  *Id.* ¶34; *id.* ¶30, Ex. 24 at '118.

The first driver of Kudoboard's growth has been sustained efforts over the past six years to position itself as a brand leader in the eCard space.  Rubens Decl. ¶35.  Kudoboard now ranks among the top 5 organic Google search results for terms such as "group ecard," "group card," "virtual group card."  *Id.*  The second driver of Kudoboard's growth has been "virality":  users who have been invited to contribute to a board later recalling Kudoboard and starting their own board.  *Id.* ¶36; *id.* ¶9, Ex. 3 at 104:5-9, 154:17-155:3. 190:14-191:4.  This viral growth is intrinsically tied up in prior users or recipients recalling the "Kudoboard" name and associating it with their positive experience.

1   *Id.*  This viral growth to the good will associated with the Kudoboard mark is the result of six years

2   of hard work, all of which would be lost if the Kudoboard name were discontinued.  *Id.* 195:25-

3   196:3 ("[V]iral loops take a long time to get started.· They start little and  then it spreads and it

4   spreads and it spreads, and  it takes -- sometimes it takes years.").  Word of mouth—users telling

5   others about "Kudoboard"—is also a key input of the aforementioned growth, and all of these

6   existing positive associations and recommendations would likewise be lost should Kudoboard LLC

7   be ordered to cease use of its longstanding mark.  *Id.* ¶37; *id.* 30, Ex. 24 at '117.

8            **D.      Plaintiff's Business And Enforcement Of Its Marks**

9            Plaintiff has asserted its KUDOS mark against at least 24 parties in the past nine years alone.

10   Plaintiff's characterization of its business morphs based on its current trademark dispute, apparently

11   to suggest similarities between its products and the alleged infringer "du jour."  In this proceeding,

12   for example, Plaintiff claims that it sells and has "always" sold "an employee recognition product

13   that has a social network that is meant to improve morale for the organization."  Durham Decl. ¶2,

14   Ex. 35 (30(b)(6) deposition of Plaintiff's representative Muni Boga ("Boga Depo.")) at 29:23-30:6.

15   Yet in a September 13, 2012 cease and desist letter sent to ▇▇▇▇, an HR company, Plaintiff

16   claimed that it employed the "▇▇▇▇▇▇▇▇▇▇▇▇" not with an employee

17   recognition product, but ▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* ¶3, Ex. 36.  Mr. Boga

18   contradicted this statement in 2020, asserting against yet another third party that characterizing "the

19   Kudos Platform as a 'human resources' service and a 'rewards' solution … is an inaccurate …

20   description."  *Id.* ¶4, Ex. 37 at ¶10.  In that dispute, Plaintiff opposed a trademark application filed

21   by a company seeking to register the term Kudos in connection with "Downloadable software for

22   enabling online conferencing in multiple languages."  *Id.* at ¶4.  There, Mr. Boga's sworn declaration

23   stated that "to describe the Kudos Platform as merely a [sic] 'an internal way at a company to

24   recognize an employee and reward them,' … would be highly inaccurate" (*id.* at ¶15) and that he

25   "strongly dispute[s]" that "[Plaintiff's] target customer is interested in 'employee recognition

26   solution' [sic]" (*id.* at ¶32).  Plaintiff has even targeted an exercise application.  Durham Decl. ¶ 5,

27   Ex. 38.  While it is impossible to definitively ascertain the contours of Plaintiff's business based

28   upon the available evidence, that evidence does show Plaintiff ▇▇▇▇▇▇▇▇▇▇▇

1   ████████████████.  *Id*. ¶6, Ex. 39 (Plaintiff's chief customer officer Tom Short ("Short

2   Depo.")) at 161:14-162:7.

3         **E.      Mr. Rubens Reaches Out To Plaintiff**

4         In early 2019, Mr. Rubens began contacting a wide range of companies, including Plaintiff,

5   to discuss potential business opportunities.  Rubens Decl. ¶9, Ex. 3 at 83:13-84:11.  Thereafter, Mr.

6   Boga and Mr. Rubens had a phone call to discuss potential collaborations, after which Mr. Boga

7   reported on the possibility of a merger between Kudoboard LLC and Plaintiff to Plaintiff's board,

8   describing Kudoboard LLC as "potentially … a good feeder to [Plaintiff's] platform" (Durham Decl.

9   ¶2, Ex. 35 at 143:1-9) and opining that it was an opportunity "worth exploring" (*id*. at 144:19-22).

10  But rather than proceed with evaluating a potential merger, Plaintiff requested various documents

11  from Defendants, including their confidential pitch deck, purportedly for purposes of performing

12  due diligence.  Plaintiff then proceeded to send a cease-and-desist letter to Defendants.  Nine months

13  later and five years after Kudoboard went live, Plaintiff filed the instant lawsuit.

14  **III.    ISSUES TO BE DECIDED (CIV. L.R. 7-4(A)(3))**

15       1.      Whether Plaintiff's claims are barred pursuant to the equitable doctrine of laches.

16  **IV.   LEGAL STANDARD**

17        Summary judgment is appropriate where there is "no genuine issue as to any material fact"

18  and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "In

19  opposing summary judgment, a nonmoving party must go beyond the pleadings and . . . designate

20  specific facts showing that there is a genuine issue for trial."  *Bias v. Moynihan*, 508 F.3d 1212,

21  1218 (9th Cir. 2007).  Thus, Plaintiff "must establish a 'genuine' factual dispute, which involves

22  'more than … some metaphysical doubt as to the material facts.'"  *Stanislaus Food Prod. Co. v.*

23  *USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (citations omitted).  "Disputes over

24  irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv.,*

25  *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *see also In re Oracle Corp.*

26

27

28

1   *Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (non-movant's "burden is not a light one").

2   **V.      ARGUMENT**

3          **A.      The Doctrine Of Laches Bars Plaintiff's Claims**

4          The Lanham Act "contains no statute of limitations" and so it instead "expressly provides

5   for defensive use of equitable principles, including laches." *Pinkette Clothing, Inc. v. Cosm.*

6   *Warriors Ltd.*, 894 F.3d 1015, 1022 (9th Cir. 2018) (internal citation and quotation omitted).

7   "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one

8   who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas*, 304 F.3d

9   at 835 (internal citations and quotation marks omitted).  To establish a laches defense, a defendant

10  must show "(1) an unreasonable delay by plaintiff in bringing suit, and (2) prejudice to [it]self."

11  *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 997 (9th Cir. 2006).  Laches is available as a

12  defense to each claim and each form of relief sought in the Complaint.  *Saul Zaentz Co. v. Wozniak*

13  *Travel, Inc.*, 627 F. Supp. 2d 1096, 1109 (N.D. Cal. 2008) ("[L]aches is a valid defense to federal

14  Lanham Act claims … to state law dilution and unfair competition claims … [and] a bar to both

15  monetary and injunctive relief."); *see also Jarrow Formulas*, 304 F. 3d at 835, 840 (similar).

16          **B.      Plaintiff's Delay Was Unreasonable**

17          "A determination of whether a party exercised unreasonable delay in filing suit consists of

18  two steps." *Jarrow Formulas*, 304 F.3d at 838.  "First, [a court] assess[es] the length of delay,

19  which is measured from the time the plaintiff knew or should have known about its potential cause

20  of action." *Id*.  Accordingly, in making this assessment *either* actual *or* constructive knowledge of

21  the alleged infringement is sufficient to establish a period of delay.  *Saul Zaentz Co.*, 627 F. Supp.

22  2d at 1109–10.  Constructive knowledge is judged "from an objective reasonable person standard,

23  and therefore, a trademark owner is chargeable with the information it might have received had due

24  inquiry been made." *Id*.  This standard "imposes on a trademark owner the duty to police its rights

25  against potential infringers." *Id*.  Second, once a court determines the length of delay, it must then

26  decide whether that delay was "unreasonable." *Jarrow Formulas*, 304 F.3d at 838.  Courts "assess

27  the plaintiff's delay by looking to whether the most analogous state statute of limitations has

28  expired." *Pinkette*, 894 F.3d at 1025.  If *any part* of the allegedly wrongful conduct occurred outside

8

1  of the relevant limitations period, there is a strong presumption that laches applies.  *Jarrow*

2  *Formulas*, 304 F.3d at 836-37.  A court should then assess the equity of applying laches using the

3  factors set out in *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983) (*see* n.1, *supra*).

4                  **1.**    ***Plaintiff Delayed Filing Suit For Five Years***

5        Plaintiff "knew or should have shown" of the facts purportedly underlying its claims, namely

6  Kudoboard LLC's uses of the Kudoboard Mark in 2015.  The kudoboard.com URL registered in

7  February of 2015 and the site went live in March 2015.  *See* §IIA, *supra*.  Three months later, in

8  May of 2015, Plaintiff sent out a series of cease-and-desist letters to parties who registered

9  "KUDO"-iterated ***URLs*** similar to kudoboard.com.  *See, e.g.*, Durham Decl., ¶7, Ex. 40 at '2590

10  ("█████████████████████████████████████████████████████████████████

11  ███████████████████"); *id*. ¶8, Ex. 41 at '2584 (similar); *id*. at ¶9, Ex. 42 at '2596 (similar).

12  Plaintiff could likewise have located the kudoboard.com URL registration and asserted its claims at

13  that point, but did not do so.

14        Precluding any argument in opposition that the use of the Kudoboard Mark was not

15  problematic until more recently, Plaintiff's sworn testimony is that "████████████████████

16  ███████████████████████████████████" (Durham Decl., ¶2, Ex. 35 at 219:7-23.).  *See Fitbug*

17  *Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1187 (N.D. Cal. 2015) ("[W]hen we ask whether [plaintiff]

18  or another trademark owner knew or should have known of its potential cause of action, what we

19  are really asking is when the mark holder knew or should have known about the likelihood of

20  confusion between the marks.") (internal citations and quotations omitted).  Beginning no later than

21  July 2015, (i) Kudoboard LLC's products were publicly available on the Kudoboard website under

22  the Kudoboard Mark, (ii) those products were openly and widely advertised across a variety of

23  publicly available online platforms under the Kudoboard Mark, (iii) there was significant online

24  media coverage of Kudoboard and the Kudoboard Mark, (iv) Defendants were devoting substantial

25  resources and time to expanding the Kudoboard brand.  *See* §IIB, *supra*.  Plaintiff has also claimed

26  that since 2015 it has been monitoring uses by third parties of a variety of terms, including "KUDO,"

27  to identify potential infringement of its mark.  Durham Decl. ¶10, Ex. 43 at 4:3-17 (documenting

28

1    searches Plaintiff purports to regularly run to police its marks)[4]); *id.* at 110:20-113:17.   This

2    undisputed evidence is more than sufficient to establish that Plaintiff knew or should have known

3    of the basis for its claims no later than July 2015.  *See, e.g., E-Systems*, 720 F.2d at 607 ("[Defendant]

4    incurred substantial advertising expenditures and rapidly expanded its business.   Because plaintiff

5    and defendant advertised in the same magazines and exhibited at the same trade fairs, plaintiff had

6    ample opportunity to discover defendant's activities before defendant developed a substantial

7    business."); *Fitbug Ltd.*, 78 F. Supp. 3d at 1186 (N.D. Cal. 2015) (finding laches period began at

8    time defendant "announced its products … and began receiving significant media coverage" and

9    defendant's "website was active and visitors to the site could see [defendant's] trademark, learn

10   about its products, and place an order for the [defendant's product]"); *Saul Zaentz Co.*, 627 F. Supp.

11   2d at 1113 (charging plaintiff with constructive knowledge of the defendant's use of its mark based

12   upon, inter alia, the fact that use was "open, continuous and not insignificant").

13          This alone is sufficient to charge Plaintiff with actual or constructive knowledge as of 2015,

14   and the Court need go no further.  If the Court for any reason finds this not to be the case (it should

15   not), the evidence only mounts after 2015.  On April 20, 2016 Kudoboard LLC filed an application

16   to register the Kudoboard Mark.   Rubens Decl. ¶10, Ex. 4 at '004.   This alone gives Plaintiff

17   constructive notice for purposes of a laches defense.  *See, e.g., Polaroid Corp. v. Polarad Elecs.*

18   *Corp.*, 182 F. Supp. 350, 355 (E.D.N.Y. 1960), *aff'd*, 287 F.2d 492 (2d Cir. 1961) ("Whether or not

19   [plaintiff] had actual notice of the application, there is no doubt that under the circumstances it had

20   constructive notice thereof.").   Plaintiff never opposed this application, despite claiming that at the

21   time it was filed its employees periodically ran searches for new trademark applications.   Durham

22   Decl. ¶10, Ex. 43 at 4:3-17.  And Plaintiff plainly was running searches at exactly this time, as just

23   two weeks after Kudoboard LLC publicly filed its application, Plaintiff sent a cease-and-desist letter

24   to another party based upon a "KUDO"-iterated mark  *Id.* ¶11, Ex. 44 (alleging likelihood of

---

25   [4] Plaintiff claims that since 2015 it has been using "periodic human review of internet websites that
26   review software services like G2 and Capterra; periodic human review of internet websites using
     search databases like Google search; periodic human review of the USPTO's digital database of
27   trademark applications and registrations; and periodic human reviews of instances of actual
     confusion that become known to Kudos employees or agents."  *Id.*  Plaintiff further claims that it
28   began "using an electronic watch services designed to alert Kudos to third party trademark
     applications seeking to register KUDOS and KUDO-containing trademarks" in 2017.  *Id.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

1    confusion based upon recipient's use of the mark "TEAMKUDO").

2        The Kudoboard Mark was then published for opposition on October 18, 2016.  Rubens Decl.,

3    ¶10, Ex. 4 at '004.  The USPTO issued a federal registration for the Kudoboard Mark on February

4    28, 2017.  *Id.* at '001.  Once again, this alone is sufficient to have placed Plaintiff on notice of the

5    Kudoboard Mark and the alleged likelihood of confusion.  *See* 15 U.S.C § 1072 ("Registration of a

6    mark on the principal register … shall be constructive notice of the registrant's claim of ownership

7    thereof.").  For the foregoing reasons, there is no material factual dispute that Plaintiff unreasonably

8    delayed in asserting its infringement claims against Kudoboard LLC.

9        **2.   *Plaintiff's Claims Are Presumptively Barred By Laches Because Plaintiff***
            ***Filed Suit Outside The Applicable Statutes Of Limitations***
10

11       Counts 1-3 in the Complaint are subject to a two-year statute of limitations.[5] When a federal

12   statute lacks a specific statute of limitations, as is the case with the Lanham Act, courts consider the

13   reasonableness of a plaintiff's delay in light of the statute of limitations that applies to the most

14   closely analogous state-law claim.  *Jarrow Formulas*, 304 F.3d at 838.  Here, the state claim most

15   analogous to the Lanham Act claims is common law trademark infringement.

16       The Supreme Court of California has made clear that "[a]n action for trademark infringement

17   sounds in tort."  *Mission Imports, Inc. v. Superior Ct.*, 31 Cal. 3d 921, 931, 647 P.2d 1075 (1982).

18   Therefore, and as with other causes of action sounding in tort, trademark and unfair competition

19   claims are subject to the two-year statute of limitations set out in Cal. Civ. Proc. Code § 339, not

20   the four-year catch-all provision set out in Cal. Civ. Proc. Code § 343.  *Murphy v. Hartford Acc. &*

21   *Indem. Co.*, 177 Cal. App. 2d 539, 544 (1960) ("Liability, as used in section 339, subd. 1 includes

22   responsibility for torts, and is applicable to all actions at law not specially mentioned in other

23   portions of the statute."); *see also Guess, Inc. v. Superior Court*, 176 Cal. App. 3d 473, 479 (1986)

24   (applying two-year limitations period under § 339 to claims for trade libel); *Cusano v. Klein*, 264

25   F.3d 936, 950 (9th Cir. 2001) (same, to claims for violation of right of publicity).  The outcome

26   dictated by these cases—that Lanham Act claims are presumptively barred by laches after two years

27   _____
     [5] Plaintiff's fourth Count, for State Statutory Unfair Competition is subject to a four-year statute of
     limitations.  Cal. Bus. & Prof. Code § 17208.  Nonetheless, since the federal claims fail so must the
28   dependent state claim.  *See RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 565 (C.D. Cal.
     2005) ("Plaintiffs unfair competition claim premised upon the Lanham Act violations must fail").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

of delay pursuant to section 339—has increasingly gained traction in the Ninth Circuit, particularly in this district. *See, e.g.*, *Fitbug Ltd.*, 78 F. Supp. 3d at 1190 ("[T]he Court believes … that the line of cases assuming the four-year limitation period in Section 343 is applicable to trademark infringement and unfair competition claims is questionable."); *High Country Linens, Inc. v. Block,* 2002 WL 1998272, at *2 n.1 (N.D. Cal. Aug. 20, 2002) ("[A] common law trademark infringement claim is … limited by Cal. Civ. P. Code § 339."); *see also Polar Bear Prods., Inc. v. Timex Corp*., 384 F.3d 700, 719-720 (9th Cir. 2004) (finding that, because a claim for state trademark infringement "generally sounds in tort," Montana's three-year statute of limitations for unspecified tort actions applied thereto).

Some courts have applied a four-year statute of limitations, generally based upon an agreement of the parties with no substantive analysis of the issue. *See, e.g.*, *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) ("Neither party disputes the imputation of the four-year limitations period."); *Miller*, 454 F.3d at 997 ("The parties agree that a four year statute of limitations applies to all of Plaintiffs' claims."). But these decisions fail to address, and are inconsistent with, the authority from the Supreme Court of California.

While the foregoing authority establishes that a two-year statute of limitations is applicable, the Court may ultimately find it unnecessary to resolve this issue, because all of Plaintiff's claims are untimely whether the Court applies a two-year or a four-year statute of limitations. Such was the case in *Fitbug Ltd.*, 78 F. Supp. 3d at 1190, where the court explained that because it had "previously found that the laches period began four and a half years before [plaintiff] filed suit, [plaintiff's] claims are presumptively untimely even under the four-year period it urges." Here, Plaintiff knew or should have known of the basis for its claims at least as early as July 2015, nearly five years before it filed suit. Because Plaintiff did not initiate this action until March 2020, nine months after the longer potentially applicable period (March 2019), there is a "strong presumption" that laches bars each of the claims in the Complaint regardless of which statute of limitations applies. *Pinkette*, 894 F.3d at 1025. There are no material disputed facts that rebut this presumption.

**3.     *The E-System Factors Confirm That Plaintiff's Delay Was Unreasonable***

      a.     <u>The first *E-Systems* factor —strength of the marks—weighs in Defendants' favor.</u>

Plaintiff's marks are weak and therefore entitled to little, if any, protection.  To assess this factor, courts will measure a mark's conceptual strength as well as its commercial strength.  For conceptual strength, marks fall in different categories: arbitrary, fanciful, suggestive, descriptive, and generic.  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631–32 (9th Cir. 2005).  A descriptive mark defines a characteristic of the product and does not receive protection unless it acquires secondary meaning to create an association between the mark and the product and generic marks describes a product in its entirety.  *Id.*  "The more unique the mark, the greater the degree of protection" to which it is entitled.  *Id.* at 631.[6]  For commercial strength, evidence probative of a strong mark includes "extensive advertising, length of exclusive use, [and] public recognition."  *Entrepreneur Media*, 279 F.3d at 1144.  Kudos is both conceptually and commercially weak.

Conceptually, "Kudos" is a highly descriptive and weak mark entitled to no, or highly limited, protection.  There is ample evidence here demonstrating (i) the weakness of Plaintiff's mark and (ii) that there is no particular association between Plaintiff and the common noun "kudos" in the minds of the consuming public.  First*,* Plaintiff, through its predecessor company[7] Rare Method Capital Corporation ("Rare Method"), has already acknowledged and admitted that the term "kudos" is descriptive of its products.  In January of 2007, Rare Method applied to register "KUDOS THANK DIFFERENT" as a trademark for the exact product Plaintiff claims to sell today[8]—a "[w]eb based recognition system."  Durham Decl. ¶12, Ex. 45.  The USPTO refused to grant that application unless Rare Method included a disclaimer for the term "KUDOS," finding that term to be descriptive of the products listed in the application:  "Applicant must insert a disclaimer of 'KUDOS' in the application *because it is descriptive of applicant's services*."  *Id.* ¶13, Ex. 46 at 3

---

[6] A mark's registration status does not determine the scope of protection to which that mark is entitled, as even a registered and incontestable trademark may still be weak and thus entitled to only a limited scope of protection.  *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n. 3 (9th Cir. 2002).

[7] *See* Durham Decl. ¶6, Ex. 39 (Short Depo.) at 85:16-24.

[8] Mr. Short testified the product covered in this application ██████████████████ ███████████████████████ *Id.* at 20:4-16.

13

1  (emphasis added).   Rare Method then submitted the requested disclaimer, acknowledging the

2  descriptive nature of the term "KUDOS" vis-à-vis its products.  *Id.* ¶14, Ex. 47.

3        Second, and as the USPTO noted, "KUDOS" is a common noun which is defined as "praise

4  or honor: praise, credit, or glory for an achievement" or "acclaim or praise for exceptional

5  achievement."  *Id.* ¶13, Ex. 46 at 3; *see also id* ¶15, Ex. 48 (Expert Report of Dr. William Eggington,

6  the "Eggington Report") at ¶17 (setting out similar definition from Oxford English Dictionary).

7  Giving praise or credit is precisely how Plaintiff describes its business, at least in this proceeding[9]—

8  an "employee recognition product" (*See* §IID, *supra*)—militating in favor of a finding of the mark

9  being highly descriptive at best, and therefore exceedingly weak.  *See Threshold Enterprises Ltd. v.*

10 *Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 150 (N.D. Cal. 2020) ("[T]he dictionary definition

11 evidence tends to show the components are at least descriptive of the characteristics of the products

12 the marks cover and that the composite marks are therefore generic.")

13       Third*,* there are numerous examples of third parties, including in Plaintiff's claimed field,

14 utilizing the term "kudos" without any reference to Plaintiff.  *See* Rubens Decl., ¶31, Ex. 25 at 11:1-

15 13:2 (collecting uses); Dkt. 9 at ¶¶47-54 (same).  The Corpus of Contemporary American English

16 ("COCA") which aggregates text from a variety of sources and genres is the only large (over one

17 billion words), genre-balanced corpus of American English.  Durham Decl. ¶15, Ex. 48 at ¶23.

18 COCA contains 2,760 hits for the term "KUDOS," and a review of 200 of those results showed no

19 association with Plaintiff.  *Id.* at ¶24.  Further, an analysis of "collocates"—the words appearing

20 four words to the left and right of uses of the term "kudos"—revealed no connection to any third-

21 party entity, including Plaintiff.  *Id.* at ¶26.  The absence of any reference to Plaintiff in these

22 "collocates" is striking when compared to the same analysis performed for an established and strong

23 mark, for example Delta—four of the top ten collocates are AIR, LINES, AIRLINES and FLIGHT.

24 *Id.*at ¶27.  Similar results are obtained from the 14 billion word "iWeb" corpus.  *Id.* at ¶29.

25       Fourth*,* there is abundant usage of the term "kudos" on social media as a common noun

26 without any reference to Plaintiff.  As of July 20, 2021, the date of Dr. Eggington's report, there

27

28

---

[9] As discussed *supra* §IID, Plaintiff has offered varying descriptions of its business at various times.

1    were 358,308 #KUDOS categorical references on Instagram[10] (*id.* at ¶21), 5,605 instances of the

2    term "kudos" on the top "subreddits" utilizing the term on the Reddit website (*id.* at ¶32), and 53,000

3    Facebook posts "about" #KUDOS on Facebook (*id.* at ¶36).  A review of thousands of results

4    showed ***none*** suggested any connection with Plaintiff, though they did show connections with ***other***

5    companies, for example, an Indonesia-based talent management also called "Kudos Inc."  *Id.*

6         Fifth, there are numerous trademark registrations and applications for the term "Kudos,"

7    including in the same international classes ("IC") as Plaintiff's registrations for similar services.

8    Several of these registrations predate or are coterminous with Plaintiff's registrations, and the marks

9    they cover remain in active use today.  *See* Rubens Decl., ¶39, Ex. 27 (list of trademark registrations

10   and applications incorporating term "KUDO"); *id.* ¶40, Ex. 28 (November 14, 2014 registration for

11   "KUDOTREE" in IC 45 for "On-line social networking services"); *id.* ¶41, Ex. 29 ("KUDOTREE"

12   website); *id.* ¶42, Ex. 30 (November 27, 2012 registration for "KUDOS 365" in ICs 009 and 035

13   for "Computer software for advertising and marketing services that connect businesses, supporters

14   and nonprofits"); *id.* ¶43, Ex. 31 ("KUDOS 365" website).

15        Sixth, ***Plaintiff itself and its customers*** frequently use the term "kudos" descriptively and in

16   its primary sense.  *See generally* Boga Depo. at 133:22-139:10; Durham Decl. ¶16, Ex. 49 at 5-6

17   (Plaintiff's website, retrieved July 29, 2021) ("We've got lots of solutions for making sure everyone

18   gets Kudos"); *id.* ¶17, Ex. 50 at '1254 (Plaintiff's support site) ("By default, Kudos are sent publicly.

19   If you would like to send your Kudos privately, you can do so…"); Rubens Decl. ¶44, Ex. 32

20   (Plaintiff's white paper titled "Recognition Can Take You To The Moon," available on Plaintiff's

21   website) (Plaintiff describing its products as a means of "giving everyone a way to say 'Kudos'");

22   *id.* ¶45, Ex. 33 (Capterra review website).[11]

23        At a minimum, the foregoing evidence shows that Plaintiff's mark is highly descriptive, and

24   is thus entitled only to minimal if any protection, per the numerous decisions from the Ninth Circuit

25

26   ───────────────
     [10] Hashtags are words or multi-word phrases that categorize content and track topics on social media
27   sites like Twitter, Facebook, Instagram, and Pinterest.  *Id.* at ¶21.
     [11] The Court may, and should, take judicial notice of the evidence to the extent it has not previously
28   been produced in this proceeding.  *Threshold Enterprises*, 445 F. Supp. 3d at 145–46 (materials in
     the online files of the USPTO and websites and their contents may be judicially noticed).

finding marks to be conceptually weak based upon substantially similar evidence.  *See Entrepreneur Media*, 279 F.3d at 1143 (9th Cir. 2002) ("The need of others in the marketplace to use the term 'entrepreneur' to describe their goods or services confirms that [plaintiff's] mark is descriptive … Widespread *use* of a word by others may serve as confirmation of the *need* to use that word."); *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980) ("The word ALPHA is in common usage and has meaning in the English language; that ALPHA occurs in widespread use as a tradename or trademark; and that ALPHA as part of a trademark or tradename is weak … A 'weak' mark is a mark that is a meaningful word in common usage or is merely a suggestive or descriptive trademark."); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224-25 (C.D. Cal.), *aff'd*, 114 F. App'x 921 (9th Cir. 2004) ("[Defendant] has proffered substantial evidence, in the form of internet advertisements, that demonstrates that many retailers are selling clothing bearing either the word 'moose' or a picture of a moose … to the extent that the dominant feature of Plaintiffs' marks is actually the picture of a moose or the word 'moose,' those marks are conceptually weak."); *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003) ("In the trademark world, the word 'halo' is a popular one … the term 'halo' appears in dozens of places, many in a field which at least broadly would include or be related to plaintiff's business … Any individual user of the 'halo' term thus lacks significant ability to prevent the use of 'halo' by others in the field."); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003) ("[Plaintiff] identifies thirty third-party uses of 'Matrix' outside the automotive or racing fields … [Defendant] presents at least twenty undisputed uses of the MATRIX mark in the automotive [or racing] fields … Together, this 'crowded field' evidence shows that the mark MATRIX is exceedingly weak and diluted … and therefore is entitled to a very limited scope of protection."); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 990 (C.D. Cal. 2002) (similar).  The foregoing evidence and case law further demonstrate that there is no particular connection between the term "kudos" and Plaintiff in the public's perception, as would be necessary to establish any secondary meaning.  *See id.*; *see also* 2 McCarthy on Trademarks and Unfair Competition § 11:86 (5th ed.) ("[I]t is difficult to build up strong secondary meaning in

commonplace 'laudatory' marks which many sellers use."). [12][13]

Plaintiff cannot show that its mark has any commercial strength to compensate for its lack of conceptual strength.  This is because Plaintiff cannot show that it has any evidence of "extensive advertising, length of exclusive use, [and] public recognition."  *Entrepreneur Media*, 279 F.3d at 1144.  Plaintiff spends less ████████████████ on US-based advertising, an amount Plaintiff's own Chief Customer Officer, Tom Short, acknowledged is ████████████ Durham Decl. ¶6, Ex. 39 (Short Depo at 160:7-16).  Mr. Short moreover testified that he believed the brand is strong because the term kudos is a commonly known word which is "████████ ████████████"  *Id.* at 82:19-20.  Plaintiff mistakes the ubiquity of a popularly used term for reputation earned specifically for use of the term to identify its business.  Plaintiff has ***never*** made exclusive use of the term "kudos" as a mark, there are numerous currently active registrations for the term which predate Plaintiff's claimed first use.  *See, e.g.*, Rubens Decl. ¶46, Ex. 34 (Reg. No. 2,363,076 (registration for "KUDOS" mark dated June 27, 2000).  Finally, there is no particular association between the term "kudos" and Plaintiff, as shown by Dr. Eggington's research. [14]

The first factor therefore weighs decisively in Defendants' favor.

> b.  The second *E-Systems* factor—Plaintiff's diligence in enforcing its marks—weighs in Defendants' favor.

If Plaintiff claims not to have been aware of the abundant evidence of the open and obvious uses of the Kudoboard Mark (*see* §IIB, *supra*), this would demonstrate that Plaintiff did not diligently and effectively enforce its mark, weighing this factor in Defendants' favor.  *See Pinkette*,

---

[12] This evidence further supports Defendants' contention (Dkt. 9 ¶¶43-61) that the term "KUDOS" is generic for technological goods and services that provide a means of giving professional praise. *See Threshold Enter.*, 445 F. Supp. 3d at 150-55; *CG Roxane LLC*, 569 F. Supp. 2d at 1029-30; *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1190-94 (C.D. Cal. 2007).
[13] Earlier this year, in a proceeding before the Trademark Trial and Appeal Board ("TTAB") at the USPTO, the TTAB found Plaintiff's mark to be "highly suggestive" and therefore entitled only to an "ordinary scope of protection."  *Kudos Inc.*, 2021 WL 838647, at *6 (T.T.A.B., Mar. 2, 2021). As with all decisions from the TTAB, this decision "is not binding on this Court."  *Roxbury Ent. v. Penthouse Media Grp., Inc.*, 2008 WL 11339095, at *2 (C.D. Cal. Nov. 20, 2008).  In any case, even if the Court were to accord any deference to the TTAB's decision (it should not), even a finding that Plaintiff's mark is suggestive would place it at the weak end of the spectrum of trademark strength.  *See Alpha Indus.*, 616 F.2d at 445 ("a suggestive … trademark" is a "weak" mark).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

1   894 F.3d at 1027 (finding second factor weighed in favor of laches where party asserting

2   infringement delayed years in filing suit after opposing party's trademark registration put claimant

3   on constructive notice of the respondent's claim to ownership of mark at issue); *Grupo Gigante*,

4   391 F.3d at 1102 (finding second factor weighed in favor of laches where plaintiff delayed three

5   years before contacting defendant regarding allegedly infringing uses); *Fitbug, Inc.*, 78 F.Supp.3d

6   at 1193 (finding second factor weighed in favor of laches, and that plaintiff "was not diligent in

7   protecting its mark" where it "did not assert its trademark rights against [defendant's] from

8   September 2008, when [defendant] announced its products and began offering them for sale on its

9   website, to December 2011, when it sent a cease and desist letter to [defendant], and did not file suit

10  until 2013"); *Saul Zaentz*, 627 F.Supp.2d at 1114 (similar).   Plaintiff fares no better if it

11  acknowledges that it was aware of the allegedly infringing activity, but took no action, as this would

12  also weigh this factor in Defendants' favor. *Id.; see also Grupo Gigante*, 391 F.3d at 1102–03 ("[A]

13  plaintiff cannot simply wait without explanation to see how successful the defendant's business will

14  be and then ask for an injunction to take away good will developed by defendant in the interim.").

15  Thus, whether Plaintiff claims it was aware of the allegedly infringing activity, or whether it claims

16  it was not, the outcome is the same—the second *E-Systems* factor weighs in Defendants' favor.

17          c.   The third *E-Systems* factor—harm to senior user if relief denied—
                 weighs in Defendants' favor.

18          Plaintiff has failed to present any evidence of harm it has suffered as a result of the alleged

19  infringement.  At his deposition, Mr. Boga was given an opportunity to articulate the specific harms

20  Plaintiff claims to have suffered.  But Mr. Boga could not point to any evidence of harm to Plaintiff,

21  and indeed openly acknowledged that Plaintiff has not undertaken *any* damages analysis.  Durham

22  Decl. ¶2, Ex. 35 (Boga Depo.) at 71:2-5 ████████████████████████████████████████

23  ████████████████████████████████████████████████████ ; *see generally id.* at 60-71.[15]

24  Mr. Boga could only identify a single client which Plaintiff purportedly lost as a customer to

25  Defendants— ██████████████████ (*see id.* at 67:11-15)—but could not point to any evidence

26

27  ────────────────────

    [15] Throughout his deposition, Mr. Boga repeatedly made vague allusions to needing to review
28  "documents" to determine information, including Plaintiff's damages.  But Mr. Boga could not
    identify any specific documents containing the information he purportedly required, and he could
    offer no reason why he did not sufficiently review those documents in advance of his deposition.

                                            18
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

1  demonstrating that ████████████████ in any way confused the parties (*id.* at 91:11-93:22,

2  192-198).  Mr. Boga also could not identify any specific revenue Plaintiff claims to have lost to

3  Defendants.  *Id.* at 68:2-10.  Nor could he identify a single instance of actual consumer confusion

4  between the parties for the four and a half years between Kudoboard LLC's beginning its widespread

5  use of its mark and Plaintiff filing the Complaint.  *Id.* at 57:15-21.[16]  Mr. Boga also could not identify

6  any evidence that the Kudoboard products, or the Kudoboard Mark, have caused any harm to

7  Plaintiff's brand or products.  *Id.* at 71:6-76:20.  Because Plaintiff has failed to identify evidence

8  showing *any* harm it has suffered, this factor plainly weighs in Defendants' favor.  *See Grupo*

9  *Gigante*, 391 F.3d at 1104 (finding that third factor favored defendants, even in face of evidence of

10  actual confusion, because plaintiff "did not suffer actual harm as a result of the [defendants'] alleged

11  infringement"); *E-Systems*, 720 F.2d at 607 ("Although plaintiff's and defendant's products are

12  complementary and are already to some degree competitive, serious harm to the senior user … is

13  unlikely; in making actual purchases customers … are unlikely to confuse the two firms'

14  products.").  The case for there being no harm to Plaintiff here is particularly strong given that

15  Plaintiff unreasonably delayed filing suit for nearly five years.  *Grupo Gigante*, 391 F.3d at 1104

16  ("[D]elay weakens a claim of likelihood of confusion, because the public may learn to distinguish

17  between similar marks over time, so that any real likelihood of confusion gradually dissipates.").

18      While the foregoing is sufficient to weigh this factor in Defendants' favor, courts may also

19  consider the third *E-Systems* factor by undertaking a likelihood of confusion inquiry applying the

---

[16]  Plaintiff produced documents showing a small number of persons who were already KUDOBOARD users contacted Plaintiff via its helpdesk function after the Complaint was filed to inquire about support for use Kudoboard's group greeting card services.  This limited number of misdirected service inquiries is *de minimis* when contextualized against the user base of ***22+ million visitors to the Kudoboard website in 12 months***.  *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606 (9th Cir. 1987) (concluding the misdirection of "several letters" was insignificant in light of the "high volume of business"); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635 (6th Cir. 2002) (concluding six misdirected emails in light of 2 million units sold did not support a likelihood of confusion).  Moreover, those instances are not relevant because they do not show confusion in the purchasing context—the users had *already purchased* Kudoboards.  *See Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1014-15 (N.D. Cal. 2015) (quoting *Instant Media, Inc. v. Microsoft Corp.*, No. 07–cv–02639–SBA, 2007 WL 2318948, at \*14 (N.D. Cal. Aug. 13, 2007) ("Relevant confusion is that which affects purchasing decisions, not confusion generally.")).

19

1    "*Sleekcraft*" factors.[17]  Several of these factors are congruent with the *E-Systems* test and collectively

2    weigh decisively against any likelihood of confusion.   These factors include the weakness of

3    Plaintiff's mark, the absence of any evidence of actual confusion, and Defendants' good-faith intent

4    in selecting the Kudoboard Mark, all of which have been established without a material factual

5    dispute.  *See* §§II, VB3a, c, *supra*.  It may be that the Court finds that other of the *Sleekcraft* factors

6    cannot be evaluated on a motion for summary judgment.  This would simply mean that the weight

7    of this factor cannot be established.  *See Fitbug Ltd.*, 78 F. Supp. 3d at 1194 ("[T]he Court cannot

8    decide likelihood of confusion (and hence the weight of this factor) as a matter of law.").  Indeed,

9    even if the Court were to assume that the other *Sleekcraft* factors established a likelihood of

10   confusion, and so were to weigh this factor in Plaintiff's favor, laches would still be warranted

11   balancing the other considerations discussed herein.  *See id.* ("Nonetheless, even assuming [the third

12   *E-Systems*] factor weighs strongly in Fitbug's favor, as the fifth factor, competition between the

13   users, does … it would still be insufficient to sway the overall weight of the factors.").

14         For all of the foregoing reasons, the third *E-Systems* factor weighs in Defendants' favor.

15              d.    The fourth *E-Systems* factor— good faith ignorance by junior user—
                     weighs in Defendants' favor.

16

17         The evidence shows that Defendants did not know of Plaintiff when it selected and began

     using KUDOBOARD in 2015, and only gained general knowledge of the company later in 2016.

18   Ruben Decl. ¶47; *id.* ¶31, Ex. 25. at 16:17-17:11.  This alone precludes a finding of bad faith.  *See*

19   *Fitbug Ltd.*, 78 F. Supp. 3d at 1194 (under the fourth *E-Systems* factor, the relevant inquiry is

20   whether the defendant "had prior knowledge of [plaintiff's mark] *when it decided to adopt* [its own

21   mark]") (emphasis in original).  Defendants' good faith is moreover evidenced by their actions.

22   Since 2015, Kudoboard LLC has always used the Kudoboard mark in an open and obvious manner

23   and has made no attempt to hide that use from Plaintiff, even going so far as to reach out to Plaintiff

24   to discuss potential collaborations.  *See* §IIB, E.  Kudoboard LLC also publicly filed an application

25   to trademark the term "Kudoboard."  *Id.*  Plaintiff never opposed that application, and the USPTO

26

27   ───────────────
     [17] "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of
28   actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be
     exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of
     expansion of the product lines." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

did not cite Plaintiff's marks when it subsequently issued a registration.  *Id.*  Kudoboard LLC continued its open and public use of the registered Kudoboard Mark without a word from Plaintiff, despite Plaintiff claiming that at the time it was regularly monitoring for potentially infringing uses, and despite Plaintiff sending cease-and-desist letters to other parties throughout this period.  *Id.* After Plaintiff sent a cease-and-desist letter to Defendants, Defendants responded that they believed there was no likelihood of confusion, and Kudoboard LLC continued using the Kudoboard Mark, itself indicative of a good faith belief it was permitted to do so.  *See Groupion, L.L.C. v. Groupon, Inc.*, 826 F.Supp.2d 1156, 1165 (N.D. Cal. 2011) (continued use of mark after receipt of cease-and-desist letter not indicative of bad faith).  Numerous courts have found the fourth *E-Systems* factor weighed in favor of applying laches based on substantially similar evidence, and the Court should do the same here.  *See Pinkette*, 894 F.3d at 1028 (finding fourth factor weighed in respondent's favor where "there was no indication that [respondent] was ever trying to hide its use of the mark; it was open and notorious."); *E-Systems*, 720 F.2d at 606 ("Neither [plaintiff] nor [defendant] had actual knowledge of the other's existence until [after defendant adopted its mark]. [Defendant] adopted and used its trademark and tradename in good faith, without any actual knowledge of the existence of [plaintiff's] tradename or trademark or its application to any of [plaintiff's] products."); *Fitbug Ltd.*, 78 F. Supp. 3d at 1194 ("[I]t is … undisputed that [defendant] selected its mark before it was aware of [plaintiff], and even after learning of [plaintiff's] existence, [defendant] continued to believe there was no likelihood of confusion."); *Matsunoki Grp., Inc. v. Timberwork Oregon, Inc.*, 2011 WL 940218, at *4 (N.D. Cal. Feb. 18, 2011) ("[Plaintiff] was not ignorant of [defendant's] ongoing existence or activities during this time … Overall, these facts make clear that [plaintiff] was less than diligent in enforcing its rights, and [defendant] acted in good faith.").

e.  The fifth *E-Systems* Factor—competition between senior and junior users—weighs in Defendants' favor.

Plaintiff has failed to provide any consistent account of the products and services it sells, constantly altering the descriptions of its products in order to make them appear similar to the products being sold by the party it is then suing or threatening to sue.  *See* §IID, *supra*.  Nonetheless, even Plaintiff's newly-manufactured description of its products does not show that the parties

21

1   compete.  Simply put, Kudoboard LLC is a greeting card company focused on replacing the paper

2   card passed around and signed; Plaintiff is not.  Purchasers of Kudoboard LLC's group greeting

3   cards are not looking for Plaintiff's "employee recognition product that has a social network."  There

4   is thus no overlap between the parties' goods and services.  But even if some overlap existed, this

5   factor would still weigh against Plaintiff.  *See Servpro Indus. Inc. v. Zerorez of Phoenix LLC*, 339

6   F. Supp. 3d 898, 907 (D. Ariz. 2018) ("[Plaintiff] and [defendant] provide overlapping services but

7   they are not entirely interchangeable. While [plaintiff] is adamant that it provides carpet cleaning

8   services that compete directly with [defendant], there is no real dispute that [plaintiff's] business

9   focuses on the much broader category of restoration services … Thus, while the parties provide the

10  same services, [plaintiff] overwhelming[ly] targets and serves a different population than

11  [defendant]."). Plaintiff's own admissions further confirm that the parties are not competitors.  For

12  example, Nikki Weisgarber, Plaintiff's Director of Client Success, testified that she does not

13  consider ███████, another greeting card company, to be one of Plaintiff's competitors.  Durham

14  Decl. ¶18, Ex. 51 at 84:21-85:4.  Ms. Weisgarber also did not name Kudoboard LLC when asked to

15  list Plaintiff's competitors.[18]  *Id.* at 87:7-14.

16      Even if the Court were to find that the parties do compete, this would in no way preclude a

17  finding that laches bars Plaintiff's claims.  *See Grupo Gigante*, 391 F.3d at 1104 (finding that parties

18  competed and nonetheless finding that laches barred the plaintiff's claims); *E-Systems*, 720 F.2d at

19  607 (same); *Fitbug Ltd.*, 78 F. Supp. 3d at 1194 (same); *Matsunoki*, 2011 WL 940218, at *4 (same).

---

[18] Plaintiff may attempt to point to the Capterra and G2 websites that listed Kudoboard LLC as participating in the employee recognition space as evidence that the parties compete, but doing so would be unavailing.  These websites do not take any account of actual markets, and do not establish that the parties' products actually compete.  Kudoboard LLC itself selected the "employee recognition" category on Capterra and G2 only because there was not an option to select "eCards," Rubens Decl. ¶9, Ex. 3 at 158:6-24, and only because of the available categories, this was the only one that even remotely related to Kudoboard LLC's services.  *Id.* at 160:2-5.  This is also the **only** evidence Plaintiff might point to on this issue, as Mr. Boga could not identify a single instance of actual confusion between the parties, §VB3c, *supra*, and Mr. Short admitted that Plaintiff ███████ ████████████████████████████████  Durham Decl. ¶6, Ex. 39 at 145:8-20.

1    This factor thus weighs in favor of Kudoboard LLC.

2                    f.    Sixth *E-Systems* Factor / Prejudice—Weighs in Defendants' Favor[19]

3            "Courts have recognized two chief forms of prejudice in the laches context—evidentiary and

4    expectations-based.  Evidentiary prejudice includes such things as lost, stale, or degraded evidence,

5    or witnesses whose memories have faded or who have died.  Expectations-based prejudice derives

6    from a defendant taking actions or suffering consequences that it would not have, had the plaintiff

7    brought suit promptly." *Saul Zaentz*, 627 F. Supp. 2d at 1117.  A defendant suffers prejudice if, in

8    reliance on plaintiff's delay, it invests labor and capital to build a trademark's goodwill and future

9    value.  *Id.*  Therefore, "a defendant can make the required showing of prejudice by proving that it

10   has continued to build a valuable business around its trademark during the time that the plaintiff

11   delayed the exercise of its legal rights." *Grupo Gigante*, 391 F.3d at 1105; *see also Pinkette*, 894

12   F.3d at 1028 (same).  Similarly, a defendant may establish prejudice by showing that during the

13   delay "it invested money to expand its business or entered into business transactions based on his

14   presumed rights." *Miller*, 454 F.3d at 999.

15           Here, the uncontested evidence demonstrates that Defendants have devoted substantial time,

16   efforts, and resources to growing the Kudoboard brand.  And those efforts have been handsomely

17   rewarded, as Kudoboard LLC has seen both its revenues and number of users skyrocket over the

18   past five years.  As discussed *supra* §IIC, two critical components of this growth have been

19   Kudoboard's search rank for eCard terms and its viral and word of mouth growth intrinsically linked

20   to the Kudoboard Mark, which could not be replicated for years, if at all, were the Kudoboard Mark

21   changed.  A change would harm the business which supports Mr. Rubens and Kudoboard's eight

22   full time employees.  Kudoboard has six years of business built upon a product, which each time it

23   is used, asks multiple people to be part of a Kudoboard greeting, which creates familiarity with the

24   product, and encourages return users who remember to return to Kudoboard for their next event or

25   milestone that they want to help someone celebrate.  Taking away Kudoboard translates to loss of

26

27   ───────────────
     [19] The considerations and evidence which bear on the sixth *E-Systems* factor overlap with the
     considerations and evidence which demonstrate prejudice.  *Saul Zaentz*, 627 F. Supp. 2d at 1113–
28   14 ("Some of the *E–Systems* factors overlap with other prongs of the laches analysis … the last *E–
     Systems* factor, harm to the junior user, is discussed below in the context of prejudice.")

                                                      23

1   return users looking for "Kudoboard."  The USPTO recognized years ago that Kudoboard could

2   coexist with Plaintiff, and Kudos never disagreed until years of sacrifice by Mr. Rubens allowed

3   Kudoboard to build his website visits to over 20 million.  This is more than sufficient to establish

4   that Defendants would suffer prejudice if this case is allowed to proceed.  *See id.*; *see also Fitbug*

5   *Ltd.*, 78 F. Supp. 3d at 1194 (Here, [defendant] has provided substantial evidence detailing its efforts

6   through the period of [plaintiff's] delay to build its business … The economic prejudice would be

7   severe if Fitbit were to now lose the rights to the Fitbit name.")

8           All of the *E-Systems* factors favor Kudoboard LLC (when only the balance is required).

9           **C.       The Doctrine Of Progressive Encroachment Is Inapplicable Here**

10          Finally, any assertion by Plaintiff that its delay is excused by the doctrine of progressive

11  encroachment would lack merit.  Under this doctrine, a delay may be excused only where the junior

12  user's infringement is at first *de minimis* and the junior user later "redirects or expands its business

13  into different regions or markets bringing it into direct competition with the trademark owner."

14  *Fitbug Ltd.*, 78 F. Supp. 3d at 1190.  Moreover, it is well-settled that progressive encroachment

15  cannot be invoked where a company is engaged in normal business growth.  *Tillamook Country*

16  *Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir. 2006). Progressive

17  encroachment is inapplicable here for a host of reasons.

18          First, Plaintiff has already taken the position that "████████████████████████████████

19  ████████████████████" (i.e., July 2015) (Durham Decl. ¶2, Ex. 35 (Boga Depo.) at 219:7-23)

20  (emphasis added), and the products Kudoboard LLC makes available today—group greeting

21  cards—are the same products it offered in 2015.  This precludes any argument that progressive

22  encroachment applies here.  *See Tillamook*, 465 F.3d at 1108–09 (despite recent change to

23  defendant's distribution channels, progressive encroachment inapplicable where plaintiff delayed

24  filing suit for years after defendant's use allegedly "create[ed] the prospect of confusion.").  Ninth

25  Circuit precedent is clear that to show "expansion into a 'different market'" a plaintiff must set out

26  evidence of "something more than simply expanding existing marketing channels or increasing sales

27  in an area closely related to the junior mark holder's existing business." *Fitbug Ltd.*, 78 F. Supp. 3d

28  at 1192.  The only offering Plaintiff might point to which was not available in 2015 is the

24

1  subscription tier Kudoboard for Business, but that has been available since 2016, nearly four years

2  before Plaintiff filed suit.  In any case, precedent makes clear that the addition of a business-to-

3  business offering is a permissible outgrowth in an existing market, not expansion into a new market.

4  *Id.* at 1191 ("Fitbit's growth in the business-to-business-to-consumer market was simply the growth

5  of its existing business, not expansion into a new market."); *see Tillamook Country Smoker, Inc.*,

6  465 F.3d at 1110 (finding that commencement of sales in new outlets does not establish grounds to

7  apply progressive encroachment because "[a] junior user's growth of its existing business and the

8  concomitant increase in its use of the mark do not constitute progressive encroachment").  Plaintiff

9  might also point to the fact that Kudoboard LLC briefly conducted beta testing on an employee

10  recognition product.  But that product was not ultimately offered for sale to the public, and so does

11  not constitute a "use in commerce" of the Kudoboard Mark needed to sustain an infringement claim.

12  *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ("commercial use in

13  commerce" in context of an infringement claim means "'in connection with' ***sale*** of goods and

14  services") (emphasis added).  Indeed, the beta testing showed that there was minimal interest in the

15  service so Kudoboard decided not to proceed with it.  Rubens Decl. ¶9, Ex. 3 at 91:2-92:8, 93:23-5.

16      Second, Kudoboard LLC's uses of the Kudoboard Mark in 2015 were far from *de minimis*.

17  Rather, they were open, obvious, and even attracted significant media attention, precluding any

18  finding of progressive encroachment.  *Fitbug Ltd.*, 78 F. Supp. 3d at 1192 (finding progressive

19  encroachment inapplicable where plaintiff failed to "conduct[] further investigation, as a reasonable

20  person would have done" which would have led it to discovering that defendant "had been directly

21  competing with [plaintiff]"); *Saul Zaentz*, 627 F. Supp. 2d at 1115 (finding that "defendant's use of

22  the mark was not *de minimis*" where, inter alia, "[i]ts revenue increased steadily … and it ha[d]

23  been referenced in hundreds of newspaper articles as well as in radio broadcasts and national

24  television shows").  The doctrine of progressive encroachment thus has no applicability here.

25  **VI.    CONCLUSION**

26      For all of the foregoing reasons, Defendants respectfully submit that each of the claims in

27  the Complaint are barred by laches, and accordingly request that the Court grant summary

28  judgement in Defendants' favor on each of those claims.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-cv-01876-SI

1

2     Dated:  September 24, 2021          **DLA PIPER LLP (US)**

3                                        By:  */s/ Gina L. Durham*
                                             _____
4                                            GINA L. DURHAM
                                             COLIN J. STEELE
5                                            OSCAR M. OROZCO-BOTELLO

6                                            Attorneys for Defendants/Counterclaimants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEST/296203193