GINA DURHAM, Bar No. 295910
gina.durham@us.dlapiper.com
OSCAR M. OROZCO-BOTELLO, Bar No. 313104
Oscar.orozco-botello@us.dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel: 415.836.2500
Fax: 415.836.2501

COLIN STEELE (*pro hac vice*)
colin.steele@us.dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Tel: 212.335.4500
Fax: 212.335.4501

Attorneys for Defendants/Counterclaimants
KUDOBOARD, LLC AND AARON RUBENS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KUDOS, INC., an Alberta, Canada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>KUDOBOARD, LLC, a Louisiana Limited Liability Company; Aaron Rubens, an individual residing in California,<br><br>Defendants. | Case No. 3:20-cv-01876-SI<br><br>**DEFENDANTS KUDOBOARD, LLC AND AARON RUBENS' NOTICE OF MOTION AND MOTION TO EXCLUDE EVIDENCE AND TESTIMONY FROM MARK KEEGAN**<br><br>Date: October 29, 2021<br>Time: 10:00 a.m.<br>Courtroom: 1<br>Judge: The Honorable Susan Illston |
| KUDOBOARD, LLC, a Louisiana Limited Liability Company; Aaron Rubens, an individual residing in California,<br><br>Counterclaimants,<br><br>v.<br><br>KUDOS, INC., an Alberta, Canada corporation,<br><br>Counterdefendant. | |

WEST\296178186.3

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 2

I.    INTRODUCTION ............................................................................................................ 2

II.    BRIEF BACKGROUND RELEVANT TO THE MOTION ............................................. 2

III.    LEGAL STANDARD ....................................................................................................... 3

IV.    ARGUMENT .................................................................................................................... 5

    A.    This Court Should Exclude Mr. Keegan's Survey Report ................................... 5

        1.    Mr. Keegan's Study Did Not Measure Consumer Confusion Among Potential Purchasers of Defendant's Product. ............................... 5

        2.    Mr. Keegan Created an Artificial Marketplace and Employed a Leading Design That Still Produced Unpersuasive Results........................ 8

    B.    Mr. Keegan's Opinion and Testimony In His Rebuttal Report Should be Excluded............................................................................................................... 10

        1.    Mr. Keegan is Not a Qualified Linguist..................................................... 10

        2.    Mr. Keegan Seeks to Offer Many Opinions that Are Not Rebuttal Opinions, But Rather Attempts to Usurp the Role of the Jury. ................. 12

V.    CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**CASES**

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ................................................................................................................. 5

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D. N.J. 2004) ........................................................................................ 13

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .................................................................................................. 10

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .......................................................................................................... passim

*Edison Bros. Stores, Inc. v. Cosmair, Inc.*,
   651 F. Supp. 1547 (S.D.N.Y. Jan. 7, 1987) ........................................................................... 10

*Emblaze Ltd. v. Apple Inc.*,
   52 F. Supp. 3d 949 (N.D. Cal. 2014) ....................................................................................... 4

*Gen. Electric Co. v. Joiner*,
   522 U.S. 136 (1997) .................................................................................................................. 4

*Goodman v. Harris Cnty.*,
   571 F.3d 388 (5th Cir. 2009) .................................................................................................. 13

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................................................... 13

*Instant Media, Inc. v. Microsoft Corp.*,
   No. C07–cv–02639–SBA, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ............................. 7

*Intermedics, Inc. v. Ventritex, Inc.*,
   139 F.R.D. 384 (N.D. Cal. 1991) ........................................................................................... 10

*Jimenez v. City of Chi.*,
   732 F.3d 710 (7th Cir. 2013) .................................................................................................. 13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .................................................................................................................. 4

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
   No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ....................................... 7, 8

*Lucido v. Nestle Purina Petcare Co.*,
   217 F. Supp. 3d 1098 (N.D. Cal. 2016) ........................................................................... 10, 12

*Medisim Ltd. v. BestMed LLC*,
  861 F.Supp.2d 158 (S.D.N.Y. 2012) ................................................................................... 8

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) ............................................................................... 13, 14

*Pinterest, Inc. v. Pintrips, Inc.*,
  140 F. Supp. 3d 997 (N.D. Cal. 2015) .................................................................................. 7

*Pooshs v. Philip Morris USA, Inc.*,
  904 F. Supp. 2d 1009 (N.D. Cal. 2012) ............................................................................. 10

*Sementilli v. Trinidad Corp.*,
  155 F.3d 1130 (9th Cir. 1998) ............................................................................................ 4

*United States v. 87.98 Acres of Land*,
  530 F.3d 899 (9th Cir. 2008) .............................................................................................. 5

*United States v. Diaz*,
  No. CR 05-0167 WHA, 2006 WL 3512032 (N.D. Cal. Dec. 6, 2006) ................................ 4

*United States v. Pac. Gas and Elec. Co.*,
  No. 14-cr-00175-THE, 2016 WL 1640462 (N.D. Cal. Apr. 26, 2016) ............................. 13

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
  746 F.2d 112 (2d Cir. 1984) ........................................................................................... 5, 9

*vonRosenberg v. Lawrence*,
  413 F. Supp. 3d 437 (D. S.C. 2019) .................................................................................... 8

*Warner Bros. Ent. v. Global Asylum, Inc.*,
  No. CV 12 - 9547 PSG, 2013 WL 12114836 (C.D. Cal. Jan. 29, 2013), *aff'd*,
  544 F. App'x. 683 (9th Cir. 2013) ..................................................................................... 12

**STATUTES**

GINA .............................................................................................................................................. 1

*Trademark and Deceptive Advertising Surveys: Law* ................................................................. 5

**OTHER AUTHORITIES**

Fed. R. Evid. 104(a) ...................................................................................................................... 5

Fed. R. Evid. 403 ........................................................................................................ 1, 5, 10, 12

Fed. R. Evid. 702 ................................................................................................................ passim

Fed. R. Evid. 702(a) ...................................................................................................................... 4

Fed. R. Evid. 702(c), (d) .................................................................................................................4

Federal Rules of Evidence Rules 403 and 702 ......................................................................2, 14

Mr. Keegan's "Summary of Assignment" ......................................................................................3

Rule 702's ......................................................................................................................................4

**SUSPECTS**

*Id.* at ¶10 ......................................................................................................................................3

*Kudos, Inc. v. Kudoboard, LLC, et al.* ("Dr. Eggington Report") ....................................................3

*Id.* at p. 49 ....................................................................................................................................5

§ 32:189 .........................................................................................................................................6

# NOTICE OF MOTION AND MOTION

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on October 29, 2021 at 10:00 a.m., in Courtroom 1 of the United States District Court for the Northern District of California, San Francisco Courthouse, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as soon thereafter as this matter may be heard, Defendants Kudoboard, LLC and Aaron Rubens (collectively, "Defendants" or "Kudoboard") will and hereby do move this Court for an order precluding Plaintiff's expert witness, Mr. Mark Keegan, from (1) testifying at trial or presenting evidence to rebut the evidence or testimony of Dr. William Eggington and (2) testifying at trial or presenting evidence on the issue of likelihood of confusion, as his reports and intended testimony do not meet the threshold of reliability required under *Daubert,* Fed. R. Evid. 702, and Fed. R. Evid. 403, as his reports would confuse, rather than help, the trier of fact, and result in prejudice to Defendants.

This motion is based on this notice and motion, the accompanying memorandum of points and authorities, the Declaration of Gina Durham ("Durham Decl.") and the Exhibits therewith, all papers on file with the Court, and such other matters as may be presented at the time of the hearing.

Dated: September 24, 2021

**DLA PIPER LLP (US)**

By: */s/ Gina Durham*
GINA DURHAM
OSCAR M. OROZCO-BOTELLO

Attorneys for Defendants/Counterclaimants
Kudoboard, LLC and Aaron Rubens

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Kudoboard, LLC and Aaron Rubens (collectively "Kudoboard") respectfully submit this memorandum of law in support of its motion to exclude the testimony of Plaintiff Kudos, Inc.'s ("Plaintiff") proposed expert witness, Mr. Mark Keegan ("Mr. Keegan"), pursuant to *Daubert*, and Rules 403 and 702 of the Federal Rules of Evidence.

**I.  INTRODUCTION**

This Court should exclude the survey evidence, opinions and testimony of Mr. Keegan because they do not meet the minimum standards of reliability for admissible expert testimony under *Daubert* and the Federal Rules of Evidence.  Plaintiff proffers Mr. Keegan for two purposes: (1) to present a purported confusion survey, and (2) to rebut the linguistic opinions of Defendant's expert, William Eggington, PhD.  As to the first, Mr. Keegan's survey did not seek to measure *purchaser* confusion for the types of products sold by either Kudoboard or Plaintiff-- rather the survey was conducted only among "*current users*" of an undefined employee recognition and engagement software.  Additive to this fatal flaw, Mr. Keegan employed a methodology completely divorced from marketplace realities, including programming the display of the test stimulus to show a page of Kudoboard's website on which *he added typed content* to the slides affirmatively telling respondents "this" is "employee recognition and engagement software," instead of allowing respondents to review unadulterated stimuli and draw their own conclusions.  The survey is misleading and not probative of whether there is any likelihood of consumer confusion among the purchasing public.  As to the second proffered role of Mr. Keegan, he is simply not qualified to offer an opinion on the linguistic study of Dr. Eggington because Mr. Keegan admitted he is not a linguist, has never studied linguistics and has no familiarity with the methods employed by Dr. Eggington.  Mr. Keegan's critique boils down to a legal opinion that a consumer survey is better evidence than a study of use of the asserted mark in natural language.  This impermissibly invades the role of the jury or the Court.

**II.  BRIEF BACKGROUND RELEVANT TO THE MOTION**

This case is about a trademark dispute in which Plaintiff alleges that Kudoboard infringes its KUDOS mark by virtue of Kudoboard's use of the KUDOBOARD mark.  Dkt. No. 1 at ¶1.

1  Plaintiff sometimes describes itself as "an internet-based software communication platform to serve
2  as a social networking tool that enables its users to interact with each other in ways that promote
3  positivity, community, and well-being," and other times as offering "an employee recognition and
4  engagement software." *Id*. at ¶10; Dkt. No. 36 at 3:11-15.  Kudoboard is an online greeting card
5  company that provides a platform for consumers to create and send digital or printed greeting cards
6  from groups of people. *See* Dkt. No. 65 (Rubens Decl. ¶¶2-3, Exs. 1-2).

Plaintiff initially disclosed Mr. Keegan as an expert to present a survey which purportedly tested consumer confusion.   Durham Decl. ¶2, Ex. 1.  (Expert Report of Mark Keegan ("Mr. Keegan Affirmative Report")).  According to the Mr. Keegan Affirmative Report, Mr. Keegan was "asked to conduct a study to determine the extent to which, if at all, there is a likelihood of confusion among consumers between the defendants' KUDOBOARD-branded software and the plaintiff's KUDOS-branded software." *Id*. Ex. 1 at ¶3.

Kudoboard disclosed Dr. Eggington as an expert to offer opinions concerning the linguistic status of the terms KUDOS and KUDO.  Durham Decl. ¶3, Ex. 2 (Linguistic Report for *Kudos, Inc. v. Kudoboard, LLC, et al.* ("Dr. Eggington Report")) at ¶1.  Following which, Plaintiff again identified Mr. Keegan as an expert, this time to rebut the opinions of Dr. Eggington ("Mr. Keegan's Rebuttal Report").  Mr. Keegan's Rebuttal Report purports to identify flaws in Dr. Eggington's work however, Mr. Keegan is rather seeking to compare different types of analysis and deem one a superior approach.  By way of example, Mr. Keegan's "Summary of Assignment" states: "The Eggington Report presents no valid or reliable quantitative evidence, despite the fact that its objectives consist of testable propositions which *could have been addressed through properly designed consumer survey research*." *See* Durham Decl. ¶4, Ex. 3 at ¶7 (emphasis added).

### III.  LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), provide the framework governing the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, trial judges should admit into evidence reliable testimony from qualified experts that is helpful to the factfinder and exclude expert testimony where the proposed expert is unqualified, the expert's conclusions or methods are unreliable, or the expert's testimony would be unhelpful.  *See Daubert*, 509 U.S. at 589-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-52 (1999).

Distilled to its essence, Rule 702 requires that "(1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 961 (N.D. Cal. 2014); *see also Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) ("In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact.") (internal quotations omitted).  To satisfy the reliability requirement, the proponent must show both that the expert's opinions are the "product of reliable principles and methods" and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d); *see Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another.").  "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible," regardless of "whether the step completely changes a reliable methodology or merely misapplies that methodology." *United States v. Diaz*, No. CR 05-0167 WHA, 2006 WL 3512032, at *16 (N.D. Cal. Dec. 6, 2006).  And "fit" requires "the evidence or testimony '[helps] the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702(a)).

The party asserting the admissibility of expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the testimony satisfies the requirements of Rule 702.  Fed.

R. Evid. 702 advisory committee's note (citing Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171 (1987)); *Daubert*, 509 U.S. at 593 n.10; *see, e.g.*, *United States v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008). Thus, although Kudoboard is the moving party, Plaintiff bears the burden of establishing that the proffered testimony of its expert is admissible.

Even if the requirements of Rule 702 are satisfied, an expert's testimony still should be excluded if the probative value of that testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## IV.   ARGUMENT

### A.   This Court Should Exclude Mr. Keegan's Survey Report

#### 1.   Mr. Keegan's Study Did Not Measure Consumer Confusion Among Potential Purchasers of Defendant's Product.

If the survey universe completely misses the mark, consisting of individuals whose state of mind is not relevant to the legal issue being tested, the survey is likely to be excluded from evidence or given no weight by the court. Shari C. Diamond and Jerre Bailey Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. 28 (June 1, 2012).[1] Any misstep at the early state of the survey design process including the universe, can potentially render all future work on the survey meaningless as courts frequently discount, or even exclude surveys with flawed universes. *Id.* at p. 49. For example, in *Universal City Studios*, the Second Circuit held that a survey purporting to measure "confusion" was flawed because the survey was conducted only among individuals who had already purchased or leased the product (*i.e. users of the product*) rather than those who were contemplating a purchase or lease. *Universal City Studios, Inc. v. Nintendo Co.,*

---

[1] Dr. Shari Seidman Diamond is the author of the manual *Reference Guide on Survey Research* that assists judges in managing cases involving complex scientific and technical evidence by describing the basic tenets of key scientific fields from which legal evidence is typically derived and by providing examples of cases in which that evidence has been used.

1  *Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:189 (5th ed.) (noting lack of relevance of flawed surveys).

Mr. Keegan recognized that the appropriate universe for his study should have been prospective purchasers of KUDOBAORD products, but inexplicably went on to design a survey that did not test the perceptions of this universe. Specifically, Mr. Keegan's report stated that:

> In a typical case alleging forward confusion, such as the current matter, the appropriate population from which to sample is *likely purchasers of products bearing the junior user's mark*. "Junior" mark refers to the mark at issue in the case that is the later entrant to the marketplace—in this case, Kudoboard.

Durham Decl. ¶2, Ex. 1 at ¶7 (emphasis added). Notwithstanding the foregoing, Keegan designed a survey to be administered only to those who self-identified as "*Current users of employee recognition and engagement software.*" *Id*. at ¶47. Even more vexing was Mr. Keegan's sworn testimony where he admitted that the survey design may have only captured Plaintiff's users:

> Q.  Do you have any information as to whether any prospective Kudoboard customers were exposed to or saw the tested web pages?
>
> A.  Not specifically. All I can say is that the types of customers that Kudos is targeting were in -- were the universe. They weren't just included in the universe; that is the universe.

Durham Decl. ¶5, Ex. 4 at 47:1-7.

Mr. Keegan also admits that his screening procedures to field respondents for his survey did not seek those who have any purchase intentions whatsoever:

> Q.  Okay. And in fact, when you designed your study, you didn't ask the survey respondents even anything about their purchasing intentions, did you?
>
> A.  Well, I asked them, screened them on using this type of software, but I didn't specifically ask about purchase intentions.
>
> Q.  Okay. And every user of, I think, whatever you called it, employee recognition software, is not a purchaser of that software, are they?
>
> A.  No.

*Id*. at 89:24-90:8.

As a result, Mr. Keegan tested the perceptions of software users who would not necessarily

1  be purchasers of software, thereby making his study irrelevant to the legal issue in this case. *See*

2  *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1014-15 (N.D. Cal. 2015) (quoting *Instant*

3  *Media, Inc. v. Microsoft Corp.*, No. C07–cv–02639–SBA, 2007 WL 2318948, at *14 (N.D. Cal.

4  Aug. 13, 2007) ("Relevant confusion is that which affects purchasing decisions, not confusion

5  generally.")).  Any attempt to rehabilitate this fatal flaw by speculating that users could have

6  relevance to purchasing decisions lends a level of unreliability to the study that does not pass muster

7  under Rule 702.  This is especially so because Mr. Keegan admitted during his deposition that he

8  has no idea what types of software respondents might be referring to using when they self-identified

9  as users of "employee recognition" software:

10  Q. Do you know what the term "employee recognition" means?

11  A. Well, it's broad, but in this – in the context of this field, it's – in a corporate environment, recognizing and rewarding employees, engaging the employees in a positive context.

13  Q. And, how did you come up with that definition, sir?

14  ***

15  A. By – you say "definition." That's just me speaking here, describing it. But that description that I have given here is based on the entirety of my review in this case.

17  Q. So, that's a description that you came up with, that's all your own, that's not a formal definition; is that correct?

19  A. Yeah. I'm speaking orally here. I'm not reading from something. It's definitely an off- the-cuff definition.

20  Q. Well, do you know if that's a definition anyone else would use, sir?

21  A. I think that if you asked 100 people in the way you asked me, you'd get 100 definitions, 100 different definitions. So, it's imprecise, for sure but that's one way I would describe it.

23  Durham Decl. ¶5, Ex. 4 at 93:5-94:6.

24  Mr. Keegan could have and should have examined a universe composed of potential

25  purchasers of Kudoboard's product, but he chose not to do so.  Failure to test the correct universe

26  is grounds for inadmissibility of a survey. *See Kwan Software Eng'g, Inc. v. Foray Techs., LLC,*

27  No. C 12-03762 SI, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (excluding survey that used

28  the incorrect universe).  Specifically, in *Kwan Software*, the court concluded, in a false advertising

context, that a party that did not test the right universe in a survey "failed to meet its burden of showing the reliability and relevance of the survey." *Id*. Similarly, Plaintiff cannot carry its burden to show the reliability of and relevance of Mr. Keegan's study given his fatally flawed universe selection. Mr. Keegan's study should be excluded by this court just as another court excluded a prior study that Mr. Keegan conducted for similar flaws. *See vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437 (D. S.C. 2019) (excluding Mr. Keegan's survey noting he "improperly limited respondents . . . thus surveying the wrong universe of respondents").

### 2.   Mr. Keegan Created an Artificial Marketplace and Employed a Leading Design That Still Produced Unpersuasive Results.

Violating a golden rule of sound consumer survey design, Mr. Keegan failed to craft a study that would simulate how consumers might actually encounter the KUDOS and KUDOBOARD marks under marketplace conditions. *See Kwan Software Eng'g*, 2014 WL 572290, at *4 (quoting *Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012) ("The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility.").

First, Mr. Keegan's selection and presentation of the stimuli cannot be reconciled with the purported objectives of the survey. Mr. Keegan began his study by familiarizing respondents with the default home page of Plaintiff but did not show the respondents the bespoke pages that Plaintiff's officers testified that Plaintiff's users see when they use the Kudos platform. Durham Decl. ¶2, Ex. 1 at ¶59. If Mr. Keegan believed it was important to test the perception of "users" of software, it defies logic as to why Mr. Keegan would not use the types of pages "users" of Plaintiff's software would actually encounter.

Next, Mr. Keegan sought to familiarize respondents with an array of other companies, including Kudoboard, through showing websites for the companies. But, he did not show just the webpages and allow respondents to draw their own conclusions about them. His survey design repeatedly sought to characterize the companies for respondents. The first time the Kudoboard webpage[2] appeared with the other companies, Mr. Keegan described the stimuli as follows: "Shown

---

[2] Oddly, Mr. Keegan failed to provide respondents with the Kudoboard homepage that the overwhelming majority of Kudoboard purchasers would first encounter, instead providing a

below, in random order, are additional pages for companies offering employee recognition software and engagement software." *Id.* at ¶62. The characterization and suggestions did not stop there. He again showed the default homepage for Plaintiff and described it as follows "Please consider Page A, the first page for employee recognition and engagement software that you saw earlier in the survey. When he showed the Kudoboard webpage again, the characterization continued as follows: "Please consider this employee recognition and engagement software product and answer the questions at the bottom of the page." *Id.* During deposition, Mr. Keegan admitted that the screen showing Kudoboard's website would not have naturally contained the characterization that associated the companies:

> Q. Okay. So sir, where does it say "employee engagement software" or "employee recognition software product" other than where you typed it on the page?
>
> A. So where does the page—so the Kudoboard page, I don't believe uses that – those words.
>
> Q. That's correct, sir. The only time that the survey respondent would see those words is where you programmed it in to appear above Kudoboard's webpage; isn't that correct?
>
> A. I think that's correct. I'm just reviewing the entirety of the page here. So yes, I think that's correct.

Durham Decl. ¶5, Ex. 4 at 71:22-72:9.

This is the sort of leading study design that should be given no weight. *See Universal City Studios, Inc.,* 746 F.2d at 118 (excluding survey based on, among other things, its leading design; explaining that the "inquiry was an obvious leading question in that it suggested its own answer. The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations.")

Even with this leading design, Mr. Keegan's survey produced an unimpressive rate of confusion. *See Edison Bros. Stores, Inc. v. Cosmair, Inc*., 651 F. Supp. 1547, 1559 (S.D.N.Y. Jan. 7, 1987) (holding a net confusion level of 34% was not determinative of confusion because of flaws in the survey methodology)). This is consequential as Mr. Keegan's survey generated an even

---

Kudoboard for Business subpage that receives less than 1% of the traffic to the Kudoboard website.

1   lower net confusion of only 15.1%. Durham Decl. ¶2, Ex. 1 at ¶6. This minimal level of net
2   confusion despite the improper study design further highlights that the survey should be
3   inadmissible or at least can provide only minimal probative value that is "substantially outweighed
4   by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid.
5   403.

### B. Mr. Keegan's Opinion and Testimony In His Rebuttal Report Should be Excluded

#### 1. Mr. Keegan is Not a Qualified Linguist.

Mr. Keegan's rebuttal report of Dr. Eggington is a prototypical example of an expert opining outside his area of expertise. Mr. Keegan lacks the requisite knowledge to critique the linguistic opinions of the expert retained by Kudoboard.

When assessing expert testimony, the court "must determine whether the individual whose testimony is being proffered is an expert on the relevant topic." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (Daubert II). To do so, a court "must review and pass judgment on that person's background . . . [and] whether that specific background has provided the person with the kind of expertise that is necessary to support the giving of the proffered testimony." *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 395 (N.D. Cal. 1991).

Mr. Keegan cannot establish the expertise necessary to support his giving of the rebuttal opinion. Even if he were qualified in one field, it would not follow that the expert is qualified in another. *See Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1107 (N.D. Cal. 2016) (finding that although the purported expert had "specialized knowledge as a veterinarian," he had no "knowledge, skill, experience, training or education in areas of pet food manufacturing, testing, sampling, and control procedures," the court excluded his testimony as to pet food testing); *see also Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1019–20 (N.D. Cal. 2012) (determining that the epidemiologist focusing on public health was qualified to testify about several subjects including "the cigarette industry's knowledge regarding the risks of smoking," and "how a particular cigarette design might influence smoking behavior," but was not qualified to testify about "how to design cigarettes" or "whether the plaintiff could have avoided getting cancer if some

alternative design had been available").

Mr. Keegan's curriculum vitae does not list any relevant "knowledge, skill, experience, training, or education" in linguistics. Durham Decl. ¶2, Ex. 1 (Exhibit 1 thereto). To the contrary, Mr. Keegan has a Bachelor of Arts in history, a law degree, and is enrolled in a Principles of Market Research Program. *Id*. His curriculum vitae provides no linguistic experience, and his employment history similarly lacks any indication to demonstrate his qualifications as a linguist. *Id*.

Any doubts about his lack of qualifications were settled during his deposition. Mr. Keegan's testimony demonstrates that he lacks any qualifications in the field of linguistics:

> Q. Are you a linguist, sir?
> A. No.
> Q. Do you have a Ph.D. in linguistics?
> A. I do not.
> Q. Have you taken any courses in linguistics?
> A. No.
> Q. Do you hold any degrees in linguistics?
> A. No.
> Q. Do you have any certifications in linguistics?
> A. No.

Durham Decl. ¶5, Ex. 4 at 189:9-19.

Indeed, Mr. Keegan testified that he did not even know what the linguistic databases that Dr. Eggington relied on in his report were:

> Q. Do you know what corpora are? Corpora, like c-o-r-p-o-r-a?
> A. No.
> Q. Okay. Do you have any experience working with corpora?
> A. No.

*Id*. at 189:20-25.

Despite this lack of knowledge and experience in the field of linguistics, Mr. Keegan attempts to rebut the Defendants' expert linguistic opinion. While Mr. Keegan admits he has no

training in linguistics and does not know (1) what corpora[3] are, and (2) has no experience working with corpora, (*id.* at 189:20-25), he nevertheless criticizes Dr. Eggington for offering a qualitative search and analyzing databases, (Durham Decl. ¶4, Ex. 3 at ¶¶14, 25). Just as the court in *Lucido* excluded the expert from testifying on pet food manufacturing because he had no training, education or experience to provide opinions on pet food manufacturing, 217 F. Supp. 3d at 1107, here too, Mr. Keegan's rebuttal testimony should be excluded.

This is not the first time Mr. Keegan has attempted to provide testimony as an expert without establishing he has the proper qualifications. In *Warner Bros. Ent. v. Global Asylum, Inc.*, No. CV 12 - 9547 PSG (CWx), 2013 WL 12114836, at *7 (C.D. Cal. Jan. 29, 2013), *aff'd*, 544 F. App'x. 683 (9th Cir. 2013), the court excluded Mr. Keegan because he did not provide evidence sufficient "to establish that he is an expert in the field of consumer surveys," here, Mr. Keegan has failed to establish any expertise in linguistics.

Having absolutely no linguistic education, training or knowledge, the opinions offered in Mr. Keegan's Rebuttal Report and any related testimony should be excluded, as unreliable under Rule 702 and unduly prejudicial under Rule 403 because any probative value is substantially outweighed by its potential for unfair prejudice and the likelihood that it will confuse or mislead the trier of fact. *See* Fed. R. Evid. 403; *see Daubert*, 509 U.S. at 595 (permitting the exercise of greater control over experts when considering application of Rule 403). Because Mr. Keegan is not qualified as a linguist and because of the potential for unfair prejudice, the opinions in Mr. Keegan's Rebuttal Report and related testimony should be excluded in their entirety.

**2.  Mr. Keegan Seeks to Offer Many Opinions that Are Not Rebuttal Opinions, But Rather Attempts to Usurp the Role of the Jury.**

"Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D. N.J. 2004)

---

[3] As indicated by Dr. Eggington, "Corpus linguistics is the study of natural language behavior through the creation and analysis of large and searchable databases of a particular language," and "[i]n legal contexts, research using corpus linguistics provides a powerful tool to investigate ordinary meaning." Durham Decl. ¶3, Ex. 2 at ¶5 n.3. Corpora are large, searchable databases of language used by linguists to research language. *Id.* at ¶¶22–25.

1  (internal quotation marks and citations omitted). Experts may not offer legal opinions that invade
2  the role of the jury or the Court. *Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th Cir. 2013);
3  *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009). Under the Federal Rule of Evidence
4  702, "evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier
5  of fact to be admissible." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060
6  (9th Cir. 2008). An expert "should not be permitted to supplant the role of counsel in making
7  argument at trial, and the role of the jury in interpreting the evidence." *United States v. Pac. Gas
8  and Elec. Co.*, No. 14-cr-00175-THE, 2016 WL 1640462, at *2 (N.D. Cal. Apr. 26, 2016) (quoting
9  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004)). In Mr. Keegan's
10 rebuttal report, he attempts to do just that.

11    In Mr. Keegan's report, he repeatedly seeks to dismiss Dr. Eggington's work by comparing
12 it to survey evidence:

13 - "Consumer survey researchers follow the scientific method" and "generate[]
14   quantitative data." (Durham Decl. ¶4, Ex. 3 at ¶¶ 20–21);
15 - Dr. Eggington's report is "qualitative research," whose findings "cannot stand on
16   their own" and is "an unreliable basis for generalizing to a broad population" as
17   opposed to quantitative research. (*Id.* at ¶¶ 23–24);
18 - Dr. Eggington's report is not a "consumer research survey," which is "almost de
19   rigueur over genericness." (*Id.* at ¶¶ 29–30).

20   As mentioned above, Mr. Keegan has no experience with linguistics. He is comparing two
21 different fields of study without having any knowledge of one of the fields. Telling in his
22 deposition, he admits he has no "qualification to render an opinion as to whether a survey report is
23 more reliable than a linguistic study." Durham Decl. ¶5, Ex. 4 at 190:13–17. Yet in these
24 comparisons, that is precisely what Mr. Keegan attempts to do.

25   Moreover, in asserting such claims. Mr. Keegan seeks to "tell[] the jury what result to
26 reach," and as such, this opinion should be inadmissible. *See Nationwide*, 523 F.3d at 1060. In
27 comparing the efficacy of two different fields of analysis, Mr. Keegan greatly oversteps his role as
28 a rebuttal expert for a linguistics report. He is unqualified to assess a linguistics study, and he is

unqualified to opine on the legal import of two different fields of research.

For the foregoing reasons, including that Mr. Keegan is not qualified to assess a linguist's research and expert opinions, Mr. Keegan is unable to opine on the superiority of survey evidence over linguistic evidence, and he attempts to confuse the jury, Mr. Keegan's Rebuttal Report and related testimony should be excluded based on *Daubert* and Rules 403 and 702 of the Federal Rules of Evidence.

## V. CONCLUSION

For each of the reasons stated herein, Kudoboard respectfully requests that this Motion be granted, and that Mr. Keegan's survey evidence, opinions and testimony be excluded entirety.

Dated:  September 24, 2021

**DLA PIPER LLP (US)**

By: */s/ Gina L. Durham*
GINA L. DURHAM
COLIN STEELE
OSCAR M. OROZCO-BOTELLO

Attorneys for Defendants/Counterclaimants
Kudoboard, LLC and Aaron Rubens