BENJAMIN ASHUROV SBN 271716
bashurov@kb-ash.com
NEIL A. SMITH SBN 63777
nsmith@kb-ash.com
KYMBERLEIGH KORPUS SBN 217459
kkorpus@kb-ash.com
KB ASH LAW GROUP P.C.
2603 Camino Ramon, Suite 200
San Ramon, CA 94583
Telephone:     877.265.1476
Facsimile:     415.952.9325

*Attorneys for Plaintiff/Counterclaim-defendant*
KUDOS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **KUDOS, INC.**, an Alberta, Canada Corporation,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>**KUDOBOARD, LLC**, a Louisiana Limited Liability Company; **Aaron Rubens,** an individual residing in California,<br><br>　　　　　Defendants. | CASE NO. 3:20-cv-01876-SI<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO EXCLUDE REPORT AND OPINIONS OF PUTATIVE EXPERT WILLIAM EGGINGTON**<br><br>Hearing date: November 5, 2021<br>Time: 10am<br><br>Hon. Susan Y. Illston |
| **KUDOBOARD, LLC**, a Louisiana Limited Liability Company; **Aaron Rubens,** an individual residing in California,<br><br>　　　　　Counterclaimant,<br>　　v.<br><br>**KUDOS, INC.**, an Alberta, Canada Corporation,<br><br>　　　　　Counterclaim-defendant. | |

# <u>TABLE OF CONTENTS</u>

I.   BACKGROUND ............................................................................................. 1

   a.   Overview of Plaintiff's Claims and Defendants' Defenses and Counterclaim ...................... 1

   b.   Plaintiff's Motion for Summary Judgment ............................................... 2

   c.   Eggington's Proposed Opinions in this Case .............................................. 2

II.   ARGUMENT: EGGINGTON'S EXPERT REPORT MUST BE EXCLUDED ....................... 6

   a.   Legal Standard under Daubert ............................................................. 6

   b.   Eggington's Factual Foundation Is Insufficient and Unreliable ....................... 7

     i.   Eggington's Report Fails to Evaluate U.S. Consumer Perception ...................... 8

   c.   Eggington's "Methodology" Is Unreliable .............................................. 12

     i.   Eggington's Case -Specific Approach Is Unreliable .................................. 13

     ii.   Eggington's Approach Fails All of Daubert's Reliability Guideposts ................ 14

     iii.   Eggington's Self-Serving Conclusions Amount to Nothing More than Ipse Dixit Insufficient to Pass Daubert ....................... 16

     iv.   Eggington's Report Employed Unreliable "Controls" ............................... 17

   d.   Eggington's Proposed Opinions are Irrelevant and Lack Fit .......................... 18

     i.   Eggington's Definitional Framework is Legally Erroneous ........................... 19

     ii.   Eggington's Proposed Opinions are Inconsistent and Confusing ...................... 21

   e.   Eggington's Proposed Opinions are Not Helpful ....................................... 21

# TABLE OF AUTHORITIES

### CASES

*Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*, CV 10-3738 ABC (CWx), 2013 U.S. Dist. LEXIS 198591, at *8 (C.D. Cal. June 21, 2013)------------------------------------------------ 21

*Allgood v. Gen. Motors Corp.*, 2006 U.S. Dist. LEXIS 70764, at *33 (D. Ind. 2006) ----------------- 10

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999)------------------------------- 17

*Am. Gen. Life & Accident Ins. Co.* v. *Ward*, 530 F. Supp. 2d 1306, 1314 (N.D. Ga. 2008)----------- 16

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *5 (N.D. Cal. June 30, 2012)------------------------------------------------------------------------------------------------ 18

*Barber v. United Airlines*, 17 Fed. App'x 433, 437 (7th Cir. 2001) ------------------------------------- 10

*BBK Tobacco & Foods LLP v. Skunk Inc.*, No. CV-18-02332-PHX-JAT, 2020 WL 1285837, at *4 (D. Ariz. Mar. 18, 2020) ------------------------------------------------------------------------------------- 20

*Birge v. Dollar Gen. Corp.*, No. 04-2531 B/P, 2006 U.S. Dist. LEXIS 97195, at *40 (W.D. Tenn. Sept. 29, 2006) ------------------------------------------------------------------------------------------ 15, 17

*Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009)--------------------- 17

*Chapman v. Procter & Gamble Distrib., LLC*----------------------------------------------------------------- 17

*Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004). ----------------------------------------------- 11

*CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*, No. CIV-04-0651-F, 2006 WL 2054646, at *1 (W.D. Okla. July 24, 2006) --------------------------------------------------------------------------------- 19

*D. H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC,* No. 1:17-CV-3430-MHC, 2021 WL 2821679, at *8 (N.D. Ga. Mar. 2, 2021). ------------------------------------------------------------------ 22

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993) ----------------------------------------- 6, 15

*Eberli v. Cirrus Design Corp.,* 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009)-------------------------- 17

*Elliott v. Google, Inc.*, 860 F.3d 1151, 1159 (9th Cir. 2017) ------------------------------------------- 19

*Fed. Trade Comm'n v. Nat'l Urological Grp.,* No. 1:04-CV-3294- CAP, 2017 WL 6759868, at *41 (N.D. Ga. Oct. 10, 2017)------------------------------------------------------------------------------------- 17

*Feinberg v. Katz,* 2007 U.S. Dist. LEXIS 94967, at *14, 23-24 (S.D.N.Y. 2007)---------------------- 21

*FN Herstal, S.A. v. Clyde Armory, Inc.*, No. 3:12-CV-102, 2015 U.S. Dist. LEXIS 4310, at*39 (M.D. Ga. Jan. 8, 2015) ----------------------------------------------------------------------------------------------- 8

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)----------------------------------------------------- 15

*In re Apollo Grp. Inc.*, 527 F. Supp. 2d 957, 961 (D. Ariz. 2007).------------------------------- 13

*In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) ------------------------------------------------------------------------------------- 16

*In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 375 (Bankr. D. Del. 2006) --------------------------- 13

*J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 D.N.J. 2002) ---------------- 21

*James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA, 2009 U.S. Dist. LEXIS 14199, at *24-25 (D. Colo. Feb. 24, 2009). -------------------------------------------------------------- 7

*Joiner*, 522 U.S. at 146.------------------------------------------------------------------------------------- 16

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) -------------------------------------- 16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) -------------------------------------------- 6

*Lake Mich. Contractors, Inc. v. Manitowoc Co.*, 225 F. Supp. 2d 791, 802 (W.D. Mich. 2002). 13, 16

*Lantec, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816, at *27-28 (D. Utah 2001) ---------------- 14

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 U.S. Dist. LEXIS 4566, at *47 (S.D.N.Y. 2005) 14

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 645-46 (S.D.N.Y. 2016) ------------------------------------------------------------------------------------------------------------ 15

*Lyman v. St. Jude Med., Inc.*, 2008 U.S. Dist. LEXIS 42015, at *14-15 (E.D. Wisc. 2008) ---------- 11

*McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)------------------------------------------- 17

*Microstrategy Inc. v. Business Objects Americas, Inc.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005)-------- 7

*PODS Enters. v. U-Haul Int'l, Inc.*, No. 8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849, at *5 (M.D. Fla. Mar. 11, 2015).------------------------------------------------------------------------- 8, 16

*Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) --------- 7

*San Diego Comic Convention v. Dan Farr Prods.*, Case No. 14-cv-1865, 2017 U.S. Dist. LEXIS 147574, at *20 (S.D. Cal. Sept. 12, 2017) ------------------------------------------------- 7, 12, 15

*Stein v. Pacific Bell*, No. C 00-2915 SI, 2007 U.S. Dist. LEXIS 19193, at *33 (N.D. Cal. Mar. 19, 2007)------------------------------------------------------------------------------------------------------- 15

*United Co. v. Keenan*, 2007 U.S. Dist. LEXIS 88049, at *52 (W.D. Va. 2007) ------------------------ 14

*United States v. Fleet Mgmt. Ltd.*, 2008 U.S. Dist. LEXIS 34970, at *23 (E.D. Pa. 2008)------------ 13

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ------------------------------- 7, 12, 13

*United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)------------------------------------------ 12

Rules

Fed. R. Evid. 403 ---------------------------------------------------------------------------------------- 1

Fed. R. Evid. 702 ------------------------------------------------------------------------------- 1, 6, 14

Fed. R. Evid. 703 --------------------------------------------------------------------------------- 10

TREATISES

J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition, § 12:8 (4th ed.). -------- 19

## NOTICE OF MOTION AND MOTION

PLEAE TAKE NOTICE that on November 5, 2021 at 10am[1], plaintiff and counterclaim-defendant Kudos, Inc.  ("**Plaintiff**" or "**Kudos**") will and hereby do move for an order precluding defendants Kudoboard LLC and Aaron Rubens' (collectively "**Defendants**") putative expert witness William Eggington from testifying at trial or presenting evidence on the issue of the purported genericness of Plaintiff's asserted trademarks. His report and intended testimony do not meet the threshold of reliability required under Daubert, Fed. R. Evid. 702, and Fed. R. Evid. 403, as his reports would confuse, rather than help, the trier of fact, and result in prejudice to Defendants.

This motion ("**Motion**") is based upon this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the supporting declaration of Plaintiff's counsel Benjamin Ashurov ("**Ashurov Decl.**"), and all pleadings and papers on file in this action and such further evidence that may be submitted to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Eggington's short, unsupported, and results-driven report is too unreliable and unhelpful to be allowed anywhere near a courtroom. Accepting a report of this nature would undermine the Court's credibility as a gate keeper of "expert" opinions. For the reasons that follow, the Court must exclude Eggington' report and consequently his opinions.

## I.    BACKGROUND

### a.  Overview of Plaintiff's Claims and Defendants' Defenses and Counterclaim

This case involves a trademark dispute. Plaintiff has used and registered the mark KUDOS in connection with *inter alia* internet-based social networking software and employee engagement software. ECF No. 1, Ex. A. Plaintiff has asserted a number of federal registrations in support of its Lanham Act-based claims of trademark infringement against Defendants. ECF No. 1, *generally*.

---

[1] On October 29, 2021, a hearing in this action will be held in connection with the parties' respective summary judgment motions, ECF Nos. 61, 64, and in connection with Defendants' Motion to Exclude the Expert Witness Testimony of Plaintiff's expert witness Mark Keegan. ECF No. 67. Plaintiff consents to consolidating the hearing for this present motion with the same hearing scheduled for October 29, 2021.

Defendants deny infringing Plaintiff's KUDOS marks, and assert as an affirmative defense and counterclaim, that the marks are generic and are therefore afforded no protectible as trademarks. Defendants further contend the Court should cancel Plaintiff's federal registrations on the same grounds of genericness. ECF No. 24.

### b. Plaintiff's Motion for Summary Judgment

On September 24, 2021, Plaintiff moved for partial summary judgment on the issue of genericness (and unrelated to this motion, on the issue of laches). ECF No. 61. A court hearing is scheduled for October 29, 2021. *Id.* In the motion, Plaintiff contends that no issues of material fact exist with respect to the non-genericness of Plaintiff's KUDOS marks, and that the Court should find that Plaintiff's KUDOS marks are not generic as a matter of law. Defendants have disclosed an intention to rely on the expert witness report and opinions of Dr. William Eggington ("**Eggington**"), a putative linguistics expert in support of Defendants' allegations that Plaintiff's KUDOS marks are generic. Ashurov Decl., Ex. A ("**Eggington Report**"). For the reasons discussed hereinbelow, Eggington's Report should be excluded by the Court.

### c. Eggington's Proposed Opinions in this Case

With respect to the alleged genericness of Plaintiff's KUDOS mark, the "basic research question" Eggington purports to investigate is: "From a linguistics point of view, how valid is the assumption that KUDOS is recognized as a trademarked term associated with Kudos, Inc.?" Ashurov Decl., Ex. A, ¶15. Following his "study," Eggington concludes that "the terms KUDOS and KUDO are used by English speakers "generically[2]" without reference to any company, or third party. *Id.* ¶ 13. Eggington further opines that "it would be factually incorrect for Kudos, Inc. to argue that the commonly used terms KUDOS and KUDO is [sic] exclusively associated with Kudos, Inc." *Id.*

---

[2] As discussed hereinbelow, what Eggington's calls "generic" use is actually use in accordance with the common dictionary definition of the word "kudos," not "generic" use as the word "generic" is used in the context of trademark law – i.e., to refer to the name of a class or genus of products or services.

2

The Analysis and Discussion section of Eggington's Report starts by acknowledging that that "kudos" is a defined dictionary term. *Id.* ¶ 17 ("kudos" defined as (1) "glory, fame, or renown," or (2) to give praise, credit, or congratulations to "X."). The report proceeds to describe the "study" Eggington conducted. *Id.* ¶ 18-41. Notwithstanding that Plaintiff did not come into existence as a company until 2011, Eggington begins his "study" by conducting a search of the Corpus of Historical English. *Id.* ¶¶ 20-21. According to Eggington, "COHA contains more than 475 million words of text from the **1820s-2010s**. "*Id.* ¶ 20 (emphasis added). Eggington's COHA search for "kudos" purports to have returned 51 hits. Eggington's "examination" of the concordance lines for these 51 hits revealed, according to Eggington, "that none of these 'hits' refers to a third party company, business, or entity using KUDOS as designated referent." *Id.* Notably, Eggington's Report fails to disclose the COHA "hits" he reviewed. Eggington Report also fails to disclose or even analyze whether any of these 51 "hits" showed "kudos" used in a manner to describe the name of a class or genus of any product or service, including the goods or services offered by Plaintiff. *Id.*

After reviewing COHA hits for "kudos," Eggington proceeds to "review" search results for "kudos" from the Corpus of Contemporary American English (COCA). *Id.* ¶ 22. According to Eggington, "COCA is probably the most widely-used corpus of English . . . The corpus contains more than one billion words (25+ million words each year 1990-2019) from eight genres: spoken, fiction, popular magazines, newspapers, academic text, and (with the update in March 2020): TV and Movie subtitles, blogs, and other webpages." *Id.* ¶ 23. Eggington's COCA search for "kudos" returned 2,760 hits. Of these search results, he reviewed a random sample of only 200 and concluded that "[a] review of 200 lines revealed no association with Kudos, Inc. or any other third party or commercial activity involving KUDOS." *Id.* ¶ 24. Unlike with his COHA data, Eggington's report does disclose the COCA concordance lines he allegedly reviewed. *Id.*, Appdx. III. However, Eggington's Report again fails to offer an opinion as to whether "kudos" is used to refer to the class or genus of any particular good or service. Instead, his analysis stops with his opinion that his COCA review of "kudos" hits showed no "association with Plaintiff or any other commercial activity." *Id.*

Eggington's Report proceeds to discuss his review of "collocates," which are the words appearing "four words to the left" and "four words to the right" of "kudos" in the concordance lines he reviewed. *Id.* ¶ 25. Collocates he found associated with "kudos" include "deserve", "major" and "post." Eggington identifies no other collocates for "kudos." *Id.* ¶ 26. Yet, he concludes that [a]n examination of all of the collocates of KUDOS reveals no relation to any third party commercial company or anything like it." *Id.*

Eggington's Report proceeds to compare and contrast the COCA collocates he found for "kudos" with the COCA collocates he found for famous marks like MCDONALD'S and DELTA. *Id.* ¶ 27. According to Eggington, top COCA collocates for the search term "McDonald's" included "burgers," "food," and "eating;" and top COCA collocates "Delta" included "airlines," "flight," "river system," "university fraternity," and the scientific meaning of "delta." *Id.* ¶ 27. Based on this "data," Eggington concludes that "the fact that there are no collocates of KUDOS that exhibit a third party reference such as KUDOS INC. or KUDOBOARD supports the notion that KUDOS is a "generic" term. *Id.* ¶ 28.

Eggington's Report states that he obtained "similar" results by "accessing the iWeb corpus, "a corpus consisting of 95,000 systematically selected websites," and the GloWbe corpus, a corpus consisting of "1.9 billion" words from "national varieties of English such as American, British, Canadian, and Australian English" *Id.* ¶ 29. According to Eggington, "[a]n examination of collocates to KUDOS reveals no association to a commercial third party or anything like it." *Id.* However, Eggington's Report again does not even disclose what collocates he reviewed from iWeb or GloWBE before reaching his conclusion, and does not discuss what standard he used to measure a purported "association" or lack thereof.

Following a discussion of his corpora "studies," Eggington's Report proceeds to describe his review of uses of "kudos" in a "specialized corpora" generated from the website Reddit.com. *Id.* ¶¶ 30-35. Reddit is a "platform for users to post text, pictures, or videos and have discussions about any topic in forums known as subreddits." *Id.* ¶ 31. After selecting 20 individual "subreddits" in which to conduct searches for the search term "kudos," Eggington concludes that the "results revealed zero

association with any third-party entity with only a few returns associated with general business practices or the commercial domain." *Id.* ¶ 33. Again, Eggington's report does not disclose what collocates he reviewed from the 20 subreddits he searched, and does not discuss what standard he used to measure a purported "association" or lack thereof. Eggington's Report states he reached similar conclusions when he searched for the search term "kudos" in the "business" subreddit. *Id.* ¶ 34. Here, again, Eggington's Report fails to disclose what collocates he reviewed from the "business" subreddit and does not discuss what standard he used to measure a purported "association" or lack thereof.

Like he did with his COCA search results, Eggington proceeds to compare the Reddit search results he reviewed for "kudos" with the search Reddit results he reviewed for "McDonald's" and "Delta." *Id.* ¶ 35. Without disclosing in his report the data he actually reviewed with respect to his Reddit searches for "McDonald's" and "Delta," Eggington concludes that Reddit search results for "McDonald's" and "Delta" "indicated that the "linguistic behavior" (whatever that its) of DELTA and MCDONALD'S was similar to the results derived from the general corpora searches." *Id.* Eggington offers no other details about how the linguistic behavior in the Reddit search results he reviewed are "similar" to the corpora search results he reviewed. Following his "study" of search results for "kudos" on Reddit, Eggington's Report proceeds to discuss the "research" he conducted regarding uses of the hashtag #kudos on Facebook. *Id.* ¶¶ 36-38. To do so, he typed the hashtag #kudos into Facebook's search bar. His search allegedly returned 53,000 search results. *Id.* ¶ 36. Based on his "scan" of these search results, Eggington concluded that "[n]one of the Facebook posts showed any association with Plaintiff's company." *Id.* However, Eggington's "scan" somehow found a connection with another company called Kudos Inc.—an Indonesian talent agency. *Id.* This is despite the fact that this Indonesian company's Facebook page has only 19 followers, whereas Plaintiff's Facebook page has more than 4000 follows. Ashurov Decl., Ex. C.  Based on this "research," Eggington concluded that social media usage of the hashtag #kudos "supports the finding that KUDOS is a 'generic' term not associated with a specific third party." *Id.* ¶ 38. Eggington does not explain why his Facebook search consisted of a search for the hashtag #kudos, and not the search

*term* "kudos." Eggington's Report further does not explain why a hashtag on Facebook would be used in reference to any particular company, rather than in reference to the term's common meaning. Moreover, Eggington's "review" of these 53,000 Facebook hits was confined to a "scan" of about a "couple of hundred" hits during the course of one hour. Ashurov Decl., Ex. B, 172:14-173:6.

Following the "studies" described above, Eggington purports to "study" the use of "kudos" in the context of "employee recognition **schemes**." Ashurov Decl., Ex. A. ¶¶ 39-41. To create the universe for his "study" of "employee recognition schemes" Eggington relied on nothing more than 60 (mostly irrelevant) documents received from Defendant's counsel. *Id.* ¶ 39; Ex. B., 31:8-16. Eggington reviewed the set of documents he received from Defendants' counsel for uses of the word "kudos," and apparently found no association with Plaintiff's company. *Id.* ¶ 40. Based on this "research," Eggington concludes that analysis of his "Employee Recognition Corpus" supports the finding that "KUDOS is a 'generic' term not associated with a specific third party." *Id.* ¶ 41. A review of concordance lines from 60 documents Eggington reviewed as part of his "Employee Recognition Corpus" shows that he reviewed no documents that discuss Plaintiff at all. He reviewed no documents relating to Plaintiff's uses of KUDOS on its website or in any other advertising, no documents from product review websites that discuss Plaintiff's KUDOS brand software, no industry trade publications that discuss Plaintiff, and no other documents **at all** relating to Plaintiff. Ashurov Decl., Ex. B, 184:5-188:13.

## II.   ARGUMENT: EGGINGTON'S EXPERT REPORT MUST BE EXCLUDED

Eggington's Report and "study" of the alleged genericness of "kudos' makes a mockery of legitimate scientific research and should not be allowed anywhere near a courtroom. The report should be excluded for a number of independent reasons, each of which would be sufficient to exclude the report's discussion regarding the issue of genericness. Compounded, these reasons leave no doubt the report MUST be excluded.

### a.  Legal Standard under *Daubert*

A trial judge is charged with a gatekeeping duty to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*,

509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999). "The importance of Daubert's gatekeeping requirement cannot be overstated." *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004). "The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence." *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); see also Fed. R. Evid. 702.

### b. Eggington's Factual Foundation Is Insufficient and Unreliable

Consideration of Eggington's proposed testimony would give "the impression that his opinion is the product of some systematic collection of facts and data … when, in fact, the opposite is true." *James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA, 2009 U.S. Dist. LEXIS 14199, at *24-25 (D. Colo. Feb. 24, 2009). Eggington examined only a miniscule (and mostly irrelevant) subset of available data. His proposed testimony must therefore be excluded. *See, e.g., San Diego Comic Convention v. Dan Farr Prods.,* Case No. 14-cv-1865, 2017 U.S. Dist. LEXIS 147574, at *20 (S.D. Cal. Sept. 12, 2017) (excluding linguist whose opinions were unreliably drawn "from a narrow field of documents, most of which were provided to him by [retaining party]" because such data did not "accurately depict how consumers presently understand the phrase" at issue); *See James River Ins. Co.,* 2009 U.S. Dist. LEXIS 14199 at *21 ("A party's failure to support expert opinion with sufficient facts and data requires exclusion of the unsupported evidence."); *Microstrategy Inc. v. Business Objects Americas, Inc.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005) ("[The] pre-admission determination (i.e., whether or not enough factors have been considered to make an expert report sufficiently reliable) is committed to the sound discretion of the district court, not the jury.").

Based on the limited and filtered data that Eggington reviewed, Eggington concluded that "kudos" is a "generic" term because it is used on the internet in accordance with the term's ordinary dictionary meaning (e.g., "kudos to you for . . .") and that it is not "exclusively associated with Kudos, Inc.," Ashurov Decl., Ex. A ¶ 13. Even assuming that whether a term on the internet is used

1    in accordance with its ordinary dictionary meaning, or whether the term is exclusively associated

2    with Plaintiff, were the right litmus tests (they are not), Eggington's proposed opinions still could

3    not make it through *Daubert's* gate for the simple reason that he failed even to consider the many

4    uses of "KUDOS" as Plaintiff's trademark in the **most relevant contexts**, namely, in uses made by

5    Plaintiff, uses in industry trade organizations, uses by purchasers or prospective purchasers of

6    Plaintiff's goods and services, uses in industry product review websites, and uses in other industry

7    media publications. Ex. B, 184:5-188:13. Eggington ignored all of it. He did not even think a review

8    of use of "kudos" by competitors was relevant. Ex. B, 189:18-21.

9                    i.  Eggington's Report Fails to Evaluate U.S. Consumer Perception

10           The Lanham Act provides the test for genericness: "[t]he primary significance of the . . .

11   mark to the relevant public. . . shall be the test." See 15 U.S.C. § 1064(3). "The relevant public are

12   actual or potential purchasers of the goods in question." *See PODS Enters. v. U-Haul Int'l, Inc.*, No.

13   8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849, at *5 (M.D. Fla. Mar. 11, 2015). "When

14   determining how the public views the mark, courts should consider sources such as consumer

15   surveys, use of the mark in media publications, use of the mark by competitors in the industry, and

16   the trademark claimant's use of the mark." *See FN Herstal, S.A. v. Clyde Armory, Inc.*, No. 3:12-CV-

17   102, 2015 U.S. Dist. LEXIS 4310, at*39 (M.D. Ga. Jan. 8, 2015). Eggington considered none of

18   these. Disregarding these standards, Eggington's proposed opinions lend no insight into the primary

19   significance of the term "kudos" to **actual or potential purchasers** in the U.S. His corpora and

20   internet research was not confined to U.S. persons or consumers, and included information about

21   uses of "kudos" worldwide. Ashurov Decl., Ex. B, 68:7-73:23.  Moreover, Eggington did nothing to

22   measure the meaning of "kudos" to purchasers or potential purchasers of Plaintiff's goods and

23   services. *Id.*, 73:24-75:1.

24                   1.  *Eggington's COHA and COCA "research" fails to evaluate consumer
                          perception*

25
26           Eggington's COHA research offers no useful data or insight regarding purported genericness

27   of "kudos" in the relevant context. Eggington acknowledges that "kudos" is a word used as far back

28

                                                        8

as 1870. And despite the fact that Plaintiff has only been in business since 2011, Eggington conducted a search for "kudos" in the Corpus of Historical American English (COHA). COHA contains data from 1820s-2010s, and so it would defy logic for COHA to show an "association" of the search term "kudos" with Plaintiff's company. Of course, under these tortured conditions, there would be no doubt that historical use of the word "kudos" in accordance with the word's ordinary dictionary definition would appear more prominently than any uses of "kudos" in reference to Plaintiff. In fact, Eggington was not ever aware, and did not bother to look or consider when Plaintiff came into existence as a company. Ashurov Decl., Ex. B, 96:8-22. Eggington's fails to even identify in his report the COHA searches he bothered to review, and fails to address the issue of genericness because he fails to identify or discuss any COHA data that shows use of the term "kudos" generically – *i.e.,* as the name of a class or genus of any product or service.

Eggington's COCA "analysis" does not fare any better. COCA is a general corpus, and like COHA, it is completely detached from Plaintiff's industry, Plaintiff's goods or services, Plaintiff's purchasers or prospective purchasers, or any other relevant commercial contexts. Ashurov Decl., Ex. A ¶ 23. Furthermore, Eggington reviewed only 200 lines out of a total 2760 returned hits before concluding his review of "revealed no association with Kudos, Inc., or any other party or commercial activity involving KUDOS." *Id.* ¶ 24.

       2.  *Eggington's Reddit and Facebook "research" fails to evaluate consumer perception*

Eggington's Reddit and Facebook data yields and even less reliable factual foundation for the proposition that "kudos" is understood by purchasers or potential purchasers of Plaintiff's goods and services primarily generically – i.e., as the name of a class or genus of any products or services. Like his corpora "research," Eggington's Reddit and Facebook research is entirely divorced from any relevant commercial context. His report fails to even identify the data he allegedly "reviewed," and fails to identify the 20 subreddits from which he drew his data. Reddit is about as far of a relevant source as one can find. It is frequented by users worldwide that post about a wide variety of topics in a number of topic-based discussions forums called "subreddits." Reddit publishes subreddits about

9

irrelevant things like, for example, animals, sports, fashion, circumcision, and many other irrelevant subjects. Ashurov Decl., Ex. D. Eggington's review of the use of the hashtag #kudos is likewise completely irrelevant to the question at hand – whether purchasers and potential of Plaintiff's goods and services perceive "kudos" as the name of the genus or class of Plaintiff's goods and services. How does the fact that unknown users of Facebook use the hashtag #kudos offer any relevant insight here? It does not.

### 3. Eggington's "research" of employee recognition "schemes" fails to evaluate consumer perception

In his final bit of "research" regarding genericness, Eggington's Report appears to finally wade into an area that comes close to the relevant commercial context in this case. However, Eggington the attempt fails to accomplish what it sets out to do because it relies on an improper sampling of documents. Eggington report purports to "research" the use of "kudos" in the context of "employee recognition schemes." Ex. A, ¶¶ 39-41. His "research," however, relies on a sampling of documents that consists of nothing more than a cherry-picked selection made by Defendants' counsel. The documents Eggington used to create the "universe" for his study of "kudos" in the context of "employee recognition schemes" is so flawed that his opinions on the subject must be excluded. *Allgood v. Gen. Motors Corp.*, 2006 U.S. Dist. LEXIS 70764, at *33 (D. Ind. 2006) ("An expert's "choice in data sampling go[es] to the heart of his methodology."); *Barber v. United Airlines*, 17 Fed. App'x 433, 437 (7th Cir. 2001) ("[C]herry-pick[ing] . . . facts fails to satisfy the scientific method and Daubert.").

Eggington's review of documents from the Court's docket or discovery in this case was limited to (i) the complaint, and (ii) a biased and cherry picked subset of 60 documents compiled by Defendants' counsel. Ashurov Decl. Ex. B, 29:3-23. Eggington did not follow any checklist or protocol to gather information and there is no standard data that he requests. He did not even ask for any specific documents from counsel. *Id.*, 32:21-23. Even though extensive written discovery had been conducted, thousands of pages of documents had been produced, and numerous other witnesses were deposed, the only material in the record that Eggington reviewed, all of which was supplied by

Defendant's counsel, consisted of a copy of the Complaint and 60 internet printouts selected by Defendant's counsel. *Id.*, 29:3-32:1. Eggington did not review, and did not ask for, any deposition transcripts, any written discovery responses, any documents produced during discovery in this action other 60 documents selected by Defendant's counsel. *Id.* Other than purportedly having visited the webpages shown in the documents provided to him by Defendants' counsel to confirm they were printouts from real webpages, Eggington did nothing to confirm that the sampling of these 60 documents from the totality of the available evidence was representative or appropriate.

A putative expert may not offer opinions based "upon information spoonfed … by plaintiff's counsel." *See Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004). To permit an expert to act as "the mouthpiece" of a party by "allow[ing] him to offer testimony to a jury as to conclusions he has reached on the basis of [a] highly filtered version of events, is unacceptable." See *id.* at 546-47. Rather, an expert must "independently verif[y] the reliability of the data … as opposed to accepting it at the word of [party's] counsel" and "must base his opinions on facts and data "of a type reasonably relied upon by experts in the particular field in forming opinions … upon the subject." *See Lyman v. St. Jude Med., Inc*., 2008 U.S. Dist. LEXIS 42015, at *14-15 (E.D. Wisc. 2008); Fed. R. Evid. 703. Indeed, the set of 60 documents Defendants' counsel spoonfed to Eggington is not a representative sample of the uses of "kudos" in the context of Plaintiff's goods and services or the employee recognition space in general.  The biased (and mostly irrelevant) sample Eggington relied upon contained no evidence of Plaintiff's uses of the KUDOS marks, which show that Plaintiff uses KUDOS as a trademark; no evidence of Kudos's competitors, which show a dearth of use "kudos" by competitors in a generic manner – *i.e.,* as a category of a product or service; no evidence from any of number of available software review websites that contain hundreds of reviews from purchasers and users of Plaintiff's KUDOS-branded software, which show how *actual purchasers* understand and use KUDOS in the context of Plaintiff's goods and services; and no evidence from any relevant trade publications, industry trade groups, or business studies of Plaintiff's industry, all of which show numerous insightful highly relevant instances of KUDOS being used in reference to

11

1   Plaintiff as the source of Plaintiff's goods and services.  All of these types of evidence were

2   available to Eggington to review had he wanted to do so.[3]

3       Despite having excluded from his sampling any evidence relating to Plaintiff, Plaintiff's

4   goods and services, or third party documents that reference Plaintiff, Eggington starts with the

5   following premise: "[g]iven that plaintiff argues that their products have a strong presence in the

6   employee recognition domain, one would expect that a specific association to plaintiff's company

7   would appear in this context." Egg Rpt. ¶ 40. Having excluded from his sampling ALL

8   DOCUMENTS referencing Plaintiff, Plaintiff's goods and services, third party documents that

9   reference Plaintiff, or Plaintiff's use of its KUDOS marks in commerce, advertising, trade

10  publications, product review sites, and other documents from the relevant commercial context, **how**

11  **exactly could one expect to find *any* references to, let alone, an association with plaintiff??**

12  Having started with a set of documents that make no mention of Plaintiff, Plaintiff's goods or

13  services or Plaintiff's KUDOS marks, **it is utterly unsurprising** that Eggington found no

14  "association" with Plaintiff or its KUDOS marks in his review of this set of 60 documents received

15  from Defendants' counsel. In view of Eggington's reliance on an insufficient data in his "research"

16  of "kudos" in the employee recognition space, his opinions on the subject must be excluded. *See,*

17  *e.g., San Diego Comic Convention*, 2017 U.S. Dist. LEXIS 147574, at *20 (excluding linguist's

18  opinions on genericness where the expert relied on insufficient data and failed to address the

19  pertinent question of primary significance).

20          **c.   Eggington's "Methodology" Is Unreliable**

21          To meet its gatekeeping obligation, the trial court must "evaluate the reliability of the

22  testimony before allowing its admission[.]" *See Frazier*, 387 F.3d at 1262. The district court has

23  "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant

24  testimony is reliable." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and

---

26  [3] The evidence Plaintiff offered in support of motion for partial summary judgment identifies a wide
27  range of documents relevant to Plaintiff's use of KUDOS, or third party references to Plaintiff, its
    goods and services, and its KUDOS brand and mark. *See* ECF Nos. 61-62.

quotation omitted). "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison*, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. *Frazier*, 387 F.3d at 1261. Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and *Daubert* that proposed expert testimony must be based on "good grounds."

### i. Eggington's Case-Specific Approach Is Unreliable

"[W]hether the expert is proposing to testify about matters 'growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying'" is a "significant inquiry weighing on reliability." *In re Apollo Grp. Inc.*, 527 F. Supp. 2d 957, 961 (D. Ariz. 2007). "Reliance on an invented methodology that has not been generally accepted by experts in the field, standing alone, is sufficient to exclude [expert's] opinion." *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 375 (Bankr. D. Del. 2006). Expert opinions are unreliable if the expert "starts with his conclusion … and then works backward for reasons to explain this conclusion." *Lake Mich. Contractors, Inc. v. Manitowoc Co.*, 225 F. Supp. 2d 791, 802 (W.D. Mich. 2002).

Eggington did not employ any systematic approach to synthesize the incomplete information he bothered to review. Far from employing a step-wise analysis of whether a term is generic that would apply irrespective of the particular engagement, he took a case-specific approach through which he manipulated data to yield the conclusions he was paid to reach. This litigation-driven approach is antithetical to Daubert's fundamental teachings and renders his testimony inadmissible. *See, e.g., United States v. Fleet Mgmt. Ltd.*, 2008 U.S. Dist. LEXIS 34970, at *23 (E.D. Pa. 2008) (excluding expert who "approached his investigation with a particular conclusion in mind … and, without using any clearly-defined methodology, much less any intellectually rigorous analysis, he concluded that select facts and data could be interpreted to support that conclusion").

Eggington's "methodology" was designed specifically for this case. Ex. B., 93:8-20. Indeed, Eggington acknowledges there is no accepted methodology in linguistics for evaluating trademark genericness – *i.e.,* whether a term refers to a genus or class of any product. He also acknowledges there is no accepted authority setting forth a methodology for studying trademark genericness. *Id.*, 47:13-49:5; *see e.g., United Co. v. Keenan*, 2007 U.S. Dist. LEXIS 88049, at *52 (W.D. Va. 2007) (excluding expert where there was not "a single case in which an expert employed the methodology utilized by [the expert]" or "any scholarly work recognizing the methodology").

In view of an absence of an accepted methodology in the field of linguistics for studying trademark genericness, it is unsurprising that he relied on no accepted methodology in conducting his "study." He did not rely on an accepted methodology for selecting only 200 lines out of a total of 2760 available COCA concordance lines. Ashurov Decl., Ex. B, 116:6-117:9. He did not rely on an accepted methodology for selecting to review only 4 collocates for his searches (when as many as 9 can be reviewed). *Id.*, 118:22-119:22. He did not rely on any accepted methodology for measuring an "association." *Id.*, 44:6-15. He did not rely on any accepted methodology for selecting the number of corpora to review. *Id.*, 44:16-22. He did not rely on accepted methodology in selecting his controls of "McDonald's" and "Delta," other than the methodology of "assigning a control." *Id.*, 135:18-136:12.

In other instances, Eggington did not employ any methodology at all. *Id.*, 178:18-21. In creating the universe for his "employee recognition" corpus, his "methodology" was simply to rely on documents compiled by Defendants' counsel, and in doing so, Eggington ignored a plethora of documents that would have suggested a different conclusion. His methodology, which was "designed to avoid confronting self- interested theory with measurable facts" is "indefensible" and inadmissible. *See e.g., Lava Trading, Inc. v. Hartford Fire Ins. Co*., 2005 U.S. Dist. LEXIS 4566, at *47 (S.D.N.Y. 2005); *Lantec, Inc. v. Novell, Inc*., 2001 U.S. Dist. LEXIS 24816, at *27-28 (D. Utah 2001) (excluding expert who, "in effect, supplied a bottom line, but no more" and who was "clearly a hired gun and any semblance of objectivity is lacking").

      ii.   Eggington's Approach Fails All of *Daubert's* Reliability Guideposts

14

The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note. Rather, the trial court must consider factors such as testability, peer review and publication, and general acceptance. *Daubert*, 509 U.S. at 593-94. Putative expert opinions "connected by the *ipse dixit* of the expert" are inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "An expert's work is only admissible if it is 'reasoned, uses the methods of the discipline, and is founded on data.'" *Stein v. Pacific Bell*, No. C 00-2915 SI, 2007 U.S. Dist. LEXIS 19193, at *33 (N.D. Cal. Mar. 19, 2007) (internal citation omitted). These fundamental rules apply to linguistic no less than they do to experts in any other field. *See, e.g., San Diego Comic Convention*, 2017 U.S. Dist. LEXIS 147574, at *20 (excluding linguist whose "report fails to explain the reasoning or methodology behind his opinions" and "lacks an explanation as to … whether the linguistic tests and principles he employed have been used by others to determine genericness"). Eggington's work falls far short. *See, e.g., id.; Birge v. Dollar Gen. Corp*., No. 04-2531 B/P, 2006 U.S. Dist. LEXIS 97195, at *40 (W.D. Tenn. Sept. 29, 2006) (excluding expert whose "inability to cite to any standards in the [pertinent] industry to support his opinions renders [his] testimony unreliable").

Eggington's methodology fails *Daubert*. It is neither tested nor testable; it was developed in the context of and for the purpose of reaching opinions in this case; he extrapolated unreasonably from a one-sided subset of data while ignoring wholesale all of the readily-accessible data that undermines his pre-determined conclusions; there is no evidence that it has ever been recognized in the field of linguistics or known to produce reliable opinions as to genericness. There is no evidence that anyone – including Eggington himself – ever employed a methodology like the one he invented in this case. Courts do not hesitate to exclude experts under such circumstances. *See, e.g., LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,* 209 F. Supp. 3d 612, 645-46 (S.D.N.Y. 2016) (excluding expert who professed to apply "the tools and insights of, inter alia, semantics/linguistics" where expert's "methodology does not come close to withstanding scrutiny under Daubert"). Indeed, Eggington's case specific and litigation driven process is too nebulous even to permit a meaningful *Daubert* analysis, leaving no question that *Daubert's* reliability mandate cannot be satisfied. *See,*

*e.g., Am. Gen. Life & Accident Ins. Co.* v. *Ward*, 530 F. Supp. 2d 1306, 1314 (N.D. Ga. 2008) (excluding expert where there was no "identifiable 'methodology' to which the Court can apply the Daubert factors"); *Lake Mich. Contrs*., 225 F. Supp. 2d at 803 (excluding expert who could not "explain the methodological basis for his conclusions").

As noted above, there is a dearth of authority to support the reliability of the "methodology" Eggington applies. Nor is there any objective (or other) support for the conclusions Eggington proposes to extrapolate from his subjective review of corpora or internet search results. None of Eggington's other scattershot ideas fare any better because they all suffer from the core defect that "there is simply too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146. There is simply no credible authority to establish the reliability of Eggington's makeshift, case-by-case "method." Eggington "ignored data suggesting a contrary conclusion." *See PODS,* 2014 U.S. Dist. LEXIS 193895, at *10. This sort of advocacy is *Daubert's* raison d'etre. His proposed testimony is inadmissible. *See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert who "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion.").

### iii. Eggington's Self-Serving Conclusions Amount to Nothing More than *Ipse Dixit* Insufficient to Pass Daubert

As gatekeeper for the expert evidence presented to the jury, the judge "must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (citation and internal quotation marks omitted). It is "proper" and "necessary" for the trial judge "to focus on the reliability" of a proffered expert's "sources and methods." *Id*. at 1336. Under *Daubert*, the "district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Allison v. McGhan Med. Corp*., 184

F.3d 1300, 1316-17 (11th Cir. 1999) (citation and internal quotation marks omitted). *7; *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305-06 (11th Cir. 2014). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citation omitted).

Without any articulated methodology, Eggington's self-serving conclusions amount to nothing more than *ipse dixit* and this is insufficient to pass Daubert's reliability prong. Ex. B, 100:15-101:8, 113:18-115:13. Eggington's *ipse dixit* approach means his report must be excluded. *See Fed. Trade Comm'n v. Nat'l Urological Grp.,* No. 1:04-CV-3294- CAP, 2017 WL 6759868, at *41 (N.D. Ga. Oct. 10, 2017) (granting motion to exclude expert because "he failed to apply any reliable methodology in forming his opinions, instead relying on his own ipse dixit"); *Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) (*citing Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)) ("An expert's opinion testimony becomes inadmissible, however, where it is connected to existing data only by the *ipse dixit* of the expert."); *Eberli v. Cirrus Design Corp.,* 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009) (excluding expert testimony where the purported expert did not use "any specific technique or methodology").

Eggington's proposed testimony rests on nothing more than his subjective and untestable determination that the evidence he selectively reviewed supports his argument. *See e.g.,* Ashurov Decl., Ex. 55:11-23 ("You can ask me. I'm an authority on linguistics. That's why I'm here"); *id*., 111:6-18; *id*., 115:9-13. After categorically ignoring, dismissing, or torturing the only reasonable interpretation of all evidence against Defendants' position, Eggington's testimony boils down to nothing more than his subjective opinion that "kudos" is used "generically." In addition to usurping impermissibly the fact finder's role to weigh evidence (albeit based on a skewed universe of facts), Eggington's approach violates *Daubert's* prohibition of "trust me, I'm an expert" testimony. *See, e.g, Birge*, 2006 U.S. Dist. LEXIS 97195, at *40 (excluding say-so expert).

        iv.  Eggington's Report Employed Unreliable "Controls"

17

Eggington's selection and use of "McDonald's and Delta" as "controls" further undermine the reliability of his "study" and report. Relying on a wholly inappropriate control group may render an expert opinion so flawed as to be inadmissible. *See e.g., Apple, Inc. v. Samsung Elecs. Co*., No. 11-CV-01846-LHK, 2012 WL 2571332, at \*5 (N.D. Cal. June 30, 2012) (internal citation omitted). Eggington's Report fails to even identify the COCA data he reviewed with respect to McDonald's and Delta. Even if his report had disclosed the data he reviewed, the use of inadequate controls like "McDonald's" and "Delta" alone render his study unreliable.

Eggington did not use any methodology in selecting his control group, other than "the methodology of "assigning a control." Ashurov Decl., Ex. B, 134:24-135:12. He was not even aware of an authority that discusses selection of controls when assessing trademark genericness. *Id.* As a result, he did not review any treatises or authority relating to the subject. Ex. B, 136:8-15. He did not even consider any other controls. *Id.*, 136:16-25. The selection of an adequate control group is key to designing a reliable study, and poor controls undermine the reliability of a scientific study, as Eggington himself acknowledges. *Id.,* 137:23-138:2. Nevertheless, he proceeded to use poor controls like MCDONALD'S and DELTA. MCDONALD'S and DELTA are both world famous brands, as Eggington himself acknowledged. Ex. B, 125:8-10. Unlike "kudos," "McDonald's" is not a defined dictionary term. Ex. B, 126:3-6. To the extent "delta" has a dictionary definition, it is in the limited context of the Greek alphabet, science, or geography. Ashurov Decl., Ex. E.

Using a control group that consists solely of world famous brands which have been in existence for far longer than Plaintiff, and that either have no ordinary dictionary meaning or a far more obscure dictionary meaning than "kudos," renders Eggington's "study" unreliable. Of course, it would surprise no one that world famous brands like MCDONALD'S and DELTA would show up more prominently as brand names in COCA search results, Reddit searches, or Facebook searches, as compared to a fairly new and non-famous brand like KUDOS.

### d. Eggington's Proposed Opinions are Irrelevant and Lack Fit

"One of the most important aspects of the relevance evaluation is the question of 'fit.' In assessing 'fit,' the court must determine whether the 'expert testimony proffered in the case is

18

sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc*., No. CIV-04-0651-F, 2006 WL 2054646, at *1 (W.D. Okla. July 24, 2006) (internal citation omitted); *see also In re Apollo Group*., 527 F. Supp. 2d at 959-60.

i.  Eggington's Definitional Framework is Legally Erroneous

In designing and conducting his "study," which purports to evaluate the alleged "genericness" of the term "kudos" in the context of Plaintiff's goods and services, Eggington clearly misunderstood the meaning of "genericness" as it is used in the context of trademark law. His understanding and therefore his use of "generic" in his report referred to uses of "kudos" in accordance with the term's ordinary dictionary definition –not uses of "kudos" to describe the class or genus of any good or service, which is what "generic" means in the context of trademark law. Ex. B, 104:6-22; 134:11-17; 138:25-139:9; 143:23-144:8; 168:4-21; 183:20-184:4; 190:13-191:6.

Indeed, when confronted with the correct definition of "genericness" in the context of trademarks, namely, a term used to identify the class or type of particular goods and services, **Eggington confirmed that he found nothing in his research showing that "kudos" is used generically as the genus or class of Plaintiff's goods or services**. *Id.*, Ex. B, 123:10-24. In view of his misunderstanding of the meaning of "generic" as a term of art in trademark litigation, it appears Eggington believes that the number of times a word appears in corpora or internet searches in accordance with its plain dictionary definition, as compared to the number of times it appears in reference to a trademark, is determinative of true genericism. *Id*. Eggington is wrong.

That members of the general public may make causal non-trademark use of a "word" does not mean the same members would not view the word as a trademark in the context of purchasing or seeking to purchaser Plaintiff's goods and services. In other words, casual uses of "kudos" by the public tells us nothing about how the relevant public understand the word itself with respect to *Plaintiff's goods and services. Elliott v. Google, Inc*., 860 F.3d 1151, 1159 (9th Cir. 2017) (Even if we assume that the public uses the verb "google" in a generic and indiscriminate sense, this tells us nothing about how the public primarily understands the word itself, irrespective of its grammatical

19

function, with regard to internet search engines."). In binding precedent, the *Elliott* court rejected the notion that evidence of "majority usage" of a word in a non-trademark sense (as a verb) is insufficient to support a jury finding that a mark is generic. *Id.* Likewise, here, even if Eggington's "study" did not suffer from the many fatal flaws discussed herein, and it could be assumed that Eggington's sampling of data and subsequent methodology could pass muster under *Daubert*, evidence of majority usage by the public of "kudos" other than as a trademark cannot support an inference that KUDOS is primarily understood as the name of the genus or class of Plaintiff's goods or services. *BBK Tobacco & Foods LLP v. Skunk Inc.*, No. CV-18-02332-PHX-JAT, 2020 WL 1285837, at *4 (D. Ariz. Mar. 18, 2020) ("Skunk's arguments to the contrary—which heavily emphasize the consumer understanding component of genericness—fail to account for controlling Ninth Circuit precedent making clear that a trademark registration is not susceptible to a genericness challenge simply because it is the generic name for something; rather, it must be the generic name for the particular goods listed in the trademark registration.") (citing *Elliott*, 860 F.3d at 1159). Eggington's "research" does nothing to study or offer any insight into whether "kudos" is understood by purchasers or prospective purchasers of Plaintiff's goods or services as the generic name for the goods or services Plaintiff offers or has registered in connection with the mark KUDOS.

Eggington's proposed opinion is that "kudos" appeared more times in accordance with the term's common dictionary meaning than as a trademark in the material he reviewed. His opinion is irrelevant for the simple reason that "casual non-purchasing uses of terms are not evidence of generic usage. The analysis occurs at sale, thus precluding as evidence generic uses in other contexts." J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition, § 12:8 (4th ed.). When confronted with the idea that speakers that use "kudos" in casual conversation might still understand KUDOS as a mark in the purchasing context for Plaintiff's goods and services, Eggington stated had no response. Ex. B, 216:16-24.

Expert testimony based on a misunderstanding of the pertinent trademark definitions is subject to exclusion. *In J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369

D.N.J. 2002), for instance, the court excluded plaintiff's survey expert whose analysis was based on a fundamental misunderstanding of the definitions of the relevant classifications under trademark law. *See id.* Specifically, the *J&J* expert misunderstood a descriptive mark to be one that "bring[s] to mind a specific product, but [is] not the common way of referring to the product category." *See id*. at 371. Because the expert's opinions were not based on "the correct, recognized and binding definition of a descriptive term under trademark law," his resulting opinions were "completely untrustworthy and unreliable" and had "no relevance or bearing on whether the mark is descriptive under the proper legal definition of a descriptive mark." *See id*. at 370-71. The same is true here of Eggington.

ii.   Eggington's Proposed Opinions are Inconsistent and Confusing

Because Eggington's opinions depend on incorrect definitions, not only is his testimony irrelevant, but also it would confuse the issues with a legally-erroneous test. *See, e.g., Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*, CV 10-3738 ABC (CWx), 2013 U.S. Dist. LEXIS 198591, at \*8 (C.D. Cal. June 21, 2013) (excluding linguist who "compared the wrong things"); *Feinberg v. Katz,* 2007 U.S. Dist. LEXIS 94967, at \*14, 23-24 (S.D.N.Y. 2007) (excluding opinions that were irrelevant under governing substantive law).

**e.  Eggington's Proposed Opinions are Not Helpful**

Even if the Court were inclined to accept Eggington's corpora and internet search review and observation as a reliable methodology that withstands scrutiny under *Daubert*, Eggington's conclusions do not answer any questions relevant to the issue of the genericness of Plaintiff's KUDOS marks. Eggington's "study" does not evaluate whether "kudos" is used as the name of a genus or class of products or services. Instead, his "study" only looks at natural language uses of "kudos" and focus on uses of "kudos" casually in accordance with the term's dictionary meaning. *See e.g.,* Ashurov Decl., Ex. B, 104:8-22.

Absent any law that says that a dictionary defined word, which also happens to be used as part of a trademark, must be used more often in reference to the particular trademark as compared to uses of the word in accordance with its plain dictionary meaning, Eggington's conclusion that "kudos" is used more commonly in connection with its plain dictionary meaning than in reference to

any party's trademark, proves nothing in terms of whether "kudos" is generic in a context relevant to trademark law – i.*e.,* whether it used as the name of a genus or class of products or services. Eggington's conclusory opinions do not directly address the alleged genericness of "kudos." Accordingly, the Court should find that Eggington's opinion will not help the trier of fact assess whether "kudos" is generic. Indeed, Eggington's opinion is no more helpful than the dictionary definition for "kudos," which already identifies the most common uses of "kudos" in the English language. A dictionary definition is just that – an identification of the most common uses of the word in natural conversation in the English language. Indeed, dictionary definitions are developed using detailed and rigorous corpora research. Eggington's "study," at best creates a shoddy version of corpora research conducted by dictionary publishers when identifying definitions to include in their dictionaries.

To the extent Eggington even attempted, or could have attempted to conduct any case specific corpora research beyond what can be understood from reviewing the dictionary definition of "kudos," it would in research examining use of "kudos" in Plaintiff's trade or industry. However, Eggington did not do so, even in his "study" of uses of "kudos" in the context of "employee recognition schemes." For the reasons discussed above which make Eggington's study of "kudos" in the context of "employee recognition schemes" unreliable, his "study" is also unhelpful because by omitting from his sampling any documents that mention Plaintiff, or any documents relating to trade groups or trade publications from Plaintiff's industry, it fails to provide any helpful insight into the understanding of "kudos" by purchasers or prospective purchasers of Plaintiff's goods and services offered under the KUDOS brand. Courts do not hesitate to exclude such unhelpful putative expert witness opinions. *See e.g., D. H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC,* No. 1:17-CV-3430-MHC, 2021 WL 2821679, at *8 (N.D. Ga. Mar. 2, 2021). Likewise, Eggington's opinions on the issue of genericness should be excluded.

## III.    CONCLUSION

For the reasons discussed herein, Plaintiff respectfully requests that Court order the exclusion of Eggington's report and opinions on the issue of genericness.

22

Dated: October 1, 2021                    Respectfully submitted,

                                          **KB ASH LAW GROUP P.C.**

                                          By: __/s/ Benjamin Ashurov_____
                                          BENJAMIN ASHUROV
                                          bashurov@kb-ash.com
                                          NEIL A. SMITH
                                          nsmith@kb-ash.com
                                          KYMBERLEIGH KORPUS
                                          kkorpus@kb-ash.com

                                          *Attorneys for Plaintiff*
                                          KUDOS, INC.