BENJAMIN ASHUROV SBN 271716
bashurov@kb-ash.com
NEIL A. SMITH SBN 63777
nsmith@kb-ash.com
KYMBERLEIGH KORPUS SBN 217459
kkorpus@kb-ash.com
KB ASH LAW GROUP P.C.
2603 Camino Ramon, Suite 200
San Ramon, CA 94583
Telephone:    877.265.1476
Facsimile:    415.952.9325

*Attorneys for Plaintiff/Counterclaim-defendant*
KUDOS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **KUDOS, INC.**, an Alberta, Canada Corporation,<br><br>       Plaintiff,<br><br>  v.<br><br>**KUDOBOARD, LLC**, a Louisiana Limited Liability Company; **Aaron Rubens,** an individual residing in California,<br><br>       Defendants. | CASE NO. 3:20-cv-01876-SI<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE FROM MARK KEEGAN**<br><br>Hearing date: October 29, 2021<br>Time: 10am<br><br>Hon. Susan Y. Illston |
| **KUDOBOARD, LLC**, a Louisiana Limited Liability Company; **Aaron Rubens,** an individual residing in California,<br><br>       Counterclaimant,<br><br>  v.<br><br>**KUDOS, INC.**, an Alberta, Canada Corporation,<br><br>       Counterclaim-defendant. | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   LEGAL STANDARD ............................................................ 2

III.    ARGUMENT: MR. KEEGAN'S SURVEY STUDY, REPORT, AND OPINIONS ARE ADMISSIBLE........................................................................ 3

   a.   Defendants Concede that Mr. Keegan Is a Qualified Expert ................................... 3

   b.   Mr. Keegan's Survey Methodology Is Reliable ............................................... 4

   c.   Defendants' Failure to Conduct a Rebuttal Survey or Proffer Expert Testimony Is Fatal to Their Daubert Challenge. ........................................................................ 12

   d.   Mr. Keegan's Survey Design Is Reliable, and Defendants' Criticisms, at Most, Go to Weight and Not to Admissibility ............................................................... 12

      i.   Mr. Keegan Sampled an Appropriate Universe .............................................. 13

      ii.   Mr. Keegan's Survey Employed Appropriate Stimuli ..................................... 16

   e.   Mr. Keegan's Survey Speaks Directly to an Issue in Dispute ................................. 17

IV.   ARGUMENT: MR. KEEGAN'S REBUTTAL REPORT IS ADMISSIBLE....................... 17

   a.   Overview of Keegan's Rebuttal Report ....................................................... 18

   b.   Mr. Keegan's Rebuttal Report Is Admissible as a Rebuttal to Eggington ............................ 18

V.   CONCLUSION.................................................................... 20

i

# TABLE OF AUTHORITIES

## CASES

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc*., 944 F.2d 1446, 1455 (9th Cir. 1991) -------------------------------------------------------------------------------------- 16

*ACI Int'l. Inc. v. Adidas-Salomon AG,* 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005) -------------------- 15

*adidas-Am., Inc. v. Payless Shoesource, Inc*., 546 F. Supp. 2d 1029, 1058 (D. Or. 2008) ------------ 16

*Ava Enters. v. Audio Boss USA, Inc*., 77 U.S.P.Q.2d 1783, 1787 (T.T.A.B. 2006)--------------------- 12

*Aviva Sports, Inc. v. Fingerhut Direct Mktg.,* Inc., 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ------ 19

*Brookfield Communications Inc. v. West Coast Entertainment Corp*., 174 F.3d 1036, 1062 (9th Cir.1999) ------------------------------------------------------------------------------------------------ 16

*Campbell v. Garcia*, No. 3:13-CV-00627-LRH, 2015 WL 995244, at *2 (D. Nev. Mar. 6, 2015)--- 18

*Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1262 (9th Cir. 2001) ----------------------- 13

*Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir.2001) ---------------------- 3, 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) -------------------------------- 2, 4, 13

*E & J Gallo Winery*, 967 F.2d at 1292; *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988)). ------- 3, 13

*Exxon Corp. v. Tex. Motor Exch. of Hous., Inc*., 628 F.2d 500 (5th Cir. 1980) ------------------------ 11

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010)------------------------------------------------------------------------------------------------------- 3, 13

*Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc.,* 758 F. Supp. 512, 523-24 (E.D. Mo. 1991), aff'd 989 F.2d 985 (8th Cir. 1993) ------------------------------------------------------------------ 12

*Gross v. Bare Escentuals Beauty, Inc*., 641 F. Supp. 2d 175, 190-91 (S.D.N.Y. 2008) (finding confusion likely based on results of a Squirt survey) ----------------------------------------------- 11

*Hansen Beverage Co. v. Cytosport, Inc*., No. CV 09-0031-VBF(AGRX), 2009 WL 5104260, at *14-16 (C.D. Cal. Nov. 4, 2009) -------------------------------------------------------------------------- 11

*His & Her Corp. v. Shake-N-Go Fashion Inc*., No. 211CV05323CASVBKX, 2015 WL 13604255, at *4 (C.D. Cal. Apr. 6, 2015)-------------------------------------------------------------------------------- 12

*Humble Oil & Refining Co. v. Am. Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) ----------------------- 11

*James Burrough Ltd. v. Sign of Beefeater, Inc*., 540 F.2d 266, 279 (7th Cir. 1976)-------------------- 11

*Jockey Int'l, Inc. v. Burkard,* 185 U.S.P.Q. 201, 203 (S.D. Cal 1975) ---------------------------------- 11

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc*., 831 F. Supp. 123, 130-31 (S.D.N.Y. 1993)------ 11

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 119 S. Ct. 1167, 1169, 143 L. Ed. 2d 238 (1999) ------------------------------------------------------------------------------------------------------ 19

*Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) -------------------------------- 16

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 508 (S.D.N.Y. 2015) ----- 17

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 666 (S.D.N.Y. 2016), aff'd sub nom. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) ------------------------------------------------------------------------------------------------------ 16

*Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir.2006) ------------------------------------ 17

*Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) ----------------------------------- 11

*Nat'l Fin. Partners Corp. v. Paycom Software, In*c., No. 14 C 7424, 2015 WL 3633987, at *9 (N.D. Ill. June 10, 2015) ------------------------------------------------------------------------------------------ 11

*Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir.1982), cert. denied, 463 U.S. 1208, 103 S. Ct. 3538, 77 L.Ed.2d 1389 (1983) ------------------------------------------------- 13

*Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1216 (9th Cir. 2012) ----------------------------- 16

*Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 877 (D. Minn. 2010) --------------------- 11

*Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 (9th Cir.1997)------------------------- 3

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir.2001) ----- 13

*Superior Consulting Serv., Inc. v. Shaklee Corp.*, No. 6:16-cv-2001-Orl-31GJK, 2019 WL 913374, at *6 (M.D. Fla. Feb. 25, 2019) ---------------------------------------------------------------------------- 11

*Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153, 1162 (S.D. Cal. 2008)  19

*Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir.1997)------------------------------------------------- 3

*Whirlpool Props, Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) ----------------------------------------------------------------------------------------- 12

*Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove, Inc.*, No. CIV-S-02-0704, 2006 WL 5516883 (E.D. Cal. Dec. 11, 2006)-------------------------------------------------------------------------- 12

<u>STATUTES</u>

J. Thomas McCarthy, 6 *McCarthy on Trademarks and Unfair Competition* § 32:158 (5th ed. 2020) 2, 11

<u>OTHER AUTHORITIES</u>

Diamond, S. (2011). "*Reference Guide On Survey Research*," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 398 ------------------------- 4, 9

Shari Seidman Diamond, *Reference Guide to Survey Research* § 1, REFERENCE MANUAL ON
    SCIENTIFIC EVIDENCE (2007) ------------------------------------------------------------------------------ 4

Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd
    (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge
    University Press------------------------------------------------------------------------------------------- 9

<u>RULES</u>

Fed. R. Evid. 702).------------------------------------------------------------------------------------------------ 4

Federal Rule of Evidence 702------------------------------------------------------------------------------------ 2

*Nightlight Sys., Inc.*, 2007 WL 4563873, at *5 ------------------------------------------------------------ 4

Plaintiff and counterclaim-defendant Kudos, Inc.  (“**Plaintiff**” or “**Kudos**”) submits the following response in opposition to the Motion to Exclude Expert Report and Opinions of Mark Keegan (“**Defendants' Motion**”) filed by defendants Kudoboard LLC and Aaron Rubens' (collectively “**Defendants**”) (ECF No. 67).

This opposition (“**Opposition**”) to Defendants' Motion (“**Motion**”) is based upon this, the following Memorandum of Points and Authorities, the supporting declaration of Plaintiff's expert witness Mark Keegan (“**Keegan Decl**.”), the supporting declaration Plaintiff's counsel Benjamin Ashurov (“**Ashurov Decl**.”), and all pleadings and papers on file in this action and such further evidence that may be submitted to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Mark Keegan is a renowned expert in consumer behavior and consumer surveys who has testified as an expert in numerous trademark cases. In this case, Mr. Keegan conducted a generally accepted and “commonly used” likelihood of confusion survey that scientifically tested whether potential consumers exposed to Defendants' internet advertising for its “Kudoboard for Business” software product, as advertised on Kudoboard's website, created a likelihood of confusion with Plaintiff's KUDOS-branded software as advertised on Plaintiff's website. Mr. Keegan's survey proved that a gross of 49.9%, and a net 15.1% of such customers are likely to be, which Mr. Keegan noted was a “significant” level of confusion. This significant confusion rate comes as no surprise in light of other record evidence establishing extensive actual consumer confusion.

Defendants did not offer any survey evidence of their own, nor did they empirically test a single one of their novel criticisms of Mr. Keegan's survey. Having failed to do so, Defendants hope to convince the Court—through unsupported and unscientific attorney argument—that Mr. Keegan should not be permitted to testify. Defendants, however, appear to concede that (a) Mr. Keegan is a well-qualified consumer survey expert with a wealth of experience in conducting surveys, and (b) the long-established “Squirt” survey format he used has been routinely accepted by courts. Defendants' criticisms are substantively meritless. At most, however, they go to the proper weight to

1   be afforded to Mr. Keegan's survey, and not its admissibility. The Court should DENY Defendants'

2   Motion.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 permits "a witness who is qualified as an expert by knowledge,

skill, experience, training, or education" to testify if the testimony "will assist the trier of fact to

understand the evidence or to determine a fact in issue" and if (1) "the testimony is based upon

sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3)

"the expert has applied the principles and methods reliably to the facts of the case." *See also Daubert*

*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). "[R]ejection of expert testimony is the

exception rather than the rule." Fed. R. Evid. 702 (advisory committee's notes to 2000 amendment).

The "traditional and appropriate means of attacking" expert testimony is not exclusion, but through

"[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the

burden of proof." *Daubert*, 509 U.S. at 596.

Likelihood of confusion surveys are regularly admitted in trademark cases because such

disputes "turn largely on factual issues of customer perception." J. Thomas McCarthy, 6 *McCarthy

on Trademarks and Unfair Competition* § 32:158 (5th ed. 2020). Surveys, which directly test those

consumer perceptions, help alleviate "[t]he danger . . . that lawyers and judges will decide these

issues of perception by consulting their own personal viewpoint." *Id*. "[L]awyers and judges are in

most cases not representative at all of the reasonably prudent buyer for the goods and services in

question"—they are "too analytical, too likely to think the questions through logically." *Id*. The

ordinary customer, on the other hand, "is hurried, bombarded by hundreds of bits of advertising of

trademarks and often reacts emotionally and without deliberate scrutiny. The best way to tap into

that thought process is to question a representative sample—a survey of the target group." *Id*.

Because trademark surveys are so common, there is widespread consensus on the generally

accepted methodologies for conducting such surveys. "The usual rule is that a professionally

conducted survey that relates to the facts in issue will be admitted into evidence, with any

deficiencies or shortcomings serving to reduce the weight the survey is given." *Id*. The Ninth Circuit

2

follows this rule. "We have long held that survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010) (*citing Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir.1997); *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir.2001); *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 (9th Cir.1997); *E & J Gallo Winery*, 967 F.2d at 1292; *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988)). The Ninth Circuit has made clear that "technical inadequacies" in a survey, "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.* (*citing Keith*, 858 F.2d at 480; *Wendt*, 125 F.3d at 814 ("Challenges to survey methodology go to the weight given the survey, not its admissibility.")). Even if it were assumed that any of Defendants' criticisms of Mr. Keegan's work have any merit, they do not provide a basis for excluding Mr. Keegan's report and opinions. *Id.*

## III.    ARGUMENT: MR. KEEGAN'S SURVEY STUDY, REPORT, AND OPINIONS ARE ADMISSIBLE

### a.  Defendants Concede that Mr. Keegan Is a Qualified Expert

Mr. Keegan is a recognized expert in consumer behavior and consumer surveys. Keegan Decl., Ex. A, at Ex. 1. He is a principal at Keegan & Donato Consulting, a research and consulting firm specializing in marketing analysis, intellectual property, consumer survey research, damages analysis, forensic economic analysis, and related disciplines. *Id*. ¶ 1, Ex. A, ¶ 9. Keegan and Donato Consulting designs and executes methodologically sound consumer survey research studies and conducts objective evaluation of existing survey research as well as collaborates on a wide range of marketing and complex commercial litigation issues. *Id.* Mr. Keegan has designed and executed over 700 (indeed over 1000) consumer research studies reaching more than 250,000 respondents over the course of a two decade career. *Id.*, ¶ 1, Ex. A. He has testified as a survey expert in many trademark and intellectual property cases, including before other courts in this Circuit. *Id.*, ¶ 10. Defendants are silent as to Mr. Keegan's qualifications for his survey work, conceding he is "qualified as an expert

by knowledge, skill, experience, training, or education." *Daubert*, 509 U.S. at 588 (quoting Fed. R. Evid. 702). Defendants' Motion, *generally*.

### b. Mr. Keegan's Survey Methodology Is Reliable

"[O]ne of the focuses of inquiry regarding the reliability of a survey, and testimony related to such, is whether the survey was conducted in accordance with generally accepted survey principles." *Nightlight Sys., Inc.*, 2007 WL 4563873, at *5 (citing Shari Seidman Diamond, *Reference Guide to Survey Research* § 1, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2007)). Following generally accepted survey principles, Mr. Keegan designed and executed a survey that quantified the consumer confusion caused by Defendants' website advertising Defendants' Kudoboard for Business software. Keegan Decl., Ex. A, ¶¶ 15-24. Mr. Keegan's study employed a rigorous design using a test v. control format. *Id.*, Ex. A, ¶ 23 ("The test vs. control study design is used to determine the impact of a variable of interest above and beyond the baseline level of impact of extraneous variables in the marketplace.") (*citing* Diamond, S. (2011). "*Reference Guide On Survey Research*," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 398 ("By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus.")).

Mr. Keegan's survey utilized the well-established "Squirt" survey format. *Id.*, Ex. A, ¶ 24 ("Taking its name from the particular case in which it was first used, the Squirt format places respondents into a marketplace scenario by exposing respondents to stimuli showing the contested marks (often, and in this case, through sequential presentation), and measuring the extent to which consumers believe the products or services using the contested marks originate from the same or affiliated companies, thereby gauging consumer confusion.")

As is standard in such surveys, respondents were first presented with an image "depicting actual marketplace use of the plaintiff's branding on its website." *Id.*, Ex. A, ¶ 25.  Specifically, Mr. Keegan presented respondents with a screenshot of Plaintiff's website that, at the very top and center, displayed Plaintiff's KUDOS mark as shown below (image cropped to fit on page):

4



Next—and entirely consistent with the Squirt methodology—respondents were presented with an array of actual, real-world websites, including Defendants' website and websites from three unrelated companies (see below):








*Id.* Respondents were then again presented with image of Plaintiff's website, and then each of the four other websites, and were presented with a variety of questions to determine whether they mistakenly believe KUDOBOARD to be associated with KUDOS (discussed in detail below). *Id.*

Mr. Keegan presented respondents with a questionnaire comprised of a series of questions. *Id.*, Ex. A, ¶¶ 42-77. The questionnaire started with a set of "screener" questions, designed to obtain respondents' demographics, ensure appropriate attention from respondents, and qualify respondents to proceed to the substantive portion of the questionnaire – the "main questionnaire. *Id.*, Ex. A, ¶ 58.

7

For the "main questionnaire," respondents were first presented with images of Plaintiff's website, as shown above, and subsequently, with images of Defendants' website and the websites of the 3 controls, as shown above. While reviewing these webpages, respondents were asked to answer a series of questions designed to assess the likelihood of confusion between KUDOS and KUDOBOARD. *Id.*, Ex. A, ¶ 43-77. Respondents were also asked open-ended follow up questions to elicit additional information about their beliefs in providing their survey responses. *Id.*, Ex. A, ¶ 73.

This "sequential lineup survey is appropriate for this case and it simulates user experience that a user of employee recognition and engagement software would experience when searching for and purchasing or adopting the types of products that are sold by Kudos and Kudoboard." *Id.*, Ex. A, ¶ 26. "The sequential lineup format is therefore a reasonable approximation of the market environment in which the parties operate." *Id.*

Mr. Keegan's study employed rigorous controls. *Id.*, Ex. A, ¶¶ 27-31.  For his control, Mr. Keegan used the webpages of three unrelated third party companies in order "to measure the baseline level of consumer confusion within the marketplace that is not associated with trademark confusion," also known as "noise level." *Id.*, Ex. A, ¶ 27. In his study, "the noise level represents the extent to which consumers mistakenly believe that the non-infringing, third-party software company webpages are the same company or somehow affiliated with the plaintiff for reasons other than trademark similarity." *Id.* The controls used in the study all compete with the parties' respective software products, are marketed in similar ways, and operate in the online commerce space. *Id.*, Ex. A, ¶ 28. "The controls intentionally and appropriately control for numerous factors that could provide competing explanations for confusion among relevant consumers." *Id.*, Ex. A, ¶ 29.

Mr. Keegan used acceptable and standard ways to collect the data for his study, using respondents from the panels Dynata and Cint, both leading providers of "online sample for research projects in the U.S. and across the globe." *Id.*, Ex. A, ¶ 33. Dynata and Cint both utilize a "double opt-in" procedure to verify the respondent's identity and ensure their panels are populated by quality participants. *Id.*

The survey was programmed using an industry-leading online survey software platform and custom code integration. *Id*., Ex. A, ¶ 35. All survey programming was performed by Keegan & Donato Consulting. *Id.* The survey software facilitates the programming and execution of advanced survey designs, custom coding, complex skip logic, and advanced rotation and randomization of questions, answer options, and stimuli. *Id.* All such options were employed wherever appropriate. *Id*. The survey was designed for reliability confidence level of 95% and "all efforts were made to present the survey questions in an objective, unbiased, and nonleading format. *Id*., Ex. A, ¶¶ 36-37. Respondents were presented with a 'don't know' or 'no opinion' answer option wherever appropriate throughout the survey to minimize guessing." *Id*.

Mr. Keegan's study also employed randomization to further the study's reliability. *Id*., Ex A, ¶ 38 ("Randomization is an important tool that researchers use to minimize the potential for order bias (i.e., order effects) to impact the study's results. Order bias refers to a respondent's tendency to select the first answer in a given list of answer options regardless of the question content or answer the first question in a series of questions differently than later questions. In this study, randomization was used wherever possible to minimize the potential for order bias.") (*citing* Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240; and Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 396 ("To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level.")).

To further aid in the study's reliability, Mr. Keegan examined the final data to "ensure data integrity." *Id*., Ex. A, ¶ 39. To do so, Mr. Keegan examined the data to identify and filter out

"speeders," and low quality and nonsense responses. *Id*., Ex. A, ¶¶ 39-40. "To reduce the potential for undesirable respondents to participate in the study, the screening portion of the questionnaire employed security questions, including a CAPTCHA question to prevent bots and other automated respondents from participating in the study. Respondents who did not pass the security measures were not permitted to complete the survey." *Id*., Ex. A, ¶ 41. To further aid in the study's reliability, the study was conducted under "double blind" conditions. *Id*., Ex. A, ¶ 42 ("Double blind research is designed to prevent external or circumstantial bias from impacting the survey process and results.").

After gathering his data using the methodology disclosed in his report, Mr. Keegan reviewed the demographics and characteristics from the 381 respondents he surveyed, and concluded "the sample characteristics provide a high degree of confidence in the study sample and the responses elicited therefrom. *Id*., Ex. A, ¶ 81. The raw data obtained from the survey showed that "approximately half of all respondents 49.9 percent—indicated a belief that KUDOBOARD and KUDOS are the same company or are somehow affiliated." *Id*., Ex. A, ¶ 82. "Additionally, among those who indicated a belief that KUDOBOARD and KUDOS are the same company or are somehow affiliated, nearly half—44.7 percent—mentioned the name similarity between the two marks as a reason for their belief."  Following standard survey design practices, Mr. Keegan deducted the "average control measurement" and showed that a "net confusion measurement of 15.1%." *Id*. Ex. A, ¶ 86. On that basis, Mr. Keegan concluded that this net confusion level is "typically viewed as evidence of a likelihood of confusion among relevant consumers." *Id*.

The survey's results are reinforced by Mr. Keegan's review of the open-data from his study. *Id*., Ex. A, ¶ 87 ("As shown in Table 3 below, among those who indicated a belief that KUDOBOARD and KUDOS are the same company or are somehow affiliated (n=190), a total of 85, or 44.7 percent, cited the similarity of the marks as a reason for their response."). Based on his study, Mr. Keegan concluded with his scientific opinion that these "findings provide empirical evidence that the consumer confusion observed between KUDOBOARD and KUDOS is largely driven by the contested trademark issue being litigated in this matter—namely, the similarity of the defendants' name to the plaintiff's mark." *Id*.

10

Mr. Keegan's scientific opinion is consistent with case law, which has long recognized survey confusion rates as low as 10-15% as evidence of likely confusion. *See, e.g., Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (finding survey evidence showing 10% likelihood of confusion sufficient); *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc*., 628 F.2d 500 (5th Cir. 1980) (finding 15% probative); *James Burrough Ltd. v. Sign of Beefeater, Inc*., 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot agree that 15% is 'small.'"); *Humble Oil & Refining Co. v. Am. Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) ("The percentage figure varies from 11% [t]o as high as 49%. The lower figure itself is not an insignificant percentage."); *Jockey Int'l, Inc. v. Burkard,* 185 U.S.P.Q. 201, 203 (S.D. Cal 1975) (finding 11.4% sufficient); *Miles Labs. Inc. v. Naturally Vitamin Supplements, Inc.*, 1 U.S.P.Q.2d 1445, 1457 (T.T.A.B. 1986) ("[S]urveys disclosing likelihood of confusion ranging from 11% to 25% have been found significant."); 6 *McCarthy* § 32:188 (collecting cases).

Significantly, Defendants' Motion does not challenge the fact that the *Squirt* methodology is generally accepted as a reliable measure likelihood of confusion. Indeed, courts have accepted Squirt surveys many times. *See, e.g., Superior Consulting Serv., Inc. v. Shaklee Corp*., No. 6:16-cv-2001-Orl-31GJK, 2019 WL 913374, at *6 (M.D. Fla. Feb. 25, 2019) (finding Squirt survey method "credible and highly persuasive"), appeal filed, No. 19-10771 (11th Cir. 2019); *Nat'l Fin. Partners Corp. v. Paycom Software, In*c., No. 14 C 7424, 2015 WL 3633987, at *9 (N.D. Ill. June 10, 2015) (issuing preliminary injunction based in part on results of a Squirt survey); *Roederer v. J. Garcia Carrion, S.A*., 732 F. Supp. 2d 836, 877 (D. Minn. 2010) (finding confusion likely after bench trial based in part on results of a Squirt survey); *Hansen Beverage Co. v. Cytosport, Inc*., No. CV 09-0031-VBF(AGRX), 2009 WL 5104260, at *14-16 (C.D. Cal. Nov. 4, 2009) (issuing preliminary injunction based in part on results of a Squirt survey showing a net confusion rate of 12.5%); *Gross v. Bare Escentuals Beauty, Inc*., 641 F. Supp. 2d 175, 190-91 (S.D.N.Y. 2008) (finding confusion likely based on results of a Squirt survey); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc*., 831 F. Supp. 123, 130-31 (S.D.N.Y. 1993) (issuing preliminary injunction based in part on results of a Squirt survey); *Storck USA, L.P. v. Farley Candy Co*., 797 F. Supp. 1399, 1408-09 (N.D. Ill. 1992),

11

aff'd, 14 F.3d 311 (7th Cir. 1994) (issuing preliminary injunction based in part on results of a Squirt survey); *Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc.,* 758 F. Supp. 512, 523-24 (E.D. Mo. 1991), aff'd 989 F.2d 985 (8th Cir. 1993) (granting summary judgment based in part on results of a modified Squirt survey); *Ava Enters. v. Audio Boss USA, Inc.*, 77 U.S.P.Q.2d 1783, 1787 (T.T.A.B. 2006) (holding Squirt survey "strongly probative of a likelihood of confusion"). Instead of challenging Mr. Keegan's generally accepted survey methodology, Defendants nitpick technical issues that do not undermine the reliability of his study. Simply put, Defendants' criticisms do not justify exclusion of his testimony.

### c.   Defendants' Failure to Conduct a Rebuttal Survey or Proffer Expert Testimony Is Fatal to Their Daubert Challenge.

First and foremost, Defendants' motion should be denied because they failed to offer any empirical evidence showing that any of the purported "flaws" they assert improperly impacted the outcome of Mr. Keegan's survey. As one court explained:

> [T]he absence of competing survey evidence ... significantly undermines the efficacy of plaintiff['s] arguments that defendants' evidence is so unreliable that it must be excluded," as plaintiff's methodological criticisms "would have been substantially aided by proof that the 'correct' methodology would have led to a different result."

*His & Her Corp. v. Shake-N-Go Fashion Inc*., No. 211CV05323CASVBKX, 2015 WL 13604255, at *4 (C.D. Cal. Apr. 6, 2015) *(citing Whirlpool Props, Inc. v. LG Elecs. U.S.A., Inc*., No. 1:03 CV 414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006). Here, Defendants offer no empirical evidence to support their criticisms. Defendants' Motion consists of their counsel—who is not an expert in consumer behavior, survey methodology, or data analysis—lofting various arguments that are inadequate to support a Daubert motion. *See Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove, Inc*., No. CIV-S-02-0704, 2006 WL 5516883 (E.D. Cal. Dec. 11, 2006).

### d.  Mr. Keegan's Survey Design Is Reliable, and Defendants' Criticisms, at Most, Go to Weight and Not to Admissibility

Mr. Keegan's survey was designed in accordance with accepted standards. Keegan Decl., Ex. A, ¶ 81. Defendants do not generally criticize the overall design of Mr. Keegan's study. Rather, they

criticize certain technical issues they allege create "flaws" that undermine the reliability Mr.
Keegan's study.

Defendants first criticize the "universe" of Mr. Keegan's survey. Ninth Circuit law is clear,
however, that alleged flaws in a survey's universe "go to issues of methodology, survey design,
reliability, ... [and] critique of conclusions," and therefore "go to the weight of the survey rather than
its admissibility." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d
1025, 1038 (9th Cir. 2010) (*citing Clicks Billiards*, 251 F.3d at 1263; cf. *Daubert v. Merrell Dow
Pharms., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "Surveys in trademark
cases may be considered so long as they are conducted according to accepted principles." *Clicks
Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001) (*citing Stuhlbarg Int'l Sales
Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir.2001)). The Ninth Circuit has also
stated that surveys in trademark cases are to be admitted as long as they are conducted according to
accepted principles. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)
(*citing Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir.1982), cert. denied,
463 U.S. 1208, 103 S. Ct. 3538, 77 L.Ed.2d 1389 (1983)). "Technical unreliability goes to the
weight accorded a survey, not its admissability." *Id.*

Following the law in this Circuit, Defendants' criticisms of Mr. Keegan's "universe" simply
do not impact the survey's admissibility. For this reason alone, the Court should deny Defendants'
Motion, but even if Court were to entertain Defendants' critiques, they are meritless.

### i.   Mr. Keegan Sampled an Appropriate Universe

Defendants allege that, by including a screener question about respondents' uses of employee
recognition and engagement software, Mr. Keegan created a survey that does not test the perception
of relevant consumers, but rather focuses on "Plaintiff's users." Def's Mt. at 6-7.  Defendants'
criticism is without merit.

To arrive at an appropriate universe, one which targets the relevant universe of Defendants'
target consumers, Mr. Keegan presented potential respondents with a number of screener questions
about things like age, prior working experience, and prior uses of certain software products,

including one question about whether the respondents were users of "employee recognition and engagement software." Keegan Decl., Ex. A ¶¶ 51-52. Defendants present an excerpt from his deposition testimony that allegedly suggests that he focused on Plaintiff's target consumers instead of Defendants' target consumers. Defendant's Motion at 6 (suggesting Mr. Keegan testified his universe only captured Plaintiff's users). This is suggestion is false, which is evident when Mr. Keegan's deposition testimony is viewed in full context. Ashurov Decl., Ex. A, 47:17-48:2 ("the universe here of employees working at companies using employee recognition software is the universe that **Kudoboard is also seeking and targeting**") (emphasis added). Mr. Keegan's other testimony further confirms that he evaluated a number of relevant documents about Defendants before selecting the universe for his study. Ashurov Decl., Ex. A, 69:2-71:21.

A review of documents considered by Mr. Keegan, as well as other documents of record in this case, support his choice of universe and confirm that users and potential users of employee recognition and engagement software part of Defendants' target market. Keegan Decl., Ex. A, at Exhibit 2; *see also e.g.,* Ashurov Decl., Ex. C at 9 (Defendants stating in presentation to Plaintiff they may offer "additional employee recognition features."); *id.,* Exs. D-E (categorizing Kudoboard in the "employee recognition category); *id.,* Ex. F (email exchanges with consumers or potential consumers about Kudoboard's software being used for employee recognition purposes); *id.,* Ex. G (employee recognition beta advertisement sent by Kudoboard); *id.* Ex. F at KUDOBOARD02887 (discussing rolling Defendants' beta into its existing "Kudoboard for Business" product). Apart from these examples, the record is filled with numerous other documents and evidence demonstrating Defendants' activities in employee recognition and engagement space. Indeed, Defendants have acknowledged that 75% of Kudoboard uses are workplace related. Ashurov Decl. Ex. K at KUDOBOARD00114.

Users of employee recognition and engagement software are relevant to key issues in this case. Plaintiff specifically alleged in its Complaint Defendants' use of KUDOBOARD in connection with its "Kudoboard for Business" software product as a basis for Plaintiff's trademark claims. Complaint (ECF No. 1), ¶¶ 26-35. Furthermore, users of employee recognition software are not

14

outside of the scope of Defendants' target customers. Defendants acknowledge their customer base is very broad. Ashurov Decl., Ex. B, 183:3-13. Defendants acknowledge categorizing their software as employee recognition solutions on popular software review website like G2 and Capterra. Ashurov Decl., Ex. B, 159:1-22. Indeed, clicking "visit website" on Defendants' product pages in Capterra and G2 takes one to Defendants' "Kudoboard for Business" webpage – the very same webpage Mr. Keegan used as stimuli of Defendants' website in his study. Ashurov Decl., Exs. H-I. Defendants have acknowledged that "employee recognition" is an extremely broad term that encompasses users of Defendants' software, who are the types of users who would like for an employee social networking like Plaintiffs. Ashurov Decl., Ex. B, 85:16-24 (Rubens testified that Kudoboard's user traffic includes individuals looking for Plaintiff's goods and services), 118:6-15 (Rubens acknowledged "employee recognition" is a broad and discussed his use of the words "begin offering **additional** employee recognition features" in a pitch deck or presentation he sent to Plaintiff).

Defendants also complain that Mr. Keegan's inclusion of a screener question about "users," not "purchasers" of employee recognition and engagement software excluded relevant consumers from Mr. Keegan's study. However, there is nothing about Mr. Keegan's screener question that excluded potential purchasers of Defendants' customers or potential customers from participating in the study as long as they met the criteria of the screener questions. Moreover, users are relevant because they evidence post-sale confusion (use after purchasing). Plaintiff's arguments that users are not relevant to confusion is consistent with prior court decisions in this Circuit upholding the validity of post-sale confusion as a basis for asserting a trademark infringement claim. *See e.g., ACI Int'l. Inc. v. Adidas-Salomon AG,* 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005) (The law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act. Post-sale' confusion ... may be no less injurious to the trademark owner's reputation than confusion on the part of the purchaser at the time of sale." In addition, "use of another's trademark in a manner calculated 'to capture initial consumer

attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement. (internal quotation omitted) (*citing Brookfield Communications Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062 (9th Cir.1999)); *see also adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1058 (D. Or. 2008) (*citing Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (rejecting defendant's attempt to limit the confusion analysis to point-of-sale circumstances); *see also Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1455 (9th Cir. 1991) (reversing trial court for failure to consider post-sale confusion); *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1216 (9th Cir. 2012) (We explained that  the law in the Ninth Circuit is clear that 'post-purchase confusion,' i.e., confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act.) (internal citations and quotations omitted); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 666 (S.D.N.Y. 2016), aff'd sub nom. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) (recognizing initial-interest confusion and post-sale confusion are equally actionable) (internal citation and quotations omitted).

### ii.    Mr. Keegan's Survey Employed Appropriate Stimuli

Defendants complain that Mr. Keegan "failed to craft a study that would simulate how consumers might actually encounter the KUDOS and KUDOBOARD marks under marketplace conditions."  Defendants' Motion at 8. Specifically, Defendants complain that Mr. Keegan used a stimulus that showed respondents Plaintiff's home page. *Id*. However, according to Mr. Keegan, Plaintiff's website, and the other websites he used in his study replicated marketplace conditions. Ashurov Decl., Ex. A, 85:22-87:21. Mr. Keegan's approach is logically sound. It is not unreasonable to expect individuals comparison shopping among different employee recognition software solutions, **an internet based product advertised online**, to visit the websites of such software providers to review and compare information and marketing materials about the different types of available software.

Defendants also complain that Mr. Keegan "repeatedly sought to characterize the companies for respondents because the stimuli contained the following technical instructional statement: "*Shown below, in random order, are additional pages for companies offering employee recognition software and engagement softwar*e." Defendant's Motion at 8-9. This merely instructional statement does not create a leading survey. *See e.g., Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.,* 97 F. Supp. 3d 485, 508 (S.D.N.Y. 2015) (refusing to exclude survey that included technical on screen instructions). There is nothing in appropriate or leading including a technical instructional statement designed to provide respondents with basic technical instructions about survey components. *Id.*

Defendants criticize, briefly, Mr. Keegan's choice to use Defendants' Kudoboard for Business landing page, and not the landing page for Defendants' consumer facing product page, as the stimulus for Defendants' goods and services. Defendants' Motion at 8, fn 2. This criticism is without merit. The study purported to evaluate a likelihood of confusion measured from the perspective of visitors that visit Defendant's Kudoboard for Business website. This is the very website which users see after clicking on "Visit Website" button on Defendants' G2 and Capterra webpages. Ashurov Decl. Ex. H-I.

### e.   Mr. Keegan's Survey Speaks Directly to an Issue in Dispute

Mr. Keegan's survey specifically tests one of the allegations in the Complaint, *i.e.*, whether consumers are likely to be confused by Defendants' use of KUDOBOARD in connection with its Kudoboard for Business software as advertised on Defendants' website. As discussed above, Plaintiff's Complaint explicitly asserts Defendants' use of KUDOBOARD in connection with its Kudoboard for Business product. Accordingly, Mr. Keegan's study speaks to issues directly implicated in this action.

## IV.   ARGUMENT: MR. KEEGAN'S REBUTTAL REPORT IS ADMISSIBLE

"The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 749, 759 (8th Cir.2006) (internal citation omitted). "Rebuttal expert reports are proper if they contradict or rebut the subject matter of

the affirmative expert report." *Campbell v. Garcia*, No. 3:13-CV-00627-LRH, 2015 WL 995244, at *2 (D. Nev. Mar. 6, 2015) (internal citation omitted).

### a.  Overview of Keegan's Rebuttal Report

In addition to his affirmative expert report discussed above, Mr. Keegan also prepared a rebuttal report ("**Rebuttal Report**") rebutting the report and opinions of Defendants' putative linguistics expert William Eggington ("**Eggington**").  Keegan Decl., Ex. B; Ashurov Decl., Ex. J. According to Eggington's report, Eggington purported to have conducted a study evaluating the potential "genericness" of Plaintiff's KUDOS mark. Ashurov Decl., Ex. J, ¶ 44. Given Mr. Keegan's experience in consumer behavior studies, and his significant prior experience conducting studies to evaluate the potential genericness of disputed trademarks, Keegan Decl. ¶¶ 14-17, Mr. Keegan was asked by Plaintiff to review Eggington's report and provide a rebuttal report.

In his Rebuttal Report, Mr. Keegan explains, based on his experience in having conducted studies to evaluate the potential genericness of trademarks, that "the analyses presented in the Eggington Report are not valid or reliable evidence with regard to consumer understanding or perception of the terms KUDOS, KUDO, or KUDOBOARD." *Id.*, Ex. B, ¶ 7. Specifically, Mr. Keegan criticizes Eggington's study for: focusing on broad conversational uses of the term KUDOS; for failing to present *quantitative* evidence of genericness despite the existence of established means available to obtain quantitative evidence regarding a mark's alleged genericness; failing to present reliable evidence within the relevant market; seeking to establish a false hurdle with respect to the trademark protections afforded to Plaintiff's KUDOS mark, and providing incomplete reporting that is not methodologically transparent. *Id.*, at 3.

### b.  Mr. Keegan's Rebuttal Report Is Admissible as a Rebuttal to Eggington

Defendants contend Mr. Keegan's Rebuttal Report should be excluded for two reasons. First, Defendants argue that Mr. Keegan is not a qualified linguist. Defs' Mot. at 12. Second, Defendants argue that Mr. Keegan seeks to offer many opinions which are not rebuttal opinions, but rather attempts to usurp the role of the jury. *Id.* These criticisms are not valid, and they do not justify the exclusion of Mr. Keegan's Rebuttal Report and opinions.

Mr. Keegan does not purport to be an expert in linguistics. However, he is an expert in consumer behavior, and in the design and execution of studies that quantitatively study things like trademark genericness. Keegan Decl., Ex. A, at Exhibit 1; *id.* ¶¶ 15-17. As discussed above, Defendants have not challenged his qualifications in the area of consumer survey research. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 119 S. Ct. 1167, 1169, 143 L. Ed. 2d 238 (1999) ("Rule 702 does not distinguish between "scientific" knowledge and "technical" or "other specialized" knowledge, but makes clear that any such knowledge might become the subject of expert testimony"). It is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that establishes a standard of evidentiary reliability. *Id.* (internal quotation omitted). In view of his experience, education and training, Mr. Keegan's knowledge in the area of trademark genericness and the design and execution of quantitative studies measuring trademark genericness go to issues beyond the common knowledge of the average laymen, namely, trademark genericness and designs of studies to quantitatively measure trademark genericness. *See e.g., Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153, 1162 (S.D. Cal. 2008) (to qualify as an expert, a witness must have "knowledge, skill, experience, training, or education" relevant to such evidence or fact in issue, and "expert testimony must ... address an issue beyond the common knowledge of the average layman") (citing *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.2001), amended by 246 F.3d 1150 (9th Cir.2001). Accordingly, despite not having a linguistics background, Mr. Keegan's knowledge qualifies him to rebut opinions touching on trademark genericness and studies conducted to evaluated alleged trademark genericness.

Defendants also complain that Mr. Keegan's Rebuttal Report seeks to usurp the role of the jury. Defendants' Motion at 12. Eggington's report and opinions are that Plaintiff's KUDOS marks are generic. Mr. Keegan criticisms of the methodology, data, and principles Eggington used to arrive at his opinions regarding the purported genericness of KUDOS are valid subject matter in an expert rebuttal report and do not usurp the role of the jury. *See e.g., Aviva Sports, Inc. v. Fingerhut Direct Mktg.,* Inc., 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts'

reports. The Court finds that Manley's rebuttal experts sufficiently applied their expertise to the facts and methodologies used by each of Aviva's experts in forming their conclusions. Thus, their testimony is not unduly speculative. These experts' testimony will be helpful for the jury to weigh the evidence presented at trial."). Indeed, the opinions expressed in Mr. Keegan's Rebuttal Report would not supplant the role of the jury. Instead, they would help the jury understand Eggington's report and opinion in the proper context, and weigh his evidence accordingly.

**V.      CONCLUSION**

For the reasons discussed herein, Plaintiff respectfully requests that Court deny Defendants' motion seeking to exclude the reports and opinions of Plaintiff's expert witness Mark Keegan.

Dated: October 9, 2021                    Respectfully submitted,

                                          **KB ASH LAW GROUP P.C.**

                                          By: _/s/ Benjamin Ashurov_____
                                          BENJAMIN ASHUROV
                                          bashurov@kb-ash.com
                                          NEIL A. SMITH
                                          nsmith@kb-ash.com
                                          KYMBERLEIGH KORPUS
                                          kkorpus@kb-ash.com

                                          *Attorneys for Plaintiff*
                                          KUDOS, INC.