1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KUDOS INC,

           Plaintiff,

     v.

KUDOBOARD LLC, et al.,

           Defendants.

Case No. 20-cv-01876-SI

**ORDER RE: PENDING MOTIONS**

Re: Dkt. Nos. 61, 64, 67, 69, 63, 71, 75

On November 5, 2021, the Court heard oral argument on the parties' cross-motions for summary judgment on plaintiff's Seventh Affirmative Defense of latches, Dkt. No. 61 (Plaintiff's MSJ), Dkt. No. 64 (Defendant's MSJ); plaintiff's motion for summary judgment on defendant's Second Affirmative Defense and Counterclaim of cancellation based on genericness, Dkt. No. 61 (Plaintiff's MSJ); plaintiff's motion to exclude the opinions of defendant's linguistic expert Dr. Eggington, Dkt. No. 69 (Plaintiff's Motion to Exclude); and defendant's motion to exclude two reports prepared by plaintiff's consumer-confusion expert Mark Keegan. Dkt. No. 67 (Defendant's Motion to Exclude).

Having considered the papers and arguments made, the Court will DENY both parties' summary judgment motions on latches, GRANT IN PART plaintiff's motion for summary judgment as it pertains to cancellation based on genericness, GRANT IN PART plaintiff's motion to exclude the opinion of William Eggington, and GRANT IN PART and DENY IN PART defendant's Motion to Exclude Mark Keegan's evidence and testimony. The parties also filed various administrative motions to file under seal, Dkt. Nos. 63, 71, 75, which the Court GRANTS subject to the limited exceptions presented in the text accompanying footnotes 2 and 4 of this Order.

United States District Court
Northern District of California

## BACKGROUND[1]

### I.      The Parties

Plaintiff, Kudos, Inc. ("Kudos"), operates an internet-based software communication platform that enables users to exchange feedback and recognition with other users.  As Kudos puts it, the platform was founded on the idea that internet-based communications could be used to encourage positive interactions within businesses and other institutions.  Accordingly, Kudos considers itself a leader in the "employee recognition and rewards software" space.

The company owns various federally registered marks on the terms "kudos" and "kudo rewards."  On August 12, 2012, the U.S. Patent and Trademark Office issued a registered mark for "kudos" to plaintiff Kudos for "internet-based social networking services." Reg. 4,190,212.  Several additional registered marks for "kudos" followed: Reg. 4,641,604 ("computer application software…for use in the provision of recognition, feedback, and review of…employee, enterprise, product, and business performance"); Reg. 5,870,820 ("computer application software…for use in group collaboration in connection with an online social network…uploading and sharing digital files, use directories, photographs, images, videos, messages, emojis…publishing user profiles, blogs, image galleries, newsletters, public announcements, and invitations…preparing and publishing digital leader boards…generating, tracking, and reporting information, analytics, and statistics relating to employee performance, activity, and engagement"); Reg. 5,870,821 (similar to '820, but for "software as a service"); Reg. 4,224,053 ("peer-to-peer software in the field of an employee recognition and reward system that incorporates the allocation and collection of points…to drive corporate performance"); Reg. 4,284,697 ("a web site where users can post ratings, reviews and recommendations on employers and employees"); Reg. 4,725,421 ("software application…that enables internet users to submit comments of personal recognition and review"); Reg. 4,725,409 ("financial transaction services…providing secure commercial transaction and payments options").  Kudos also owns three registrations on the mark "kudos rewards":  Reg.

---

[1] The following is derived from the undisputed facts in the party's pleadings and responses.

4,534,578 ("arranging and conducting incentive awards program to promote the sale and use of software services in the field of performance review and recognition"); Reg. 4,725,411 ("financial transaction services…providing secure commercial transaction and payments options"); Reg. 4,725,423 ("computer software application…that enables internet users to submit comments of personal recognition and review").

Defendant, Kudoboard LLC ("Kudoboard"), is an online greeting card company that provides a platform for consumers to create and send digital or printed greeting cards. Aaron Rubens founded Kudoboard in 2015 and registered the Kudoboard.com domain name in February of that year. Kudoboard filed an application to register the Kudoboard mark in 2016 and received a USPTO registration on February 28, 2017 for "a website allowing users to create customized online group greeting cards." Reg. 5,152,792.

## II.     The Dispute

Kudos alleges it first became aware of Kudoboard in February 2019, when it saw Kudoboard listed alongside itself in the "employee recognition software" category of G2.com, a product review and recommendation website. One month later, Tom Short, a Kudos employee, received a LinkedIn message from Kudoboard's Aaron Rubens suggesting a potential collaboration. Upon request, Kudoboard later sent a "pitch deck" to Kudos so that Kudos could evaluate a potential acquisition. Nothing came of the interaction. Afterwards, Kudos' CEO Muni Boga informed Kudoboard that she believed it was infringing on the Kudos marks. On June 7, 2019, counsel for Kudos sent a letter to Kudoboard objecting to its continued use of the Kudoboard mark. A second letter to the same effect was sent on September 6, 2019. This lawsuit followed.

The Kudos complaint, filed on March 17, 2020, includes four claims against Kudoboard: (i) infringement of federally registered trademarks, 15 U.S.C. § 1114; (ii) false designation of origin and unfair competition, 15 U.S.C. § 1125(a); (iii) common law trademark infringement and unfair competition; and (iv) state statutory unfair competition, Cal. Bus. & Prof. Code § 17200 *et. seq*. Kudoboard filed its First Amended Answer and Counterclaims on September 3, 2020.

Most relevant to the pending motions now before the Court, Kudoboard alleges as its

United States District Court
Northern District of California

1
2
3
4

Seventh Affirmative Defense that plaintiff's claims are barred by the doctrine of latches. Also, defendant alleges as its Second Affirmative Defense and sole Counterclaim that the "kudos" marks registered as '488, '604, '053, '212, '697, '409, '411, '421, '423, '820, and '821 are generic and should be cancelled, 15 U.S.C. §§ 1064, 1119.

5
6
7
8
9
10
11
12

The parties have subsequently filed several motions that are now pending.  On September 24, 2021, plaintiff moved for partial summary judgment on defendant's Second Affirmative Defense and Counterclaim on cancellation based on genericness and defendant's Seventh Affirmative Defense of latches. Dkt. No. 61. That same day, defendant also moved for summary judgment on latches. Dkt. No. 64. On October 10, 2021, defendant moved to exclude evidence and testimony from plaintiff expert Mark Keegan. Dkt. No. 67. And that same day, plaintiff moved to exclude the report and opinions of defendant expert William Eggington as pertaining to genericness. Dkt. No. 69. The Court held a consolidated hearing on November 5, 2021.

13
14

**DISCUSSION**

15

**I.    Cross-Motions for Summary Judgment on Latches**

16
17
18
19
20
21
22
23
24
25
26
27
28

Both parties move for summary judgment on whether plaintiff's claims are barred by latches. Dkt. No. 61 (Plaintiff's MSJ); Dkt. No. 64 (Defendant's MSJ).  A Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burdens of production and persuasion. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). If the movant meets its initial burden, the opposing party must go beyond the pleadings and "by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). The Court cannot weigh conflicting evidence, and all justifiable inferences must be drawn in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When parties submit cross-motions for summary judgment, "each motion must be considered on its own merits" by reviewing "the evidence submitted in support of each cross-motion." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### 1.      Legal Framework for Latches

In trademark law, latches imposes an equitable time limitation on infringement lawsuits when the party asserting the trademark right "had ample opportunity to discover [and enjoin] the defendant's activities before defendant developed a substantial business" but failed to do so.  *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).  The burden is on the party asserting latches to "show it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit."  *Jarrow Formulas, Inc., v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  Although latches is an equitable defense separate from statute of limitations, Courts may presume that latches applies when a suit is brought outside of "the limitations period for [an] analogous action at law."  *Id.* at 838; *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018).  Conversely, if "the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable.  *Jarrow Formulas*, 304 F.3d at 835.

The Court's analysis thus begins with the applicable limitations period. Here, defendant urges the Court to apply a two-year statute of limitations to plaintiff's lawsuit, rendering latches presumptively applicable.  Defendant cites to the California Supreme Court's decision in *Mission Imports, Inc. v. Superior Ct.* for the proposition that "[a]n action for trademark infringement sounds in tort." 31 Cal. 3d 921, 931 (1982).  Based on this statement, defendant reasons that, as with other actions "sounding in tort," plaintiff's claims are subject to the two-year statute of limitations contained in Ca. Civ. Proc. Code § 339, not the four-year catch-all in § 343.  In response, plaintiff cites to *Kiva Health Brands LLC v. Kiva Brands Inc.*, in which a federal district court decided to "follow the weight of the authority in the Circuit and hold that the most analogous California law for... Lanham Act claims is California's trademark infringement statute, which carries with it a four-year limitations period."  439 F. Supp. 3d 1185, 1194 (N.D. Cal. 2020).  Admittedly, in the underlying cases cited by *Kiva Health*, the parties stipulated to a four-year period. However, in those cases, the Ninth Circuit also indicated that a four-year limitations period was nonetheless appropriate. *See id., citing Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 n. 2 (9th Cir. 2009) ("Neither party disputes the imputation of the four-year limitations period from California trademark infringement law, and we agree that this was the correct period to

use."), and *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) ("Lanham Act claims are governed by the analogous state statute of limitations, which in this case are state trademark infringement and dilution claims under Cal. Bus. & Prof. Code §§ 14330 and 14335. Therefore, the statute of limitations for all of Plaintiffs' eleven causes of action is four years."). Accordingly, the Court will follow the guidance of the Ninth Circuit and incorporate a four-year limitations period.

Latches will presumptively apply if plaintiff brought its case four years after possessing actual or constructive knowledge of defendant's infringing use. See *Jarrow*, 304 F.3d at 838. Even if latches presumptively applies, however, the Court will still need to ascertain whether plaintiff's delay was reasonable and whether defendant was prejudiced by the delay. *Jarrow*, 304 F.3d at 835.

As explained further below, there are disputed issues of material fact on (1) when plaintiff should be charged with constructive knowledge, and (2) the reasonability of the delay, as to deny defendant's and plaintiff's respective motions for summary judgment. Thus, the Court need not reach the issue of prejudice.

### 2.    Length of Delay and Constructive Knowledge

Courts measure the length of the delay "from the time the plaintiff knew or should have known about its potential cause of action." *Jarrow*, 304 F.3d at 838. The latter type of awareness, properly referred to as constructive knowledge, is "judged from an objective reasonable person standard," *Fitbug,* 78 F. Supp. 3d at 1186, and charges a trademark owner "with the information it might have received had due inquiry been made." *Saul Zaentz Co. v. Wozniak Travel, Inc*., 627 F. Supp. 2d 1096, 1110 (N.D. Cal. 2008). A trademark holder is "not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer," but reasonable diligence is expected. *Id.*

Neither party disputes that plaintiff lacked "actual knowledge" until February 2019, when it saw Kudoboard listed on the G2.com website as a competitor. Rather, defendant insists that plaintiff had constructive knowledge for many years prior to filing suit because (i) defendant had a notable internet and media presence as early as 2015, including a web URL, social media profiles, and news

coverage, Dkt. Nos. 65-3 ¶ 11, 65-5; 65-6; 65-9, 65-12 at 2-3; (ii) defendant registered its mark with the USTPO in 2016, Dkt. No. 65-3; and (iii) plaintiff had a robust system in place for monitoring and litigating potentially infringing marks throughout this period.  Plaintiff concedes that it

> has used a variety of way to identify potential infringers including using an electronic watch services designed to alert Kudos to third party trademark applications seeking to register KUDOS and KUDO-containing trademarks; periodic human review of internet websites that review software services like G2 and Capterra; periodic human review of internet websites using search databases like Google search; periodic human review of the USPTO's digital database of trademark applications and registrations; and periodic human reviews of instances of actual confusion that become known to Kudos employees or agents. Since 2015, generally there have been no material changes in the types of activities undertaken by Plaintiff to identify potential third-party infringers, other than the fact that Plaintiff did not make use of automated trademark watch services until around September of 2017.

Dkt. No. 66-9 at 4.  Plaintiff also declares that it "began using a trademark watch service in September of 2017, and so [it] had no trademark watch service that could have alerted [it] to the publication or registration of Defendant's application."  Dkt. 74-2 ¶ 8.

Accordingly, there exists a material dispute as to *when* plaintiff should have known about defendant's potentially infringing uses, given its enforcement policy and defendant's public presence and federally registered mark. The facts here are unlike those in *Saul Zaentz,* where defendant's company was featured on national media (including two Oprah Winfrey show appearances) and plaintiff possessed search reports prepared by counsel that repeatedly named plaintiff as a potential infringer.  627 F. Supp. 2d at 1112.  The question whether local media appearances (even in an online age) would have put an objectively reasonably diligent trademark holder on constructive notice is a disputed question of fact.  Further, even granting that plaintiff did not have a trademark watch service until 2017, the fact that plaintiff pursued other users of "kudo" and "kudos" before that date raises a factual issue of whether it should have detected Kudoboard with its existing policing efforts.  Accordingly, defendant's motion for summary judgment fails to establish the lack of a genuinely disputed material fact on an essential element of latches.

///

United States District Court
Northern District of California

### 3. Reasonableness of Delay

Courts determine whether a delay was reasonable by evaluating a plaintiff's "legitimate excuses" and comparing the delay to the time allotted by an analogous limitations period. *Jarrow*, 304 F.3d at 839. For example, the Ninth Circuit in *Jarrow* affirmed the district court's conclusion that delay was unreasonable where the plaintiff waited seven years to file suit—more than "double the time available to file suit under the analogous limitations period." *Id.* The Ninth Circuit also affirmed the district court's finding that plaintiff's excuse was invalid where it could have easily made alternative arrangements to obtain the evidence it needed to file suit. *Id.* at 839. In addition to considering potential excuses, courts may also balance the six equitable factors set forth in *E-Systems:* (i) strength and value of trademark rights asserted; (ii) plaintiff's diligence in enforcing mark; (iii) harm to senior user if relief denied; (iv) good faith ignorance by junior user; (v) competition between senior and junior users; and (vi) extent of harm suffered by junior user because of senior user's delay. 720 F.2d at 607.

Assuming the Court could fix the length of delay, plaintiff fails to establish a factually undisputed excuse that would render its delay reasonable as a matter of law. It is true that if the four-year limitations period applies and the earliest plaintiff could have known of defendant was in 2016 (when defendant filed the Kudoboard registration), then the delay would not be *presumptively* unreasonable because the case was filed within the four-year period. But that does not resolve the matter; defendant could rebut the presumption by pointing to evidence directed at the equitable *E-Systems* factors. For example, defendant asserts that it has used the mark in good faith, as evidenced by its open and obvious use coupled with its USPTO filings. (To which plaintiff disagrees, arguing that in 2016, defendant signed up for a free trial of Kudos and then "pursued a switch in strategy to pursue the enterprise or employee recognition markets." Dkt. No. 74-12, Ex. C.). Defendant could also argue that it is not in competition with plaintiff because Kudoboard is in the business of digital greeting cards, and Kudos is not. Dkt. No 64 at 22. (To which plaintiff disagrees, arguing that both parties offer services "associated with providing employee appreciation, increasing employee happiness and engagement, boosting and morale, and building team culture." Dkt. No. 74 at 15). These areas of factual contestation preclude a legal finding that plaintiff was reasonable in filing

suit given the length of delay.  The Court is not permitted to weigh conflicting evidence to settle disputed facts. Accordingly, plaintiff's motion for summary judgment fails to establish the lack of a genuinely disputed material fact on an essential element of latches, namely, the reasonableness of delay.

Because the Court finds disputed issues of fact as to the length and reasonableness of delay, the Court need not consider the final element of latches: prejudice to the defendant.  Both parties' motions for summary judgment on latches are denied.

## II.     Plaintiff's Motion for Summary Judgment on Genericness

Plaintiff moves for summary judgment on defendant's Second Affirmative Defense and Counterclaim of trademark cancellation based on genericness.  Dkt. No. 61 (Plaintiff's Motion). Summary judgment should be granted when the record, read in the light most favorable to the non-movant, indicates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 447 U.S. 317 (1986). Usually, the moving party bears the initial burdens of production and persuasion.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos*., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  But because federally registered marks are entitled to a "presumption of validity," when petitioning for cancellation of registered marks, the burden automatically shifts to the non-movant to demonstrate that the "marks do not deserve protection."  *Threshold Enterprises Ltd. v. Pressed Juicery, Inc*., 445 F. Supp. 3d 139, 148 (N.D. Cal. 2020).  Accordingly, defendant must go beyond the pleadings and "by its own evidence set forth specific facts showing that there is a genuine issue for trial" on whether the "kudos" mark is generic.  *Far Out Productions,* 247 F.3d at 997.

### 1.     Legal Standard for Genericness

Generic marks are not protectable.  *Elliott v. Google, Inc*., 860 F.3d 1151, 1155 (9th Cir. 2017).  A mark becomes generic "when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source."  *Id*.  For example, ASPRIN, CELLOPHANE, and ESCALATOR were once protectable marks that were "primarily understood"

by consumers as identifying the *source* rather than the type of product (i.e., Bayer's Aspirin Medication, DuPont's Cellophane Wrap, Otis Elevator Company's Escalator). *Elliott,* 860 F.3d at 1156. These marks lost their protection when consumers began using the marks not to name the particular trademarked good, but to name the broader "class" of goods to which the trademarked goods belonged as "particular…exemplification[s]." *United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2304 (2020).

In a recent case involving Booking.com, the Supreme Court framed the genericness inquiry as whether the "Booking.com" mark, "taken as a whole, signifies to consumers the class of online hotel-reservation services" rather than one exemplification of a hotel-reservation service. *Id.* The court explained that if "Booking.com" were generic, we might expect a potential consumer "searching for a trusted source of online hotel-reservation services, could ask a frequent traveler to name her favorite 'Booking.com' provider." *Id.* Accordingly, the Court will follow a two-step process to evaluate claims of genericness: (i) identify the "class of goods" in which the trademarked good is but one exemplification, and (ii) analyze whether the relevant consuming public primary perceives of the mark as referring to the *particular* good or to the *class* of goods. See *Threshold Enterprises*, 445 F. Supp. 3d at 148, citing *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). See also *Elliott*, 860 F.3d at 1156 (framing the genericness inquiry as "whether the primary significance of the word 'google' to the relevant public is as a generic name for internet search engines, or as a mark identifying the Google search engine in particular").

## 2.       Identifying the Class

To identify the relevant class of goods, the Court need look no further than plaintiff's own federal registrations. 15 U.S.C. § 1064(3) (cancellation is appropriate when a registered mark "becomes the generic name for the goods or services…for which it is registered."); *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991) ("a proper genericness inquiry focuses on the description of services set forth in the certificate of registration.").

As detailed above, plaintiff registered the "kudos" mark for an online platform in which

users could exchange praise, recognition, or other forms of media. Generalizing from the registrations, the "kudos" mark held by plaintiff is directed to a good or service within the class of "employee recognition and rewards software," "social recognition software," or "employee experience" platforms. Dkt. No. 61 at 8. With this "class" of goods or services in mind, defendant's burden on summary judgment on the issue of genericness will be to offer evidence from which a trier of fact could infer that potential consumers of the goods or services within that class view the "primary significance" of "kudos" as referring to the class of "employee recognition and rewards software" rather than the particular good or service that plaintiff provides. *Elliott*, 860 F.3d at 1156; *Id*. at 1157 (a claim of genericness "must be made with regard to a particular type of good or service.").

### 3.    Primary Significance to Relevant Consumers

Defendant's genericness analysis begins by observing that "kudos" is a "common and widely used noun" defined as "praise, credit, or glory for an achievement" or "acclaim or praise for exceptional achievement." Dkt. No. 72 (Defendant's Opposition). Defendant then offers three grounds for the Court to find the existence of a genuine dispute of material fact on whether consumers perceive the "primary significance" of kudos as a generic term. None of these reasons, however, are directed to the proper inquiry—namely, consumer's use of the word "kudos" as a generic referent to employee recognition software programs, which is the class of goods involved in this analysis.

First, defendant points to evidence suggesting plaintiff itself believes its marks are generic, citing the deposition of Kudos founder and Chief Customer Officer, Tom Short, where he was shown a video interview in which he stated that the word "kudos" "personifies recognition," and while there might be other words that "might feel right," kudos in particular "personifies the category." Dkt. 72-6, Ex. 4 at 80-82 (filed under seal).[2]   Defendant also directs the Court's attention to the

---

[2] Defendant filed Exhibit 4 under seal per plaintiff's confidentiality designation. Dkt. No. 71. District Courts have "inherent supervisory power" over the decision whether to seal documents. *Brennan v. Opus Bank*, 796 F.3d 1125, 1134 (9th Cir. 2015). The Court will grant defendant's motion to seal, Dkt. No. 71, with the exception of the quoted text above, which the court finds unwarranted to seal given the content.

United States District Court
Northern District of California

1    actions of Rare Method Capital Corporation, Kudos' predecessor company which initially registered

2    the Kudos mark.  Upon request of the USPTO, Rare Method submitted a disclaimer that "kudos" is

3    "descriptive of the applicant's services."  Dkt. 66-12 at 4.

4           Second, defendant highlights instances where plaintiff and its customers use the term kudos

5    "generically" in reference to plaintiff's products.   However, defendant conflates trademark

6    genericism with a common noun usage. Defendant cites language from Kudos' website, which

7    states, for example, "We've got lots of solutions for making sure everyone gets Kudos," Dkt. No.

8    66-15 at 6, and "By default, Kudos are sent publicly. If you would like to send your Kudos privately,

9    you can do so…" Dkt. No. 66-16 at 2.  Defendant also cites to various consumer reviews on the

10   software review website, Capterra.com, for the proposition that consumers use the term "kudos"

11   "generically."[3]  Dkt. No. 65-32, Ex. 33.  Defendant also cites to deposition testimony of Nikki

12   Weisgarber, Director of Client Success, who testifies that customers refer to Kudos as a means of

13   "sending," "giv[ing]," "reciev[ing]," and "provid[ing]" "kudos."  Dkt. No. 66-17, Ex. 51: 117, 123

14   (filed under seal).[4]

15          Third, defendant states that third parties use the term "kudos" without any reference to

16   plaintiff.  For example, defendant refers the Court to paragraphs 47 through 54 of its Amended

17   Counterclaim, where it notes that (i) LinkedIn began using the term "kudos" to describe a

18   technology feature that enables users to share appreciation with other users, Dkt. No 21-1 ¶ 48, (ii)

19   a company Flagger Force allows people to go online "to provide kudos" to a specific team member,

20   *id.* ¶ 49, (iii) UMass Lowell allows its employees to go online to "submit a kudos nomination to

21

---

22          [3] Defendant errs by conflating "generic" noun usage with generic usage as a class referent for employee
23   recognition and rewards software. Even if defendant were correct that generic noun usage could be probative
     of trademark genericism, the Capterra reviews do not offer the support which defendant claims. Out of the
24   nearly 100 consumer reviews contained in Exhibit 33, the Court identifies only *one* instance in which a
     reviewer uses "kudos" as a generic noun that does not refer to the Kudos company. *See id.* at 13 ("I like that
25   you can choose to send your kudos privately or publicly…I like that you can get kudos on your birthday."].
     In the vast majority of the Capterra reviews, consumers use "kudos" to refer to plaintiff. *See, e.g., id.* at 19
26   ("I like to be able to give my co-workers thanks in a professional and interesting way for their contributions.
     Kudos provides an excellent medium to compliment one another in the workplace.").

27          [4] Defendant filed Exhibit 51 under seal per plaintiff's confidentiality designation. Dkt. No. 63. The
28   Court grant defendant's motion to seal, Dkt. No. 63, with the exception of the text quoted above.

recognize a University employee," *id*. ¶ 50, (iv) the employee recognition platform Disco allows users to celebrate teammates "by giving them kudos," *id*. ¶ 51, *id*. ¶ 52 (similar), *id*. ¶ 53 (similar), *id*. ¶ 54 (similar).  Defendant also cites to an expert report prepared by Dr. William Eggington, a linguistic expert.  In his report, Dr. Eggington draws on corpus linguistics—a methodology that involves computer-based empirical analysis of natural language uses to study linguistic behaviors.  See Dkt. No. 66-14 (Eggington Expert Report).  Based on analysis from various linguistic databases, Eggington concludes that English speakers use "kudo" and "kudos" "generically" without reference to a any company or third party. *Id*. ¶ 44.  He does not, however, present any evidence that English speakers use "kudo" or "kudos" to refer to a class of employee recognition software.  Rather, Eggington conflates trademark genericness with generic noun usage.

### 4. Analysis

Viewing the evidence in the light most favorable to defendant, the Court finds no evidence from which a trier of fact could infer that consumers primarily perceive "kudos" to refer to the "class" of employee recognition and engagement software.   To establish genericism, defendant needed to offer evidence that relevant consumers, when in the market for employee recognition or rewards software, could turn to a friend or colleague and ask them to name their "favorite kudos provider."  See *Booking.com B. V*., 140 S. Ct. at 2304-05.  Defendant offers no evidence to support such public perceptions.  Merely establishing that "kudos" is generic for *something*—in this case, the term's own dictionary meaning—does not establish that "kudos" is generic for the relevant class of goods.  See *Elliott,* 860 F.3d at 1157 (petitioner's claim that "the word 'google' has become a generic name for 'the act' of searching the internet" does not establish the genericness of the term "Google" as it pertains to search engines).  It is unsurprising that most of instances of "kudos" that appear in English corpora will not reference a third-party commercial entity, such as plaintiff's company, and that other companies, such as LinkedIn, use "kudos" to refer to the act of giving praise or recognition.   As defendant's own expert recognizes, the term "kudos" has an independent dictionary meaning and first appeared in the Corpus of Historical American English in 1870. Dkt. No. 66-14 ¶ 20.

Defendant argues that Dr. Eggington's report, by establishing that the public uses "kudos" in a "non-source identifying" way, would permit a fact finder to infer that the term is generic. But this is not enough. It is true that "[g]eneric terms are not protectable because they do not identify the source of a product." *Elliott*, 860 F.3d at 1155. However, defendant also needs to produce evidence affirmatively demonstrating that relevant consumers primarily perceive the "kudos" mark to refer to employee recognition software, the relevant class.[5]

Thus, even assuming Dr. Eggington's report were admissible, the Court will grant plaintiff's Partial Motion for Summary Judgment on defendant's Second Affirmative Defense and Counterclaim of cancellation based on genericness.

### III.    Plaintiff's Partial Motion to Exclude Testimony of Dr. Eggington

Plaintiff moves to exclude the opinions of Dr. Eggington, the linguistic expert retained by defendants. Dkt. No. 69 (Plaintiff's Motion). As defendant describes it, Dr. Eggington would offer three opinions: (1) English speakers use the terms "kudo" and "kudos" to either express "glory, fame, or renown" or to give praise, credit, or congratulations; (2) English speakers use the terms "kudo" and "kudos" "generically" without reference to any company or third party; and (3) consumers think of the word "kudoboard" as a "single semantic unit" that references an electronic "board" where praise, credit, or congratulations are exchanged. Dkt. No. 79 at 6 (Defendant's Opposition); Part VII.44 of Eggington's Report, Dkt. No. 66-14 at 13. Plaintiff's motion to exclude Eggington does not appear to take issue with the first or third opinions. Rather, plaintiff's motion targets the second opinion, see text in ECF docket entry 69 ("Exclude Eggington Report and Opinions re: Genericness"), and the Court thus treats the Motion as a Partial Motion to Exclude.

---

[5] The mere *absence* of a necessary condition for protection (i.e., source-identification) does not itself permit a trier of fact to infer that a term is generic. See *Wilson v. Horton's Towing*, 906 F.3d 773, 782 (9th Cir. 2018) ("Plaintiff's argument commits the logical fallacy of mistaking a sufficient factor for a necessary one."); *Arar v. Ashcroft*, 585 F.3d 559, 601 (2d Cir. 2009) ("This appears to reflect a classic logical fallacy, 'denial of the antecedent,' which mistakes a necessary condition for a sufficient one.").

United States District Court
Northern District of California

1      **1.      Legal Standard**

2          Under Federal Rule of Evidence 702, expert testimony is admissible if it reflects "scientific,

3   technical, or other specialized knowledge that will assist the trier of fact to understand the evidence

4   or to determine a fact in issue." Fed. R. Evid. 702.  The Rule also requires that the testimony be

5   based on sufficient facts or data and be the product of reliable principles and methods that were

6   reliably applied.  *Id*.  The district courts are tasked with acting as "gatekeepers" to prevent the

7   admission of unreliable, irrelevant, or unhelpful expert testimony.  *Daubert v. Merrell Dow Pharms.,*

8   *Inc*., 509 U.S. 579, 589 (1993); *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063

9   (9th Cir. 2002), amended by 319 F.3d 1073 (9th Cir. 2003).

10         When ascertaining the reliability of an expert's methods, a court may rely on several non-

11  exhaustive factors: (1) whether the theory or technique is generally accepted within a relevant

12  scientific community, (2) whether the theory or technique has been subjected to peer review and

13  publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be

14  tested.  *Daubert*, 509 U.S. at 593-94; see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137

15  (1999).  Reliability is only half the of equation; Rule 702 embodies the "twin concerns" of reliability

16  and helpfulness.  *Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007).

17         To determine the helpfulness of an expert's proffered testimony, courts consider whether the

18  testimony makes a fact of consequence more or less probable, which is "in essence a relevance

19  inquiry."  *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1184 (9th Cir. 2002); *Daubert*, 509 U.S. at

20  591 ("Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-

21  helpful.").  Stated differently, the Court's role is to "determine whether there is 'a link between the

22  expert's testimony and the matter to be proved.'"  *Stilwell*, 482 F.3d at 1192.

23

24      **2.      Summary of Dr. Eggington's "Genericness" Opinion**

25         To devise his report, Dr. Eggington relied on various databases.  First, Dr. Eggington looked

26  to the Corpus of Historical American English, where he found 51 occurrences of "kudos," none of

27  which was associated to any third-party such as plaintiff.  Dkt. No. 66-14 ¶ 20.  Second, Dr.

28  Eggington searched the Corpus of Contemporary American English ("COCA"), which returned

United States District Court
Northern District of California

2,760 "hits" for kudos. *Id*. ¶ 20. After using a native feature in COCA to randomly select 200 "concordance lines" (the lines of text containing the "hits"), Eggington looked at the four words before and after each hit (the "collocates") and determined that none of the collocates revealed a "relation to a third-party commercial company or anything like it." *Id*. ¶ 24-26.   Third, Dr. Eggington examined data from iWeb and GloWbe, and again found no links between kudos and a third-party commercial entity. *Id*. ¶ 29. Fourth, he "scraped" text from various Reddit forums, *id*. ¶ 32, including "r/business," and did not find "kudos" being used to refer to a third-party entity. *Id*. Searching "#kudos" on Instagram and "kudos" on Facebook produced similar results.  *Id*. ¶ 36. Lastly, Eggington reported that he compiled and analyzed "a corpus consisting of [documents from] 60 employee recognition programs," and concluded that, based on his analysis of those documents, kudos "is a generic term not associated with a specific third party." *Id*. ¶ 41.

### 3.     Reliability

Plaintiff contests Dr. Eggington's methods and factual foundations as unreliable. For example, plaintiff asks the Court to query why Dr. Eggington only limited his collocate search on COCA to four words on each side, rather than, say, eight words before and after each occurrence of "kudos."  Plaintiff also targets the construction of the putative "employee recognition scheme."  In plaintiff's view, the "Employee Recognition Corpus" was built from "an improper sampling of documents" "cherry-picked" by defense counsel that conspicuously omits any documentation pertaining to Kudos, its marks, or its products. Dkt. No. 69 at 10.  Elsewhere, plaintiff remarks that Dr. Eggington's Facebook and Reddit searches were "entirely divorced" from the relevant commercial context of consumers of the goods and services of the type offered by Kudos.  *Id*. at 9. Defendant responds that Dr. Eggington is a highly qualified expert whose methods are "well-accepted by linguists."  Dkt. No. 79 at 12.  Further, defendant insists that Dr. Eggington's methodology is both tested and test*able*, such that nothing stops plaintiff from hiring an expert to undertake a similar empirical analysis using either the same or more liberal parameters.

The Court need not resolve these methodological disputes.  Even if Dr. Eggington's report were methodologically sound, the opinion he seeks to proffer is unhelpful because it bears no "link"

to trademark genericness.  *Stilwell*, 482 F.3d at 1192.

### 4.     Helpfulness

Dr. Eggington opines that "[t]he terms KUDOS and KUDO are used by English speakers generically without reference to any company, or third party." Part VII.44.b of Eggington's Report, Dkt. No. 66-14 at 13.  Notably, Dr. Eggington's report does not explicitly define what he means by "generically."  It is undisputed that he does not mean "generic" in the trademark sense, as the non-protectable status that arises "when the 'primary significance of the registered mark to the relevant public' is as the name for a particular type of good or service irrespective of its source." *Elliott,* 860 F.3d at 1156.  Even defendant concedes that Dr. Eggington's opinion does not go to the ultimate issue of genericism.  Dkt. No. 79 at 27 ("It is highly appropriate that Dr. Eggington does not offer an ultimate conclusion on trademark genericness based on his linguistic analysis").

Instead, "generic" usage, as detailed in Eggington's report, seems to denote noun usage consistent with a dictionary definition that "does not refer to or create an exclusive association with any specific third party." Dkt. No. 66-14 ¶ 35.  But if that is what Eggington means by "generic," then his opinion makes no fact of consequence to *trademark genericness* more or less probable than it would be without the report.  The fact that English speakers primarily use "kudos" as a noun according to its dictionary definition without regard to commercial entities suggests nothing about whether relevant consumers primarily perceive of "kudos" as a signifier of employee recognition and rewards software.  Further, even if the report had minimal probative value, by conflating trademark genericness with generic noun usage, Dr. Eggington's report substantially risks misleading the jury on the proper inquiry.

Thus, the Court will grant in part plaintiffs' motion and exclude the opinion in Part VII.44.b of Eggington's Report, Dkt. No. 66-14 at 13 ("The terms KUDOS and KUDO are used by English speakers generically without reference to any company, or third party."), and all characterizations of "kudos" or "kudo" as "generic" terms.

**IV.     Defendant's Motion to Exclude Mark Keegan's Evidence and Testimony**

Defendant moves to exclude two reports prepared by plaintiff's expert, Mark Keegan.  Dkt. No. 67 (Defendant's Motion).  In the first report, Keegan conducted a survey to assess consumer confusion between plaintiff and defendant's products.  Dkt. No. 73-15 (Keegan Affirmative Report). The second report rebuts the opinions of Dr. Eggington.  Dkt. No. 68-3, Ex. 3 (Keegan Rebuttal Report).  To determine the admissibility of Keegan's Affirmative and Rebuttal Reports, the Court will rely on the same *Daubert*/Rule 702 framework articulated in above.

**1.     Affirmative Report**

**a.     Legal Standard**

When assessing the validity and reliability of a consumer survey, the court should "consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts." *Kwan Software Eng'g, Inc. v. Foray Techs.*, LLC, No. C 12-03762 SI, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014), quoting *Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012).

**b.     Affirmative Report Summary**

Keegan is a recognized expert in consumer behavior and consumer surveys.  Dkt. No. 73-14, Ex. A (Keegan Declaration).  Plaintiff commissioned Keegan to "conduct a study to determine the extent to which, if at all, there is a likelihood of confusion among consumers between the defendants' KUDOBOARD-branded software and the plaintiff's KUDOS-branded software."  Dkt. No. 73-15 ¶ 3.  The "relevant consumers," according to the resulting Affirmative Report, were "current users of employee recognition and engagement software."  *Id.* ¶ 17.  Keegan thus assembled a sample of "381 users of employee recognition and engagement software" to test for likelihood of confusion. *Id.* ¶ 15.

United States District Court
Northern District of California

To assemble his sample, Keegan screened potential respondents with a series of questions "designed to identify and qualify members of the target audience for this study: current users of employee recognition and engagement software." Dkt. No. 73-15 ¶ 47. Surmising that such software tends to be used in corporate work environments, Keegan only permitted respondents who indicated that they "work for a company or organization (full- or parttime)" to continue the survey. *Id*. ¶ 48. Retirees, students, self-employed, or unemployed respondents "were terminated." *Id*. Respondents who remained were then asked what type of software they used in the workplace. *Id*. ¶ 51. Potential options included productivity software, accounting software, employee recognition and engagement software, CRM software, logistics or supply chain software, or "Don't know/None of these." *Id*. Only respondents "who selected 'Employee recognition and engagement software' were considered current users within the relevant market and were permitted to continue with the survey. All other respondents were terminated." *Id*. ¶ 52.

Having assembled his 381 respondents, Keegan designed and executed a survey based on the "Squirt" survey format, which places "respondents in a marketplace scenario" and exposes them to sequential "stimuli showing the contested marks" in order to measure the "extent to which consumers believe the products or services using the contested marks originate" from the same source. Dkt. No. 73-15 ¶ 24. First, respondents were shown screenshot of Kudo's website homepage, which prominently displays the Kudo mark. *Id*. ¶ 25. Next, respondents were shown a randomized series of webpage screenshots from four other companies that offer employee recognition and engagement software products, including Kudoboard's business-level product webpage. *Id*. (The three non-Kudoboard websites acted as "controls." *Id*. ¶ 27-28.). As Keegan puts it, "[t]he sequential lineup presentation simulates the user experience that a user of employee recognition and engagement software would experience when searching for and purchasing or adopting the types of products that are sold by Kudos and Kudoboard." *Id*. ¶ 26. After displaying the Kudos webpage—but before displaying any of the other four screenshots—the survey presented the following on-screen text:

> Shown below, in random order, are additional pages for companies offering employee recognition and engagement software. Again, please consider the pages as you would if you

encountered them in the workplace. Please take as much time as you would like to look at the pages. You can click on each image for an enlarged view.

Dkt. No. 73-15 ¶ 62.  After displaying the stimuli, a series of questions followed designed to assess the likelihood of confusion between Kudos and Kudoboard.  See generally, *id*. ¶¶ 47-77 (detailing survey questions).

Based on the survey results, Keegan concluded that his study confirms "the presence of a likelihood of confusion among relevant consumers between KUDOBOARD and KUDOS: approximately half of all respondents—49.9 percent—indicated a belief that KUDOBOARD and KUDOS are the same company or are somehow affiliated." Dkt. No. 73-15 ¶ 82.  And out of those respondents who reported confusion, approximately half "mentioned the name similarity between the two marks as a reason for their belief."  *Id*. ¶ 83.  After factoring in the control measurement, Keegan ultimately derived "an average net confusion measurement of 15.1 percent."  *Id*. ¶ 86.

### c.      Analysis

Defendant's motion presents two arguments for excluding Keegan's Affirmative Report. First, defendant argues that Keegan selected the wrong "universe" for his study when he selected "current users" of "employee recognition and engagement software" rather than prospective purchasers of Kudoboard products.  Dkt. No. 67.  Defendant notes that Keegan did not even "ask about purchase intentions" when selecting his respondents, Dkt. 68-4 at 7, and by only allowing those who self-identified as current users of employee recognition and engagement software to participate, Keegan's universe "excludes potential Kudoboard customers, while over-including existing users of undefined 'employee recognition' software."  Dkt. No. 80 at 6.

Second, defendant argues that Keegan failed to present "unadulterated stimuli" that would allow respondents to "draw their own conclusions about the connection, if any, between the two parties."  Dkt. No. 67 at 13.  Defendant believes that the text displayed after the Kudos webpage, which told respondents that they were about to see "additional pages for companies offering employee recognition and engagement software," improperly presented a leading question that "sought to characterize the companies for respondents."  *Id*.

United States District Court
Northern District of California

The Court agrees with defendant. To be "probative and meaningful," surveys "must rely upon responses by potential consumers of the products in question." *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981). Accordingly, the utilization of an improper universe can render a survey inadmissible. See *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding a survey on consumer confusion when the survey "was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."). The "appropriate universe of respondents in a trademark-related survey are those consumers 'most likely to purchase' the competing products" sold by the junior user of the mark. *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition*, LLC, No. 1:16-CV-949, 2021 WL 2185699, at *17 (N.D. Ga. May 28, 2021).

Here, Keegan relied exclusively on current users of employee recognition software rather than prospective buyers of Kudoboard's good or service. The design choice is particularly puzzling given that Keegan himself recognized that "the appropriate population from which to sample is likely purchasers of products bearing the junior user's [i.e., Kudoboard's] mark." Dkt. No. 73-15 ¶ 18. Plaintiff attempts to salvage the survey universe by arguing that "users of employee recognition software are not outside the scope of Defendant's target consumers" because Kudoboard operates in the employee recognition and engagement software space. Dkt. No. 73 at 19-20. But even assuming that Kudoboard has enterprise-level customers that use its digital group greeting card platform for employee recognition and engagement, Keegan's sample selection does not capture a representative sample of the customers "most likely to purchase" Kudoboard's products, which may also include educators, community groups, and casual users. Stated differently, the survey universe was "under-inclusive in that it excluded otherwise qualified consumers, arguably some of the most likely consumers to have knowledge of the products at issue." *Hi-Tech Pharms. Inc.*, 2021 WL 2185699, at *18.

The Court will also exclude the report on the independent basis that Keegan presented respondents with leading stimuli, rendering the results unreliable. Plaintiff characterizes the text that preceded the display of the four non-Kudos webpages as "merely" a "technical instructional statement" that "does not create a leading survey." Dkt. No. 73 at 22. However, the statement,

"[s]hown below, in random order, are additional pages for companies offering employee recognition and engagement software," is nothing like the technical instruction telling respondents that they could "click to enlarge" an image, as in *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*, 97 F. Supp. 3d 485, 508 (S.D.N.Y. 2015), the case cited by plaintiffs. Rather, the statement constitutes a lead-in that departs from simulated market conditions by substantively describing the products that followed. Thus, the Court will grant defendant's motion as it pertains to Keegan's Affirmative Report.

### 2. Keegan's Rebuttal Report

#### a. Legal Standard

An expert qualified in one area is not necessarily qualified to offer expert testimony in another area. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Further, mere "awareness" or a fleeting "familiarly" in a particular subject does not qualify one as an expert in that subject. *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153, 1163 (S.D. Cal. 2008).

#### b. Rebuttal Report Summary

In his Rebuttal Report, Keegan concludes that the "analyses presented in the Eggington Report are not valid or reliable evidence with regard to consumer understanding or perception of the terms KUDOS, KUDO, or KUDOBOARD." Dkt. No. 73-16 ¶ 7. In support of that conclusion, the Rebuttal Report describes "fatal[] flaw[s]" in the Eggington Report. *Id*.

*First*, Keegan states that Dr. Eggington's methodology focused on the wrong universe and market level by conducting a linguistic analysis "on broad public use of the term KUDOS across all varieties of written materials." *Id*. ¶ 13. Such a focus, Keegan opines, does not "convey any useful information about how consumers within the relevant market of employee recognition and engagement software use and understand the term KUDOS." *Id*.

*Second*, Keegan opines that the Eggington Report is not reliable evidence for confusion. "The appropriate and accepted method" for investigating potential confusion, Keegan writes, "is through the execution of a properly designed consumer survey" rather than "a subjective qualitative

analysis" *Id.* ¶¶ 16, 21, 23.

*Third*, Keegan believes that because "the Eggington Report provides no consumer survey evidence on the issue of the genericness," it cannot provide "reliable evidence on consumer perceptions of the term KUDOS within the relevant market on the genericness issue." *Id.* ¶ 32.

*Fourth*, Keegan states that Dr. Eggington creates a false hurdle when concluding that no third-party entity, including plaintiff, is associated with the name "Kudos." *Id.* ¶ 33. "This conclusion," Keegan writes, "establishes a false hurdle that is not necessary for an entity (e.g., the plaintiff) to be afforded trademark protection in a mark." *Id.*

*Fifth*, Keegan believes Eggington's methodology was not transparent, as the Eggington Report only includes two short paragraphs in the "Research Methodology" section and does not "actually explain the method that is used." *Id.* ¶ 39-40.

### c.    Analysis

Defendant argues that because Keegan has no education, training, or experience in linguistics, he is not qualified to critique the "linguistic opinions" of Eggington. Dkt. No. 67 at 15-17 (Defendant's Motion). Second, defendant argues that Keegan's Rebuttal Report seeks to usurp the jury's role by "comparing the efficacy of two different fields of analysis" in stating that consumer surveys are categorically better than Dr. Eggington's methods. *Id.* at 18.

The Court first notes that Keegan's third and fourth rebuttal opinions, pertaining to Dr. Eggington's opinions on genericness, are rendered irrelevant given the Court's exclusion of Dr. Eggington's genericness opinions. Accordingly, the third and fourth rebuttal opinions are excluded due to irrelevance.

As to the remaining rebuttal opinions (first, second, and fifth), the Court finds that Keegan's rebuttal testimony is admissible. Keegan does not draw on the field of linguistics to derive his rebuttal opinions; he does not proclaim to know the "correct" method of conducting a corpus-based linguistic study. Rather, Keegan's opinions stem from his expertise in the "the area of trademark genericness and the design and execution of quantitative studies measuring trademark genericness." Dkt. No. 73 at 24. From his own vantage point of expertise, Keegan is qualified to opine on how

other fields fare in establishing a contested fact in litigation.  See *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.,* 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").  Thus, rather than usurping the jury's role, Keegan's rebuttal would help the jury situate Dr. Eggington's opinion in a broader context and thereby better evaluate its contents.

Thus, the Court will grant in part and deny in part defendant's Motion to Exclude Keegan's Rebuttal Report.  The Court grants the motion as it pertains to Keegan's Affirmative Report and the third and fourth opinions contained in the Rebuttal Report.  The Court denies the motion as it pertains to the first, second, and fifth opinions in the Rebuttal Report, which do not relate to Dr. Eggington's excluded genericness opinion.

## CONCLUSION

Based on the foregoing, the Court DENIES plaintiff's and defendant's Motions for Summary Judgment on the Seventh Affirmative Defense of latches, GRANTS plaintiff's Motion for Summary Judgment on defendant's Second Affirmative Defense and Counterclaim of genericness, GRANTS IN PART plaintiff's Motion to Exclude the opinions of Dr. Eggington, and GRANTS IN PART and DENIES IN PART defendant's Motion to Exclude the opinions of Mark Keegan. Further, the Court GRANTS the parties' administrative motions to file under seal, Dkt. Nos. 63, 71, 75, subject to the limited exceptions presented in the text accompanying footnotes 2 and 4 of this Order.

**IT IS SO ORDERED**.

Dated: November 20, 2021

SUSAN ILLSTON
United States District Judge